1  ZACHARY A. KELLER (Texas 24087838)
   zkeller@ftc.gov; (214) 979-9382
2  REID A. TEPFER (Texas 24079444)
   rtepfer@ftc.gov; (214) 979-9395
3  EDWARD HYNES (New York 4887584)
   ehynes@ftc.gov; (214) 979-9381
4  Federal Trade Commission
5  1999 Bryan St. Ste. 2150
   Dallas, Texas 75201
6  Fax: (214) 953-3079

7

8                    **UNITED STATES DISTRICT COURT**

9                    **EASTERN DISTRICT OF CALIFORNIA**

10

11  **FEDERAL TRADE COMMISSION**,                )  Case No.:
                                                 )
12                              Plaintiff,        )
                        v.                        )  **COMPLAINT FOR PERMANENT**
13                                                )  **INJUNCTION AND OTHER**
    **GOLDEN SUNRISE NUTRACEUTICAL,**            )  **EQUITABLE RELIEF**
14  **INC.**, a corporation,                      )
                                                 )
15  **GOLDEN SUNRISE PHARMACEUTICAL,**           )
    **INC.**, a corporation,                      )
16                                                )
17  **HUU TIEU**, individually and as an officer of )
    Golden Sunrise Nutraceutical, Inc. and Golden )
18  Sunrise Pharmaceutical, Inc., and             )
                                                 )
19                                                )
    **STEPHEN MEIS**, individually and as an officer )
20  of Golden Sunrise Nutraceutical, Inc.,        )
                                                 )
21                              Defendants.        )
    _____ )
22

23         Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

24         1.     The FTC brings this action under Section 13(b) of the Federal Trade Commission

25  Act ("FTC Act"), 15 U.S.C. § 53(b), to obtain temporary, preliminary, and permanent injunctive

26  relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of

27  ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Sections

28  5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52, in connection with the labeling, advertising,

marketing, distribution, and sale of products they claim will treat, prevent, or cure COVID-19, cancer, and Parkinson's Disease.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

3.      Venue is proper in this District under 28 U.S.C. § 1391(b)(1), (b)(2), and (c)(1), and 15 U.S.C. § 53(b).

## PLAINTIFF

4.      The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41–58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces Section 12 of the FTC Act, 15 U.S.C. § 52, which prohibits false advertisements for food, drugs, devices, services, or cosmetics in or affecting commerce.

5.      The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies. 15 U.S.C. § 53(b).

## DEFENDANTS

6.      Defendant Golden Sunrise Nutraceutical, Inc. is a Delaware corporation with its principal place of business at 219 North E Street, Porterville, California 93257. Defendant Golden Sunrise Nutraceutical transacts or has transacted business in this District and throughout the United States. At all times material to this Complaint, acting alone or in concert with others, Defendant Golden Sunrise Nutraceutical has advertised, marketed, distributed, or sold products to consumers throughout the United States.

7.      Defendant Golden Sunrise Pharmaceutical, Inc. is a California corporation with its

principal place of business at 560 West Putnam Avenue, Suite 2, Porterville, California 93257. Defendant Golden Sunrise Pharmaceutical transacts or has transacted business in this District and throughout the United States. At all times material to this Complaint, acting alone or in concert with others, Defendant Golden Sunrise Pharmaceutical has advertised, marketed, distributed, or sold products to consumers throughout the United States.

8.      Defendant Huu Tieu ("Tieu") is the President and Chief Executive Officer of Defendants Golden Sunrise Nutraceutical and Golden Sunrise Pharmaceutical. At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Defendants Golden Sunrise Nutraceutical and Golden Sunrise Pharmaceutical, including the acts and practices set forth in this Complaint. Defendant Tieu resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

9.      Defendant Stephen Meis ("Meis") is the Medical Director of Defendant Golden Sunrise Nutraceutical and a member of its board of directors. At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Defendants Golden Sunrise Nutraceutical and Golden Sunrise Pharmaceutical, including the acts and practices set forth in this Complaint. Defendant Meis resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

## COMMON ENTERPRISE

10.      Defendants Golden Sunrise Nutraceutical and Golden Sunrise Pharmaceutical (collectively, "Corporate Defendants" or "Golden Sunrise") have operated as a common enterprise while engaging in the deceptive acts and practices alleged below. Corporate Defendants have conducted the business practices described below through an interrelated network of companies that have common ownership, officers, managers, business functions, employees, and office locations.

Because these Corporate Defendants have operated as a common enterprise, they are partners in concerted wrongdoing and liable for the acts and practices alleged below. Defendants Tieu and Meis have formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants that constitute the common enterprise and are partners in the concerted wrongdoing of the common enterprise.

## COMMERCE

11.     At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

### *Defendants' Product Offerings and General Marketing*

12.     Since at least 2016, Defendants have promoted and sold a variety of products labeled as dietary supplements. Defendants claim that these products provide numerous health benefits, including in the treatment of serious diseases.

13.     On their Golden Sunrise Nutraceutical homepage, Defendants claim that their products can effectively treat serious diseases and other medical conditions:



Welcome to Golden Sunrise Nutraceutical!

Golden Sunrise Nutraceutical Incorporation was founded in 2016. After thirty (30) extensive years of Research and Development of *micronutrients* and *nutraceuticals*, Golden Sunrise Nutraceutical has successfully developed alternative herbal (botanical) products creating gene rejuvenation and promote overall-health to the patient. Preventing disease and creating overall well-being prolongs our life expectancy. The priority of Golden Sunrise Nutraceutical is to increase a healthy and productive life for those suffering from *Chronic, Serious or Life-threatening* diseases or conditions;

(www.GoldenSunriseNutraceutical.com, captured on May 26, 2020).

14.     On their Golden Sunrise Pharmaceutical homepage, Defendants repeat the claim that their products treat numerous serious diseases or disorders.

15.     Defendants also claim that their products are safe and effective:

    a)     On Defendants' Golden Sunrise Nutraceutical homepage, they claim that their "soft approach has led to the development of effective Golden Sunrise Nutraceutical herbal (botanical) products that have helped give a safe and effective use for many patients while efficiently improving the condition without harmful '***side-effects***' leading to healthier patient." (Emphasis in original).

    b)     On their Golden Sunrise Pharmaceutical homepage, Defendants similarly claim that their "soft approach has led to the development of effective Golden Sunrise Pharmaceutical herbal/botanical products that have helped give a safe and effective use for many patients while efficiently improving the condition without harmful '***side-effects***' leading to healthier patient." (Emphasis in original).

16.     Defendants market their supplements individually and collectively through four "plans of care": (a) Primary Plan of Care; (b) Emergency D-Virus Plan of Care; (c) Metabolic Plan of Care; and (d) Cancer Plan of Care.

17.     Defendants market their treatment plans as providing consumers safe, effective treatment for serious diseases.

18.     On their Golden Sunrise Nutraceutical homepage, Defendants expressly state that their plans "are intended to treat, modify, reverse, or cure a ***Serious or Life-threatening*** disease or condition; and ***real-world evidence*** indicates that the Golden Sunrise Nutraceutical treatments have potential to address unmet medical needs for such disease or condition." (Emphasis in original).

19.     Defendants market their treatment plans as virtual cure-alls for serious illnesses. Defendants' Golden Sunrise Nutraceutical homepage lists 29 health conditions that the treatment plans purportedly treat or cure:

*Alcohol, Drug & Nicotine addictions - METABOLIC Plan of Care*
Alzheimer's Disease - *METABOLIC Plan of Care*
Amyotrophic Lateral Sclerosis (ALS) - *METABOLIC Plan of Care*
Autism Spectrum Disorder (ASD) - *METABOLIC Plan of Care*
*Autoimmune Disorders - METABOLIC Plan of Care*
Cancer - *CANCER Plan of Care*
*Chronic Constipation - METABOLIC Plan of Care*
Debilitating Chronic Pain - *METABOLIC Plan of Care*
Depressive Disorder - *METABOLIC Plan of Care*
*Diabetes - METABOLIC Plan of Care*
Epilepsy - *METABOLIC Plan of Care*
Fibromyalgia - *METABOLIC Plan of Care*
Fragile-X Syndrome - *METABOLIC Plan of Care*
Hemostasis (less blood to be lost) - *PRIMARY Plan of Care*
Hypertension - *METABOLIC Plan of Care*
Lyme Disease - *METABOLIC Plan of Care*
Menopause - *METABOLIC Plan of Care*
Multiple Sclerosis (MS) - *METABOLIC Plan of Care*
Neuropathy - *METABOLIC Plan of Care*
Obesity - *METABOLIC Plan of Care*
*Osteoporosis - METABOLIC Plan of Care*
Peripheral - *METABOLIC Plan of Care*
Prostate - *METABOLIC Plan of Care*
Parkinson's Disease - *METABOLIC Plan of Care*
Schizophrenia - *METABOLIC Plan of Care*
Stroke - *METABOLIC P Plan of Care*
Thalassemia - *METABOLIC Plan of Care*
Viral Illnesses - *EMERGENCY D-Virus Plan of Care*
Weight Loss - *METABOLIC Plan of Care*

(www.GoldenSunriseNutraceutical.com, captured on May 26, 2020).

20.   On their Golden Sunrise Pharmaceutical homepage, Defendants list 18 health conditions that the treatment plans purportedly treat or cure and state:

health to the patient. The priority of Golden Sunrise Pharmaceutical is to increase a healthy and productive life for those suffering from **Serious or Life-threatening** conditions, **Chronic condition**, Alzheimer's disease, Amyotrophic Lateral Sclerosis (ALS), Autoimmune disorders, Cancer, Constipation, Diabetes, Epilepsy, Debilitating Chronic Pain, Fragile-X Syndrome, Hemostasis (less blood to be lost), Hypertension, Menopause, Obesity, Parkinson's disease, Schizophrenia, Stroke, Thalassemia, Viral illnesses, and etc..... This soft approach has led to

(www.GoldenSunrisePharmaceutical.com, captured on May 26, 2020).

21.     Defendants claim their products and treatment plans promote longevity of life. On their Golden Sunrise Nutraceutical homepage, Defendants state their "products and treatments improve Telomeres for cellular rejuvenation which increases overall-health to the body and can increase human longevity."

22.     Defendants claim on their Golden Sunrise Nutraceutical website that their products have been reviewed and accepted by the FDA, including through the following claims:

            a)      "All Golden Sunrise Nutraceutical products are in compliance with Food and
            Drug Administration (FDA) regulations. All necessary documentation on each of the
            products was submitted to the FDA"; and

            b)      Their product ImunStem received a National Drug Code on July 2, 2018.

23.     In the product description documents for their Metabolic and Cancer treatment plans, Defendants also claim that their products are "designated as a Regenerative Medicine Advance Therapy (RMAT) by the Food & Drug Administration (FDA)."

24.     In their product description document for the Emergency D-Virus treatment plan, Defendants claim that (a) their products "have proven themselves" to the FDA and (b) one of their products "was the first dietary supplement in the United States to be approved as a prescription medicine and also for the indication to treat *Serious or Life-threatening* conditions. It qualified for both of these under the Regenerative Medicine Advance Therapy (RMAT) . . . . This designation acknowledges not only the effectiveness of these herbs, usually only associated with pharmaceutical drugs, but also [that they] caus[e] no side effects, a quality of dietary supplements." (Emphasis in original).

25.     In fact, Defendants' products are not approved by the FDA as RMATs or under any other designation.

*Defendants' Treatment Plan Ingredients and Pricing*

26.     Despite representing their treatment plans to contain "metabolic therapies" that will effectively treat "***Serious or Life-threatening*** conditions," the dietary supplements contained in Defendants' treatment plans consist almost entirely of common herbs and spices.

27.     Two products—ImunStem and Aktiffvate— form the core of all four of Defendants' treatment plans and are the sole products in their Primary plan.

28.     ImunStem and Aktiffvate generally contain common herbs and spices as their primary ingredients:

> a)      ImunStem's primary ingredients are 260mg of olive leaf extract, 52mg of yarrow extract, and 63mg of rosemary extract per serving; and

> b)      Aktiffvate's primary ingredients are 175mg of turmeric extract, 40mg of cayenne extract, and 20mg of eucalyptus extract per serving.

29.     Defendants' Emergency D-Virus treatment plan adds two more products—AnterFeeron-1 and AnterFeeron-2—to the Primary plan's ImunStem and Aktiffvate products.

30.     Like ImunStem and Aktiffvate, both AnterFerron-1 and AnterFerron-2 generally contain common herbs and spices as their primary ingredients:

> a)      AnterFerron-1's primary ingredients are 40mg of bilberry leaf, 120mg of graviola, and 80mg of goldenseal per serving; and

> b)      AnterFerron-2's primary ingredients are 45mg of mistletoe, 20mg of astragalus, and 95mg of reishi per serving.

31.     Defendants' Metabolic treatment plan adds 10 more products to the Emergency D-Virus plan's product list. Defendants market these additional products as CrProtein, DetoxHerb-1, DetoxHerb-2, DetoxHerb-NR, DetoxHerb-PI, HyProtein-1, HyProtein-2, HyProtein-3, HyProtein-4, and LyProtein.

32. Like the other four products in the Metabolic treatment plan, the 10 additional products in the Metabolic treatment plan generally contain common herbs and spices as their primary ingredients:

a) CrProtein's primary ingredients are 35mg of cat's claw, 10mg of selfheal, and 20mg of rosemary;

b) DetoxHerb-1's primary ingredients are 100mg of poke weed, 65mg of graviola, and 17mg of turmeric;

c) DetoxHerb-2's primary ingredients are 110mg of olive leaf, 70mg of papaya leaf, and 120mg of vinca;

d) DetoxHerb-NR's primary ingredients are 60mg of gotu kola, 35mg of foti, and 45mg of vinca;

e) DetoxHerb-PI's primary ingredients are 40mg of bilberry, 120mg of graviola, and 50mg of goldenseal;

f) HyProtein-1's primary ingredients are 95mg of astralagus, 40mg of oregano, and 70mg of cat's claw;

g) HyProtein-2's primary ingredients are 40mg of green tea, 75mg of reishi, and 55mg of blood root;

h) HyProtein-3's primary ingredients are 60mg of garlic, 30mg of turmeric, and 45mg of ashwagandha;

i) HyProtein-4's primary ingredients are 25mg of garlic, 30mg of reishi, and 50mg of St. John's wort; and

j) LyProtein's primary ingredients are 25mg of horse chestnut, 40mg of garlic, and 50mg of turmeric.

33. Defendants' Cancer treatment plan consists of 14 products, 10 of which are the same as in the Metabolic plan. The remaining four products in the Cancer treatment plan are KemoHerb

products that replace the DetoxHerb products featured in the Metabolic plan.

34.    The ingredients in the KemoHerb and DetoxHerb products are nearly identical:

a)    KemoHerb-1 and DetoxHerb-PI contain the exact same ingredients in slightly different amounts per serving;

b)    KemoHerb-2 contains the exact same primary ingredients as DetoxHerb-2 in slightly different amounts per serving;

c)    KemoHerb-NR and DetoxHerb-NR contain the exact same ingredients in the exact same amounts per serving; and

d)    KemoHerb-PI and DetoxHerb-PI contain the exact same ingredients in the exact same amounts per serving.

35.    According to information available on Defendants' websites, the list price for both the Metabolic and Cancer treatment plans is $170,000—$200,000.

### Defendants' False and Unsubstantiated Disease Claims

36.    Defendants promote their products and treatment plans through their Golden Sunrise websites, testimonial videos, social media, physical billboards, and other marketing materials. Through these means, Defendants have widely disseminated advertising and other marketing that represents their products and treatment plans as preventing, treating, or curing serious, life-threatening diseases, including COVID-19, cancer, and Parkinson's disease.

**Defendants' COVID-19 Claims: Emergency D-Virus Plan of Care**

37.    In March 2020, Defendants began marketing their Emergency D-Virus treatment plan as a cure for COVID-19.

38.    To induce consumers to purchase the Emergency D-Virus treatment plan as a treatment for COVID-19, Defendants have disseminated or caused to be disseminated advertisements and marketing materials through websites, social media, and physical billboards.

39.     Defendants' advertisements of their Emergency D-Virus treatment plan typically direct consumers to a product description document available on Defendants' Golden Sunrise Nutraceutical website.

40.     Until approximately May 11, 2020, Defendants expressly claimed in the product description document that their Emergency D-Virus treatment plan could effectively treat COVID-19. Defendants represented in the document that:

a)      "Stephen R. MEIS, M.D., Board Certified, I strongly recommend Golden Sunrise Nutraceutical Incorporation herbal products *ImunStem* and *Aktiffvate*, along with their *AnterFeerons* product, as uniquely qualified to treat and modify the course of the Coronavirus epidemic in CHINA and other countries" (emphasis in original);

b)      With increased use of one of the supplements included in the Emergency D-Virus treatment plan, "disappearance of viral symptoms is expected within two (2) to four (4) days";

c)      The recommended dietary supplements "are available now and once they are started, they will help alleviate the people immediately [sic] with the acute illness of the Coronavirus";

d)      "Physicians have observed that using Emergency D-Virus Plan of Care provokes a significant response, i.e., a reduction in symptoms in patients with the COVID-19 virus"; and

e)      "Up until now, because there has been no effective treatment, the effort of controlling the *COVID-19* virus pandemic has necessitated a preventative approach . . . Now with the *EMERGENCY D-Virus Plan of Care* showing effective treatment for the *COVID-19* virus, the focus can change, at [sic] it should, from prevention to treatment. . . . Prompt administration of this treatment will significantly diminish the

occurrence of serious cases and need for hospitalization." (Emphasis in original).

41.    The FTC issued a warning letter to Defendant Golden Sunrise Pharmaceutical on April 29 demanding that it remove all unsubstantiated claims that their product could prevent, treat, or cure COVID-19.

42.    In response to the FTC's warning letter, Defendants modified their marketing materials to replace "COVID-19 virus" with terms such as "the virus," "viral," or "the viral pandemic."

43.    In the revised materials, Defendants continue to represent that their Emergency D-Virus treatment plan can effectively treat COVID-19. These materials state that:

a)    "Stephen R. MEIS, M.D., Board Certified (Dr. Meis), I strongly recommend Golden Sunrise Nutraceutical Incorporation herbal products *ImunStem* and *Aktiffvate*, along with their *AnterFeerons* product, as uniquely qualified to treat and modify the course of the **virus** epidemic in CHINA and other countries" (emphasis in original);

b)    With increased use of one of the supplements included in the Emergency D-Virus treatment plan, "disappearance of viral symptoms is expected within two (2) to four (4) days";

c)    The recommended dietary supplements "are available now and once they are started, they will help alleviate the people immediately [sic] with the acute illness of the virus";

d)    "Physicians have observed that using Emergency D-Virus Plan of Care provokes a significant response, i.e., a reduction in symptoms in patients with the virus"; and

e)    "Up until now, because there has been no effective treatment, the effort of

controlling the viral pandemic has necessitated a preventative approach . . . Now with the ***EMERGENCY D-Virus Plan of Care*** showing effective treatment for the **virus**, the focus can change, at [sic] it should, from prevention to treatment. . . . Prompt administration of this treatment will significantly diminish the occurrence of serious cases and need for hospitalization." (Emphasis in original).

44.     On their Golden Sunrise Pharmaceutical website, Defendants have promoted their Emergency D-Virus treatment plan as a treatment for COVID-19. Defendants installed and maintained a prominent banner advertisement announcing "NEW COVID-19 TREATMENT EMERGENCY D-Virus Plan of Care" on their Golden Sunrise Pharmaceutical homepage that directed consumers to the original product description document.

45.     In response to the FTC's warning letter, Defendants reworded the banner advertisement on their Golden Sunrise Pharmaceutical homepage to "Innovative Virus Treatment EMERGENCY D-Virus Plan of Care," which directed consumers to the revised product description document via hyperlink.

46.     Defendants removed the banner advertisement from their Golden Sunrise Pharmaceutical webpage on or about June 5, 2020. However, Defendants continue to maintain the "Innovative Virus Treatment EMERGENCY D-Virus Plan of Care" banner advertisement on their Golden Sunrise Nutraceutical homepage, and the banner ad continues to direct consumers to the revised product description document described in Paragraph 43 via hyperlink.

47.     On their Golden Sunrise Nutraceutical Facebook account, Defendants promote their Emergency D-Virus treatment plan with four posts that were created in March and April 2020:

a)     In a March 3 Facebook post, Defendants posted materials they describe as "the best Coronavirus advice I have seen yet!" The materials claim: "There is one company with a proven cure. WHO and CDC don't want to use it because it is not in vaccine form but an oral formula. Golden Sunrise Pharmaceutical /Nutraceutical []

Tested and Proven in Wuhan."

b)      In a March 18 Facebook post, Defendants claim that products in their Emergency D-Virus treatment plan, "ImunStem, Aktiffvate, and AnterFeeron are now on the market, especially in the current global situation of new coronavirus invasion, they will immediately help relieve patients with acute disease of coronavirus. . . . The efficacy of this product [i.e. treatment plan] has been witnessed by countless users!"

c)      In an April 9 Facebook post, Defendants reprint the text of and provide a link to an article in a local newspaper in which Defendant Meis:

i)      Promotes ImunStem and Aktiffvate as potential treatments for COVID-19, with the article profiling a particular consumer who allegedly improved because of the treatment; and

ii)     Claims "ImunStem, a dietary supplement, was approved by the Food and Drug Administration in 2018 as a treatment for serious, life threatening conditions."

d)      In an April 16 Facebook post, Defendants posted an advertisement containing an image substantially similar to their billboard advertisements, stating "GO GO CHECK THE TREATMENT" and providing a link to their Golden Sunrise Nutraceutical website.

48.     Defendants are also marketing the Emergency D-Virus treatment plan as a "NEW COVID-19 Treatment" through at least four billboards in California, each of which looks substantially similar to the following:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



(Photo taken July 8, 2020, on California State Route 198)

**Defendants' Cancer Claims: Metabolic and Cancer Plans of Care**

49.     Defendants also market their Metabolic and Cancer treatment plans as cures for cancer.

50.     To induce consumers to purchase their Metabolic and Cancer treatment plans, Defendants have disseminated or caused to be disseminated advertisements and marketing materials through their websites and social media accounts.

51.     Defendants' Golden Sunrise Nutraceutical website contains more than a dozen videos claiming that their products treat, cure, or prevent serious disease, including six videos promoting their products as cures for cancer. These videos are accessible on Defendants' Golden Sunrise Nutraceutical homepage by clicking on a conspicuous "Testimonial" navigation menu option and are posted on their Golden Sunrise Nutraceutical YouTube account.

52.     Two promotional videos that Defendants disseminated in mid-2017 feature an endorsement by a now-deceased former NFL quarterback who was diagnosed with cancer and who claims that Defendants' Cancer treatment plan is superior to chemotherapy as a cancer treatment. In these two videos, subtitled "NFL Quarterback has Amazing Results with ImunStem & Aktiffvate for Cancer, Part 1" and "NFL Quarterback has Results with KemoHerb for Cancer, Part 2," the endorser states:

a)      "I was able to take a product called KemoHerb which changed my life. My Kemo therapy was able to rip the skin off that, off the tumor and expose it so that the body and the white blood count which had been raised from the ImunStem and the Aktiffate could kill it. The KemoHerb, yeah, it set me back for a couple of days, but I flushed my system like it has never been flushed before. It was the most powerful detox I ever felt in my life";

b)      "I was on the product from Golden Sunrise Pharmaceuticals for about three days; I told my wife I don't feel the tumor anymore. Now, I'm not playing, and I wasn't trying to make her feel good at that point in time; previously I was. But this has been over ten days now and I have not felt the tumor inside my esophagus at all. There is no question in my mind, no doubt in my mind that the tumor is shrinking. I haven't had any pain";

c)      "I can't be more proud, I can't be more honest, and I can't be more truthful to tell you that I honest to goodness believe that I have been delivered from the hand of God with the help of Golden Sunrise Pharmaceuticals. We've cured cancer. I truly believe at this point. I can't feel it anymore; I haven't felt it in about six or seven days. I truly believe that the cancer has been cured. I've never felt better; I wake up every morning with zest"; and

d)      "I am here to tell you that without any chemo, without any radiation, and

1

without any surgery, I feel better today than I when I left the NFL in 1992."

2    53.    Another promotional video titled "Cancer Breakthroughs with KemoHerb" and

3   disseminated on or about June 2017 similarly claims that Defendants' products cure cancer. In the

4   video, a woman who claims to have been diagnosed with cancer says that Defendants' products

5   purged cancer from her body. She states she "called Golden Sunrise Pharmaceuticals to see what

6   were some of the things coming out of me [from an unusual bowel movement after taking

7   KemoHerb], and they said that it was the cancer. . . . and they said it was part of the healing, and I

8   felt like a different person. I would like to thank Golden Sunrise Pharmaceutical for giving me my

9   life back."

10

11   54.    A final set of three videos claim that Defendants' products can treat cancer and

12   reduce the side effects of chemotherapy. The last in the set, titled "Cancer Breakthroughs, Another

13   Cancer Patient Successful Results Treated with KemoHerb, Part 3 of 3" and created on or about

14   June 2017, represents Defendants' Cancer treatment plan—specifically Defendants' KemoHerb

15   product—to be an alternative to chemotherapy that treats cancer. In that video, another individual

16   who claims to have been diagnosed with cancer also says that Defendants' products purged cancer

17   from his body. In the video, he explains how Defendants told him that:

18

19          a)    KemoHerb will "strip the edges off the tumors and expose them so that the

20                body's own immune system can attack";

21

22          b)    An unusual bowel movement "sounds like the shell—like the mucus sac that

23                the tumor is in . . . fifteen minutes later, another bowel movement happened, this

24                time though it was this like brownish red, like a spider web-looking substance in the

25                toilet, and I called them and I said 'all right,' I said, 'what is this?' and they said it

26                sounds like the outside of the tumor's shell"; and

27          c)    "Golden Sunrise Pharmaceuticals told me, they said as you continue to do

28                KemoHerb, what's going to happen is, as your cancer cells get weaker, your body is

going to start feeling stronger, and you will feel it. They said but what also will happen is your platelets will start going up and your white count will go up too, and what they said what that means is your immune system is taking over the cancer and basically being in control."

55.     The other two videos in the series, titled "Cancer Breakthrough Successful Results – Part 1 of 3" and "Cancer Breakthroughs, Another Cancer Patient Successful Results Treatment, Part 2 of 3," feature a purported cancer patient who claims that two products in Defendants' treatment plans—ImunStem and Aktiffvate—reduce the side effects of chemotherapy. In the "Part 1" video, which is also available on Defendants' Golden Sunrise Pharmaceutical Facebook account, the purported patient represents:

a)     "During the meeting with Golden Sunrise, I was told that this product [i.e., the therapy] would do amazing things for me. . . . I was told was the product would rebuild my stem cells and make them larger like they were, like they were before";

b)     "I was also told that the stem, that the cells rebuild faster than the chemo could tear it apart, that it supersede the chemo and I probably would not lose my hair . . . They told me that the product [i.e., the therapy] would build my immune system up to where as I go through chemo, my side effects should be not much more than getting a flu shot or a mild flu";

c)     "I left that day with the products [ImunStem and Aktiffvate], went home, started taking them, and this was three days prior to my next round of chemo; within two days, the sores in my mouth had cleared up; the pains in my hips and my neuropathy were a little bit less intense";

d)     "After the next round of chemo, the third round of chemo, Golden Sunrise I called them up and I said 'do you have any suggestions for me?' and they said to increase your dosage—the day before chemo, during chemo triple your dosage the

day after, it will kinda help to offset the side effects of the chemo. Well, as I did that, my mouth, the sores in my mouth cleared up instantly";

e)      "When I asked Golden Sunrise about [wounds healing more quickly], they said that's because my immune system is being rebuilt by the oils, and my body heals more normally compared to somebody who suffers from chemo and their body does not, does not heal";

f)      "As the Aktiffvate and ImunStem built up in my system, and repaired my system, I was able to handle the chemo with very little side effects"; and

g)      "My body is tolerating the chemo very well, and I believe that's strictly because of Golden Sunrise products and the way they build a barrier against the chemo so I get the benefits but don't get the suffering. And without Golden Sunrise, I'd be very scared to know where I'd be right now."

56.     Defendants' Golden Sunrise Nutraceutical website contains a section titled "Cancer is Primary [sic] a Metabolic Disease" that concludes by stating:

> "Golden Sunrise Nutraceutical dietary supplements have established their safety and efficacy in helping to reverse, modify, or heal ***Serious or Life-threatening*** conditions.  They cause release of toxins out of the cells and at the same time the herbs supply the essential nutrients which the cells have been starving for.  These nutrients serve as building blocks allowing the cells to repair and rejuvenate themselves and return the cells to perform the functions they were intended to perform." (Emphasis in original).

57.     Defendants' Golden Sunrise Nutraceutical website also contains a section titled "Treatment," where product description documents for the Emergency D-Virus, Metabolic, and Cancer treatment plans are posted that claim:

a)      The Metabolic Plan of Care "is a preventative for cancer, which primarily is a metabolic problem like our other diseases";

b)      "The ***METABOLIC Plan of Care*** is also designed as a preventative plan of

care to arrest or reverse the metabolic abnormalities at the cellular level leading to the development of cancer cells" (emphasis in original);

c)      The Metabolic treatment plan is "given to flush the system and aim at arresting the development of the metabolic disorders. The treatments are continued in order to support the elimination of metabolic disorders";

d)      "The administration of herbal (botanical) ***CANCER Plan of Care*** treatments for human health has led to the benefit of cancer treatments from plant based materials" (emphasis in original);

e)      "***CANCER Plan of Care*** treatment begins with the use of ***ImunStem*** and ***Aktiffvate*** to improve the immune system function. Then the administration of ***KemoHerbs*** are given to flush the system and attempt arresting the development of the cancer. The treatments are continued in order to support and attempt elimination of cancer cells" (emphasis in original); and

f)      The Cancer treatment plan "arrests the fermentation process and the cancer."

58.     Defendants' Golden Sunrise Nutraceutical website contains a section titled "The Evidence Our Science," where Defendants also claim:

> "The **_CANCER Plan of Care_** is the key for the effectiveness on the immune system and cellular metabolism.  They have immune-stimulating properties.  In-vivo studies on treated patients demonstrate increasing phagocytic activity and synthesis of helper cell function.  **_CANCER Plan of Care_** have shown to transform Deoxyribonucleic Acid / Ribonnucleic Acid (DNA / RNA) repair, before, during and after chemotherapy drugs, prescription drugs, toxic exposure and chemical induced damage.  The variety of Golden Sunrise Nutraceutical herbals / botanical[s] have many effects including antioxidants activity and anit-inflammatory [sic] properties."

> *        *        *

> **_METABOLIC Plan of Care_** possess a bipolarity and a lipophilicity that facilitates molecular diffusion through various permeable and selective membranes.  In-vivo studies on test subjects have indicated that the cell membrane integrity remains intact and is not disrupted or

destroyed in the process of assimilating into the cell, thus ensuring long-term effectiveness.  The technology developed by Golden Sunrise Nutraceutical is the key for the effectiveness on immune system and cellular metabolism.  They have immune-stimulating properties.  In-vivo studies on treated patients demonstrate increasing phagocytic and synthesis of helper cell function. ***METABOLIC Plan of Care*** have shown to transform Deoxyribonucleic Acid / Ribonucleic Acid (DNA / RNA) repair, before during and after chemotherapy drugs, prescription drugs, toxic exposure and chemical induced damage.  The variety of these herbals / botanical[s] have many effects including antioxidant activity and anti-inflammatory properties." (Emphasis in original).

59.     Defendants include cancer survival rate results on their Golden Sunrise Nutraceutical website that compare Defendants' Cancer treatment plan favorably to chemotherapy. Defendants claim that these purported test results show:

a)      "A total of 27-patients have been treated for various cancer after chemotherapy, radiation and surgery had been treated with poor outcomes. Golden Sunrise Nutraceutical provided ***CANCER Plan of Care*** to these patients that improved their quality-of-life" (emphasis in original);

b)      In a chart with columns titled "Side-Effects" and "Quality of Life," that their Cancer treatment plan has no side effects and "good well-being" as the quality of life, while chemotherapy has "multiple toxic-effects and [h]ospitalization" as side-effects and "[p]oor overall-health" as quality of life; and

c)      In a chart titled "***CANCER Plan of Care* STAGE-0, I, II, III, AND IV FOR ALL TYPE[S] OF CANCER**," that patients using their Cancer treatment plan have a two-year survival rate of 100% for Stage-I cancer, 86% for Stage-II cancer, 100% for Stage-III cancer, and 60% for Stage-IV cancer. To reach these percentages, Defendants use sample sizes ranging from one to seven purported patients. (Emphasis in original).

60.     Finally, Defendants also market their Metabolic and Cancer treatment plans as cures

for cancer through their Golden Sunrise Nutraceutical Facebook account.

          a)      In a March 18, 2020 Facebook post, Defendants claim that their Metabolic treatment plan "is a preventive agent for cancer, and like other diseases it is mainly a metabolic problem."

          b)      In a February 27, 2020 Facebook post, Defendants promote the cure-all claims on their Golden Sunrise Nutraceutical website and list "Cancer – CANCER Plan of Care" among the treatments they provide.

**Defendants' Parkinson's Disease Claims: Metabolic Plan of Care**

61.      Defendants also market their Metabolic treatment plan as a cure for Parkinson's disease.

62.      To induce consumers to purchase their Metabolic treatment plan as a cure for Parkinson's disease, Defendants have disseminated or caused to be disseminated advertisements and marketing materials through their websites and social media accounts.

63.      Defendants promote two testimonial videos that tout their treatment plan as treating, mitigating the symptoms of, or curing Parkinson's disease. Both videos are accessible on Defendants' Golden Sunrise Nutraceutical website by clicking on a conspicuous "Testimonial" navigation menu and are posted on their Golden Sunrise Nutraceutical YouTube account.

64.      These videos contain endorsements by a well-known musician who was diagnosed with Parkinson's disease.

65.      In one video, titled "Parkinson's Breakthrough with ImunStem and Aktiffvate," the musician states that he saw immediate improvement in his condition after taking Defendants' products:

          a)      "When I started taking Aktiffvate, the stumbling actually stopped the same day I was taking it. . . . I did realize that every time I took it over the next few days,

then I would stop stumbling, and I wouldn't get as much tremoring in my wrist and everything else"; and

b)      "When I took Aktiffvate, all I can say honestly and it doesn't matter about star and celebrity and fame and all that, it's just a matter of—it helped, and I say take it, try it."

66.     The second video is an interview between the same musician and an interviewer:

a)      Interviewer: "I say it tastes like WD-40 and licorice, but it works—it works; and so with that said, this has helped you pick up the guitar again, it helped you with your beautiful voice again, how are you right now today as we speak? How much playing are you doing?"

Musician: "Well I'm actually preparing to do a whole lot. I'm still sort of [indecipherable] at home and recording, because I'm trying to put together some projects for Japan actually . . . I've got a bunch of gigs lined up . . . "; and

b)      Interviewer: "Check out Golden Sunrise Pharmaceuticals.com and everything they've done for people who are ailing with cancer, multiple sclerosis, ALS, and Parkinson's."

67.     In addition to promotional videos, Defendants further promote their Metabolic treatment plan as a cure for Parkinson's disease through a document titled "Insulin Resistance Cellular Restorative Results" available on their Golden Sunrise Nutraceutical website. This document states that "Golden Sunrise Nutraceutical's ***METABOLIC Plan of Care***, with Golden Sunrise Nutraceutical's products produced a significant response in 99% of their patients," and provides a list of conditions including Parkinson's Disease that see a "reduction of symptoms in patient[s] with [the] condition[]." (Emphasis in original).

68.     Defendants also market their Metabolic treatment plan as a cure for Parkinson's disease through their Golden Sunrise Nutraceutical Facebook account.

a)      In a March 18, 2020 post, Defendants claim that their "METABOLIC Nursing Plan is a carefully planned treatment plan that uses herbal treatments to treat chronic diseases such as hypertension, diabetes, peripheral neuropathy, Parkinson's disease, multiple sclerosis, gastrointestinal disorders, mental illness at the cellular level Schizophrenia, Lyme disease, etc."

b)      In a February 27, 2020 Facebook post, Defendants promote their Golden Sunrise Nutraceutical homepage's cure-all claims, which include listing Parkinson's disease among the conditions they treat.

69.     Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission.

## VIOLATIONS OF THE FTC ACT

70.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

71.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

72.     Section 12 of the FTC Act, 15 U.S.C. § 52, prohibits the dissemination of any false advertisement in or affecting commerce for the purpose of inducing, or which is likely to induce, the purchase of food, drugs, devices, services, or cosmetics. For the purposes of Section 12 of the FTC Act, 15 U.S.C. § 52, the constituent ingredients of each "plan of care" described above are each a "food" or a "drug" as defined in Section 15(b) and (c) of the FTC Act, 15 U.S.C. § 55(b) and (c).

**Count I**
**False and Unsubstantiated Disease Claims: COVID-19**

73.     In numerous instances in connection with the advertising, marketing, promotion,

offering for sale, or sale of Defendants' treatment plans, including through the means described in Paragraphs 37—48, Defendants have represented, directly or indirectly, expressly or by implication, that the Emergency D-Virus treatment plan effectively treats, mitigates the symptoms of, or cures COVID-19.

74.    The representation set forth in Paragraph 73 is false or misleading or was not substantiated at the time the representation was made.

75.    Therefore, the making of the representation as set forth in Paragraph 73 of this Complaint constitutes a deceptive act or practice and the making of false advertisements in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52.

**Count II**
**False and Unsubstantiated Claims for Serious Diseases: Cancer**

76.    In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of Defendants' treatment plans, including through the means described in Paragraphs 18—20 and 49—60, Defendants have represented, directly or indirectly, expressly or by implication, that their Metabolic and Cancer treatment plans effectively treat, mitigate the symptoms of, or cure cancer.

77.    The representation set forth in Paragraph 76 is false or misleading or was not substantiated at the time the representation was made.

78.    Therefore, the making of the representation as set forth in Paragraph 76 of this Complaint constitutes a deceptive act or practice and the making of false advertisements in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52.

**Count III**
**False and Unsubstantiated Claims for Serious Diseases: Parkinson's Disease**

79.    In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of Defendants' treatment plans, including through the means described in Paragraphs 18—20 and 61—68, Defendants have represented, directly or indirectly, expressly or by implication, that their Metabolic treatment plan effectively treats, mitigates the symptoms of, or cures Parkinson's disease.

80.    The representation set forth in Paragraph 79 is false or misleading or was not

1  substantiated at the time the representation was made.

2      81.    Therefore, the making of the representation as set forth in Paragraph 79 of this

3  Complaint constitutes a deceptive act or practice and the making of false advertisements in violation

4  of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52.

5                                      **Count IV**
6  **False Claims about the Use for Which the FDA Cleared Golden Sunrise Products**

7      82.    In numerous instances in connection with the advertising, marketing, promotion,

8  offering for sale, or sale of Golden Sunrise products, including through the means described in

9  Paragraphs 22—24 and 47, Defendants represent, directly or indirectly, expressly or by implication,

10  that:

11          a)     Defendants' products have been reviewed and accepted by the FDA;

12          b)     The FDA designated their products as Regenerative Medicine Advanced

13          Therapies; and

14          c)     The FDA's designation signifies that Defendants' products are safe and

15          effective.

16      83.    The representations set forth in Paragraph 82 are false.

17      84.    Therefore, the making of the representation as set forth in Paragraph 82 of this

18  Complaint is false and misleading, and constitutes a deceptive act or practice and the making of

19  false advertisements in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52.

20                              **CONSUMER INJURY**

21      85.    Consumers are suffering, have suffered, and will continue to suffer substantial injury

22  as a result of Defendants' violations of the FTC Act. In addition, Defendants have been unjustly

23  enriched as a result of their unlawful acts or practices. Absent injunctive relief by this Court,

24  Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public

25  interest.

26                     **THIS COURT'S POWER TO GRANT RELIEF**

27      86.    Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant

28  injunctive and such other relief as the Court may deem appropriate to halt and redress violations of

1   any provision of law enforced by the FTC. The Court, in the exercise of its equitable jurisdiction,

2   may award ancillary relief, including rescission or reformation of contracts, restitution, the refund

3   of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of

4   any provision of law enforced by the FTC.

5   **PRAYER FOR RELIEF**

6         87.    Wherefore, Plaintiff FTC, pursuant to Section 13(b) of the FTC Act, 15 U.S.C.

7   § 53(b), and the Court's own equitable powers, requests that the Court:

8           a)    Award Plaintiff such preliminary injunctive and ancillary relief as may be

9   necessary to avert the likelihood of consumer injury during the pendency of this

10  action and to preserve the possibility of effective final relief, including temporary

11  and preliminary injunctions;

12          b)    Enter a permanent injunction to prevent future violations of the FTC Act;

13          c)    Award such relief as the Court finds necessary to redress injury to consumers

14  resulting from Defendants' violations of the FTC Act, including but not limited to,

15  rescission or reformation of contracts, restitution, the refund of monies paid, and the

16  disgorgement of ill-gotten monies; and

17          d)    Award Plaintiff the costs of bringing this action, as well as such other and

18  additional relief as the Court may determine to be just and proper.

19             Respectfully submitted,

20             ALDEN F. ABBOTT

21             General Counsel

22  Dated:  July 30, 2020         */s/  Zachary A. Keller  /s/*
           ZACHARY A. KELLER

23             Texas Bar No. 24087838
           zkeller@ftc.gov; (214) 979-9382

24             REID A. TEPFER

25             Texas Bar No. 24079444
           rtepfer@ftc.gov; (214) 979-9385

26             EDWARD HYNES
           New York Bar No. 4887584

27             ehynes@ftc.gov; (214) 979-9381
           1999 Bryan St. Ste. 2150, Dallas, Texas 75201

28             Fax: (214) 953-3079
           Attorneys for Plaintiff Federal Trade Commission