UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>GOLDEN SUNRISE NUTRACEUTICAL, INC., et al.,<br><br>Defendants. | No.  1:20-cv-01060-DAD-SKO<br><br>ORDER GRANTING PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER<br><br>(Doc. No. 3) |

This matter came before the court on August 5, 2020, for a hearing on the motion for a temporary restraining order filed on behalf of plaintiff Federal Trade Commission ("FTC"). (Doc. No. 3.) Attorneys Zachary Keller, Reid Tepfer, and Edward Hynes appeared via video for plaintiff, and attorney David McNamara appeared via video for defendant Stephen Meis. For the reasons explained below, the court will grant plaintiff's motion for a temporary restraining order in its entirety.

**BACKGROUND**

In its complaint plaintiff alleges as follows.  Defendant Golden Sunrise Nutraceutical, Inc. ("G.S. Nutraceutical") is a Delaware corporation with its principal place of business in California. (Doc. No. 1 ("Compl.") at ¶ 6.)  Defendant Golden Sunrise Pharmaceutical, Inc. ("G.S. Pharmaceutical") is a California corporation.  (*Id.* at ¶ 7.)  Defendant Huu Tieu is the president

1

and chief executive officer of both aforementioned entities,[1] and defendant Meis is the medical director and a board member of defendant G.S. Nutraceutical.  (*Id.* at ¶¶ 8, 9.)

Since at least 2016, defendants have promoted and sold a variety of products labeled as dietary supplements.  (*Id.* at ¶ 12.)  Defendants have claimed that these products provide numerous health benefits, including treatment of serious diseases.  (*Id.*)  Defendants marketed their supplements individually and collectively through four "plans of care":  (a) Primary Plan of Care; (b) Emergency D-Virus Plan of Care; (c) Metabolic Plan of Care; and (d) Cancer Plan of Care.  (*Id.* at ¶ 16.)  Defendants marketed their treatment plans as providing consumers safe, effective treatment for serious diseases.  (*Id.* at ¶ 17.)  On the G.S. Nutraceutical homepage, it was expressly stated that these plans of care "are intended to treat, modify, reverse, or cure a Serious or Life-threatening disease or condition; and real-world evidence indicates that the G.S. Nutraceutical treatments have potential to address unmet medical needs for such disease or condition."  (*Id.* at ¶ 18.)  Defendants marketed their treatment plans as virtual cure-alls for serious illnesses.  (*Id.* at ¶ 19.)

Defendants also claimed on the G.S. Nutraceutical website that their products have been reviewed and accepted by the Food & Drug Administration ("FDA").  (*Id.* at ¶ 22.)  Defendants claimed that their products are "designated as a Regenerative Medicine Advance Therapy (RMAT) by the [FDA]."  (*Id.* at ¶ 23.)  Additionally, in their product description document for the Emergency D-Virus treatment plan, defendants stated that (a) their products "have proven themselves" to the FDA and (b) one of their products

> was the first dietary supplement in the United States to be approved as a prescription medicine and also for the indication to treat Serious or Life-threatening conditions.  It qualified for both of these under

---

[1] Defendant Tieu was also named as the defendant in a criminal indictment returned by a federal grand jury of this district on July 9, 2020, based on the same conduct underlying plaintiff's claims in this action. (*See* Doc. No. 3-6 at 9–27.) In the order setting conditions of defendant Tieu's pretrial release, he was directed to, among other things, cease manufacturing, selling, or dispensing the product Emergency D-Virus and to instruct all employees to do the same; cease representing any Golden Sunrise product as having been approved or having proven itself to the FDA and to instruct all employees to do the same; and cease representing that his product has been approved or recognized by any government entity as preventing, treating, or curing COVID-19. *See United States v. Tieu*, Case No. 1:20-cr-00109-DAD-BAM (Doc. No. 6 at 2).

> the Regenerative Medicine Advance Therapy (RMAT). This designation acknowledges not only the effectiveness of these herbs, usually only associated with pharmaceutical drugs, but also [that they] caus[e] no side effects, a quality of dietary supplements.

(*Id.* at ¶ 24.)

According to plaintiff, defendants' products are not approved by the FDA as RMATs or under any other designation. (*Id.* at ¶ 25.) Plaintiff asserts that despite defendants representing their treatment plans to contain "metabolic therapies" that will effectively treat "Serious or Life-threatening conditions," the dietary supplements contained in those treatment plans consist almost entirely of common herbs and spices. (*Id.* at ¶ 26.) Two products—ImunStem and Aktiffvate—form the core of all four of defendants' treatment plans and are the sole products in their Primary plan. (*Id.* at ¶ 27.) ImunStem and Aktiffvate generally contain common herbs and spices as their primary ingredients, such as olive leaf extract, yarrow extract, turmeric extract, cayenne extract, and eucalyptus extract. (*Id.* at ¶ 28.) The Emergency D-Virus treatment plan adds two more products—AnterFeeron-1 and AnterFeeron-2—to the Primary plan's ImunStem and Aktiffvate products; the two products include bilberry leaf, graviola, goldenseal, mistletoe, astragalus, and reishi. (*Id.* at ¶¶ 29, 30.) Defendants' Metabolic treatment plan adds ten more products to the Emergency D-Virus plan's product list. (*Id.* at ¶ 31.) Like the other four products in the Metabolic treatment plan, the ten additional products in the Metabolic treatment plan, according to plaintiff, generally contain common herbs and spices as their primary ingredients. (*Id.* at ¶ 32.)

In March 2020, defendants began marketing their Emergency D-Virus treatment plan as a cure for COVID-19. (*Id.* at ¶ 37.) To induce consumers to purchase the Emergency D-Virus treatment plan as a treatment for COVID-19, defendants have disseminated or caused to be disseminated advertisements and marketing materials through websites, social media, and physical billboards. (*Id.* at ¶ 38.) Defendants' advertisements of their Emergency D-Virus treatment plan typically direct consumers to a product description document available on defendants' G.S. Nutraceutical website. (*Id.* at ¶ 39.) Until approximately May 11, 2020, defendants expressly claimed in the product description document that their Emergency D-Virus treatment plan could effectively treat COVID-19. (*Id.* at ¶ 40.)

3

Plaintiff issued a warning letter to defendant G.S. Pharmaceutical on April 29, 2020 demanding that it remove all unsubstantiated claims that their product could prevent, treat, or cure COVID-19. (*Id.* at ¶ 41.) In response to the warning letter, defendants modified their marketing materials to replace "COVID-19 virus" with terms such as "the virus," "viral," or "the viral pandemic." (*Id.* at ¶ 42.) In the revised marketing materials, defendants continued to represent that their Emergency D-Virus treatment plan can effectively treat COVID-19. (*Id.* at ¶ 43.)

On the G.S. Pharmaceutical website, defendants have promoted their Emergency D-Virus treatment plan as a treatment for COVID-19. (*Id.*) Defendants also installed and maintained a prominent banner advertisement announcing "NEW COVID-19 TREATMENT EMERGENCY D-Virus Plan of Care" on their G.S. Pharmaceutical homepage that directed consumers to the original product description document. (*Id.* at ¶ 44.) In response to plaintiff's warning letter, the banner advertisement on the G.S. Pharmaceutical homepage was reworded to state "Innovative Virus Treatment EMERGENCY D-Virus Plan of Care," which directed consumers to the revised product description document via hyperlink. (*Id.* at ¶ 45.) The banner advertisement was removed from the G.S. Pharmaceutical webpage on or about June 5, 2020. (*Id.* at ¶ 46.) However, the "Innovative Virus Treatment EMERGENCY D-Virus Plan of Care" banner advertisement continued to appear on the G.S. Nutraceutical homepage, and the banner ad continued to direct consumers to the revised product description document. (*Id.*)

On the G.S. Nutraceutical Facebook account, defendants promoted their Emergency D-Virus treatment plan as treating COVID-19 with four posts that were created in March and April 2020. (*Id.* at ¶ 47.) Defendants also marketed the Emergency D-Virus treatment plan as a "NEW COVID-19 Treatment" through at least four billboards in California. (*Id.* at ¶ 48.) Plaintiff alleges that it has reason to believe that defendants are violating or are about to violate laws enforced by the FTC.

Plaintiff filed the complaint and initiated this action on July 30, 2020. (Compl.) The complaint alleges four causes of action for engaging in deceptive acts or practices and the making of false advertisements in violation of sections 5(a) and 12 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45(a), 52: (I) false and unsubstantiated disease claims pertaining to

COVID-19; (II) false and unsubstantiated claims pertaining to cancer; (III) false and unsubstantiated disease claims pertaining to Parkinson's Disease; and (IV) false claims about the use for which the FDA cleared Golden Sunrise products. (*Id.* at 24–26.) On July 31, 2020, plaintiff filed the pending motion for a temporary restraining order requesting relief under counts I and IV. (Doc. No. 3.) The motion specifically requests a temporary restraining order prohibiting the practices challenged in counts I and IV of the complaint and that defendants be: (1) temporarily restrained from further violations of 15 U.S.C. §§ 45(a), 52, as alleged in the complaint; (2) required to show cause why this court should not issue a preliminary injunction extending such temporary relief pending a final adjudication on the merits; (3) temporarily restrained from destroying or disposing of business records or clinical tests or studies; (4) temporarily restrained from releasing consumers' personal information; (5) required to report to plaintiff any new business activity; (6) required to provide a copy of this order to their employees and affiliates; and (7) required to suspend the collection of accounts for the products covered by this temporary restraining order.[2] (*See id.* at 24; Doc. No. 3.)

On August 4, 2020, defendant Meis filed a declaration in response to the pending motion for a temporary restraining order. (Doc. No. 10.) Defendants G.S. Nutraceutical, Inc., G.S. Pharmaceutical, Inc., and Tieu did not file an opposition or otherwise respond to the motion.[3]

---

[2] Plaintiff notes that its request for a temporary restraining order does not include a bond provision because 15 U.S.C. § 53(b) specifically provides that "a temporary restraining order or a preliminary injunction may be granted without bond." (Doc. No. 3-3 at 6 n.2.)

[3] In a declaration attached to the pending motion, plaintiff's counsel noted that plaintiff intended on notifying defendants of the filing of its complaint and its motion for a temporary restraining order in this action by phone and email and serving defendants via Federal Express. (Doc. No. 3-15 at 2.) Plaintiff's counsel noted that he would "file a supplemental Certificate of Counsel Pursuant to Local Rule 231(c)(5) after completing the steps discussed above." (*Id.*) By minute order, the court stated it had preliminarily reviewed the pending motion for a temporary restraining order and intended on granting the motion, unless defendants filed an opposition and/or requested a hearing by 2:00 p.m. on Monday, August 3, 2020. (Doc. No. 7.) The court directed plaintiff to serve that minute order on defendants and to thereafter file documentation with the court outlining the steps it had taken to effectuate such service. (*Id.*) On August 1, 2020, plaintiff filed a supplemental certificate of counsel. (Doc. No. 8.) Therein, plaintiff's counsel declared that he could not reach any those defendants by phone, and their voicemail inboxes were full. (*Id.* at ¶ 12.) He did, however, send the complaint and motion by email to all defendants. (*Id.*) Additionally, plaintiff's counsel provided a copy of the minute order (Doc. No. 7) to the

**LEGAL STANDARD**

The standard governing the issuing of a temporary restraining order is "substantially identical" to the standard for issuing a preliminary injunction. *See Stuhlbarg Intern. Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n. 7 (9th Cir. 2001). "The proper legal standard for preliminary injunctive relief requires a party to demonstrate 'that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *see also Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1172 (9th Cir. 2011) ("After *Winter*, 'plaintiffs must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction."); *Am. Trucking Ass'n, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009). The Ninth Circuit has also held that an "injunction is appropriate when a plaintiff demonstrates . . . that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011) (quoting *Lands Council v. McNair*,

/////

/////

/////

/////

---

process server and requested that they either include it with the documents if they were still attempting to serve defendants, or to re-serve defendants with the minute order. (Doc. No. 8 at ¶ 9.) Plaintiff's counsel also sent a second email to all defendants, which included a copy of the minute order. (*Id.* at ¶ 10.) Plaintiff did not receive any replies, but plaintiff's counsel declares that he used read receipts and received an alert that his second email with the minute order was opened by defendant Tieu. (*Id.* at ¶ 12.) Plaintiff's counsel notes that because defendant Tieu is an officer of both defendants G.S. Pharmaceutical and G.S. Nutraceutical, notice has effectively been effectuated for the two corporate defendants. (*Id.*) On August 3, 2020, the summons for defendants G.S. Nutraceutical, G.S. Pharmaceutical, and Tieu were returned as executed. (Doc. Nos. 11, 12, 14.) On August 3, 2020, the court also left a voice message for attorney Edgar Sevilla—who is listed as being retained by defendant Tieu in his criminal action before this court—to inform defendant Tieu of the opportunity to oppose the pending motion in this civil action. *See United States v. Tieu*, Case No. 1:20-cr-00109-DAD-BAM (Doc. No. 4). Nonetheless, to date, no appearance has been made on behalf of defendant Tieu in this action.

6

537 F.3d 981, 97 (9th Cir. 2008) (*en banc*)).[4]  The party seeking the injunction bears the burden of proving these elements.  *Klein v. City of San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009); *see also Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) ("A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief.")  Finally, an injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter*, 555 U.S. at 22.

## ANALYSIS

Plaintiff seeks a temporary restraining order against defendants pursuant to the FTC Act.  The FTC Act provides, in relevant part, that the FTC can seek injunctive relief in a district court when it has reason to believe:  (1) that a person, partnership, or corporation is violating the FTC Act and "(2) that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final, would be in the interest of the public."  15 U.S.C. § 53(b).

Here, plaintiff alleges that the defendants have violated sections 5(a) and 12 of the FTC Act, and thus this action is properly before this court.  Additionally, plaintiff's sought-after relief—prohibiting the practices challenged in counts I and IV of the complaint, including the dissemination of misrepresentations about defendants' products, the disclosure of consumer information, and the destruction of records related to defendants' business activities—are within

/////
/////
/////
/////

---

[4] The Ninth Circuit has found that this "serious question" version of the circuit's sliding scale approach survives "when applied as part of the four-element *Winter* test." *All. for the Wild Rockies*, 632 F.3d at 1134.  "That is, 'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest."  *Id*. at 1135.

this court's authority to grant ancillary relief.[5]  *See F.T.C. v. H. N. Singer, Inc.*, 668 F.2d 1107, 1113 (9th Cir. 1982) ("We hold that Congress, when it gave the district court authority to grant a permanent injunction against violations of any provisions of law enforced by the Commission, also gave the district court authority to grant any ancillary relief necessary to accomplish complete justice because it did not limit that traditional equitable power explicitly or by necessary and inescapable inference."); *F.T.C. v. Affordable Media*, 179 F.3d 1228, 1232 n.2 (9th Cir. 1999) (noting that the district court granted a temporary restraining order prohibiting defendants from "destroying or otherwise failing to maintain their business records").

Since actions under this provision of the Act "involve[e] statutory enforcement where the governing statute authorizes injunctive relief, irreparable harm is presumed, and a court need only weigh the equities and consider the likelihood of success on the merits." *See Fed. Trade Comm'n v. Consumer Def., LLC*, 926 F.3d 1208, 1212 (9th Cir. 2019).  Thus, the court will begin its analysis by considering the likelihood that plaintiff will prevail on the merits.

**I.   Likelihood of Success on the Merits**

In this FTC enforcement action, the district court "need[] only to find some chance of probable success on the merits." *United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172,

---

[5] In defendant Meis' declaration in opposition to the pending motion, he reports that he resigned as medical director for defendant G.S. Nutraceutical two days after this action was initiated on August 2, 2020.  (Doc. No. 10 at ¶ 1.)  He also states that he has requested that any reference to his name as medical director be removed from defendant G.S. Nutraceutical's website, and that he has no control over the website or informational and advertising efforts.  (*Id.* at ¶¶ 3, 4.)  At the hearing on the pending motion, defendant clarified that he did not oppose issuance of the temporary restraining order but rather the order's applicability to himself because (1) he is no longer a primary participant in this matter, and (2) he fears the collateral consequences that the issuance of a restraining order against him might bring about.  In response, plaintiff's counsel noted that plaintiff has no information indicating that defendant Meis has actually stopped participating in this alleged scheme, and defendant has not met his burden of proving that the harm will not reoccur.  As plaintiff's counsel has pointed out, "[t]he standard for the voluntary cessation exception to mootness is whether the defendant is free to return to its illegal action at any time, " and it is the defendant who bears the burden of "show[ing] that subsequent events [have] made it absolutely clear that the allegedly wrongful behavior cannot reasonably be expected to recur." *F.T.C. v. Affordable Media*, 179 F.3d 1228, 1238 (9th Cir. 1999) ("[A]a defendant's conduct can moot the need for injunctive relief, but the 'test for mootness in cases such as this is a stringent one.'") (internal citations and quotation marks omitted); *see also Demery v. Arpaio*, 378 F.3d 1020, 1026 (9th Cir. 2004) (and cases cited therein), *cert. denied* 545 U.S. 1139 (2005).  Here, defendant Meis has not satisfied that stringent burden at this juncture.

176 (9th Cir. 1987). The court will consider the likelihood of success on the merits of counts I and IV in turn.

  A. *Plaintiff Has Shown a Probable Chance of Success in Proving that Defendants Violated the FTC Act Because of their False and Unsubstantiated Disease Claims Pertaining to Treating COVID-19*

The court first finds that plaintiff has shown a probable chance of success on the merits of count I in which it alleges that defendants have engaged in deceptive acts or practices and the making of false advertisements in violation of sections 5(a) and 12 of the FTC Act by representing that the Emergency D-Virus treatment plan effectively treats, mitigates the symptoms of, or cures COVID-19. (Compl. at ¶¶ 73–75.)

While section 5(a) of the FTC Act generally prohibits unfair acts or practices in commerce, section 12 specifically prohibits the dissemination of any false advertisement in order to induce the purchase of food, drugs, devices, services, or cosmetics. *F.T.C. v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994). The Act defines "false advertisement" as "an advertisement, other than labeling, which is misleading in a material respect." *Id.* (citing 15 U.S.C. § 55). Section 12 also states that "the dissemination of any such false advertisement is an 'unfair or deceptive act or practice in or affecting commerce' within the meaning of section 5." *Id.* Thus, violations of section 12 constitute violations of section 5(a).

As an initial matter, it appears that defendants' Emergency D-Virus treatment is a drug covered by section 12 because it is intended to cure, mitigate, treat, or prevent disease or affect the structure or any function of the human body. *See* 15 U.S.C. § 55(c) (defining a "drug"); (Doc. No. 3-5 at 23) ("Our Plans of Care are intended to treat, modify, reverse, or cure a Serious or Life-threatening disease or condition."). The court must therefore make a preliminary determination of whether defendants have engaged in false advertising to induce the purchase of Emergency D-Virus. The Ninth Circuit has adopted the FTC's three-part test for determining whether an advertisement violates section 12:

/////

/////

/////

> Under this test, "the Commission will find an act or practice deceptive if, first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material."

*Id.* (citing *In re Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 165–65 (1984)).

Here, defendants made representations that their product, Emergency D-Virus, can cure or treat COVID-19. Initially, defendants made these representations expressly. (*See, e.g.*, Doc. Nos. 3-5 at 23; 3-6 at 4, 6–7; 3-10 at 2, 6.) After plaintiff sent defendants a warning letter demanding that they cease making claims that their products treated COVID-19, (Doc. No. 3-6 at 28–30), defendants began to make representations that implied that Emergency D-Virus could cure or treat COVID-19. According to plaintiff, defendants modified their marketing materials to replace "COVID-19 virus" with terms such as "the virus" and "viral," (*see, e.g.* Doc. No. 3-5 at 50, 55), "the virus epidemic," (*see, e.g.*, *id.* at 49), and "the viral pandemic" (*see, e.g.*, *id.* at 55). Given the context of the current COVID-19 pandemic, and defendants' previous marketing of Emergency D-Virus as treating COVID-19, it is clearly a reasonable inference that the advertisements following plaintiff's warning letter implied that Emergency D-Virus was an effective treatment for COVID-19. *Accord Cliffdale Assocs.*, 103 F.T.C. 110 ("When the advertisement contains an express claim, the representation itself establishes its meaning. When the claim is implied, the Commission will often be able to determine the meaning through an examination of the representation, including an evaluation of such factors as the entire document, the juxtaposition of various phrases in the document, the nature of the claim, and the nature of the transaction.").

Next, the court must determine whether those representations were likely to mislead consumers. To meet this burden, plaintiff can pursue two theories: proving either that the representations were false or that defendant lacked a "reasonable basis" for its representations. *Pantron I*, 33 F.3d at 1096. To prevail on the "reasonable basis" theory, plaintiff "must 'show that the advertiser lacked a reasonable basis for asserting that the message was true.' In determining whether an advertiser has satisfied the reasonable basis requirement, the Commission or court must first determine what level of substantiation the advertiser is required to have for his

10

advertising claims." *Id.* (citing *In the Matter of Thompson Med. Co., Inc.*, 104 F.T.C. 648 (1984)). The FTC has determined the appropriate level of substantiation for advertising claims by weighing the following factors: "(1) the product involved; (2) the type of claim; (3) the benefits of a truthful claim; (4) the ease of developing substantiation for the claim; (5) the consequences of a false claim; and (6) the amount of substantiation experts in the field would agree is reasonable." *Thompson Med*, 104 F.T.C. 648.

Here, plaintiff pursues the reasonable basis theory and asserts that consideration of the *Thompson Medical* factors weighs in favor of requiring a high degree of substantiation. The court agrees. "[C]laims that any food, drug, or device can help a user achieve any result, such as weight loss, require competent scientific or medical tests or studies." *Pantron I*, 33 F.3d at 1096 n.23. The first and second factors therefore weigh in favor of a high degree of substantiation, because defendants' products are presented as a medicinal cure to treat, mitigate the symptoms of, or cure, a disease that has caused a global pandemic and thus require competent tests or studies. (Doc. No. 3-3 at 22.) As to the third factor, plaintiff correctly asserts that the benefits of defendants' claim that their products to successfully treat COVID-19 would obviously be globally significant. (*Id.*) Regarding the fourth factor, plaintiff does not elaborate on the expenses of securing controlled scientific evidence to validate defendants' claims. (*See id.*) As to the fifth factor, plaintiff argues that a false claim could result not only in consumers not seeking proper medical care but also in their not adhering to social and safety norms regarding mask wearing, social distancing, and other activities designed, as effectively as possible, to keep not only themselves but also others safe from the COVID-19 virus. (*Id.*)

As to the sixth factor, according to the declaration of Dr. Richard Bruce van Breemen—a professor of pharmaceutical sciences and principal investigator at the Linus Institute at Oregon State University—defendants' claims regarding their products require validation from controlled, scientific trials establishing the product's ability to treat, mitigate the symptoms of, or cure COVID-19. (Doc. No. 3-10 at 83–85.) As declarant van Breemen notes, there are no valid scientific studies substantiating any of defendants' claims in this regard. (*Id.*) After plaintiff did not receive a response to its April 29, 2020 warning letter, FTC staff called defendant G.S.

11

1  Pharmaceutical on May 11, 2020 and advised defendant Tieu that defendants' purported
2  substantiation materials regarding their COVID-19 and FDA claims were inadequate.  (Doc. No.
3  3-3 at 10.)  In response, defendant Tieu followed that conversation with an email providing
4  documents purporting to substantiate defendants' claims regarding their products; FTC staff
5  responded stating that the materials provided were inadequate.  (*See* Doc. Nos. 3-6 at 38–49; 3-
6  7, 3-9 at 94, 3-10 at 1.)  Because defendants' representations completely lack the requisite
7  substantiation, they are likely to mislead consumers.

8        Lastly, the court must evaluate whether the false representation was material.  Because
9  "[e]xpress product claims are presumed to be material," *Pantron I*, 33 F.3d at 1095–96, the court
10 finds that defendants' initial representations that expressly identified Emergency D-Virus as a
11 COVID-19 treatment or cure were material.  As to the implied representations, courts have held
12 that claims "that significantly involve health, safety, or other areas with which reasonable
13 consumers would be concerned" are also material.  *Kraft, Inc. v. F.T.C.*, 970 F.2d 311, 322 (7th
14 Cir. 1992) (citing *Thompson Med.*, 104 F.T.C. 648); *see also Fed. Trade Comm'n v. Wellness
15 Support Network, Inc.*, No. 3:10-cv-04879-JCS, 2014 WL 644749, at *17 (N.D. Cal. Feb. 19,
16 2014), judgment entered, No. 3:10-cv-04879-JCS, 2014 WL 3805755 (N.D. Cal. Feb. 20, 2014).
17 Thus, all of defendants' representations are material because they concern consumer health.

18       Accordingly, plaintiff has established a probable chance of success in proving that
19 defendants' representations that their product, Emergency D-Virus, can cure or treat COVID-19
20 are deceptive and satisfy all three prongs under the applicable legal standard.  Thus, plaintiff has
21 also shown that the representations likely violate section 12—and by extension, section 5(a)—of
22 the FTC Act.

23       B.    *Plaintiff Has Shown a Probable Chance of Succeeding in Proving that Defendants Violated the FTC Act Because of their False Claims About the Use for Which the*
24           *FDA Cleared Golden Sunrise Products*

25       The court also finds that plaintiff has shown a probable chance of success on the merits of
26 count IV.  In count IV, plaintiff alleges that defendants have engaged in deceptive acts or
27 practices and the making of false advertisements in violation of sections 5(a) and 12 of the FTC
28 Act by representing that their products have been reviewed and accepted by the FDA; that the

FDA designated their products as RMATs; and that the FDA's designation signifies that defendants' products are safe and effective. (Compl. at ¶¶ 82–84.)

Here, defendants made several express representations to the public that the FDA has reviewed and approved their products, including the products contained in their Emergency D-Virus treatment plan. (*See, e.g.*, Doc. No. 3-5 at 23, 49.) Additionally, because these representations are inherently about the legitimate effectiveness of defendants' products, such as Emergency D-Virus, to cure or treat COVID-19, consideration of the *Thompson Medical* factors weigh in favor of requiring a high degree of substantiation on the part of defendants for the same reasons as set forth above. As previously stated, that substantiation is lacking here. Lastly, because defendants' claims are express and relate to consumer health, they are clearly material. *See Pantron I*, 33 F.3d at 1095–96; *Kraft, Inc.*, 970 F.2d at 322; *Wellness Support Network, Inc.*, 2014 WL 644749, at *17.

Accordingly, plaintiff has shown a probable chance that these representations satisfy all three prongs under the applicable legal standard and thus violate section 12—and by extension, section 5(a)—of the FTC Act.

## II. Balance of the Equities

As it pertains to the balance of the equities, the Ninth Circuit has "held that when a district court balances the hardships of the public interest against a private interest, the public interest should receive greater weight." *World Wide Factors*, 882 F.2d at 347 (citing *Federal Trade Comm'n v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1165 (9th Cir. 1984)). "Public equities include, but are not limited to, economic effects and pro-competitive advantages for consumers and effective relief for the commission." *Id.*

Plaintiff contends that absent the granting of injunctive relief, there is a strong likelihood that violations will continue as this court determines the appropriate injunctive and other equitable relief for consumers harmed by defendants' conduct. (Doc. No. 3-3 at 23.) As stated above, defendants' deceptive representations "could result not only in consumers not seeking proper medical care but also in their not adhering to new social and safety norms regarding mask wearing, social distancing, and other activities that keep not only themselves but also others safe."

(*Id.* at 22.) Plaintiff argues that any interests defendants may have are far outweighed by the public's interest in halting this conduct and preventing the victimization of additional consumers. (*Id.* at 23) (citing *World Wide Factors*, 882 F.2d at 346 (affirming the district court's finding that "there is no oppressive hardship to defendants in requiring them to comply with the FTC Act, refrain from fraudulent representation or preserve their assets from dissipation or concealment")). Moreover, plaintiff correctly notes that while private interest will be negatively impacted by a temporary restraining order, those equities "alone do not outweigh the Commission's showing of likelihood of success." (*Id.* at 24) (citing *Warner Commc'ns*, 742 F.2d. at 1165).

The court therefore concludes that the balance of the equities here weighs strongly in favor of granting plaintiff's motion for a temporary restraining order.

## CONCLUSION

For the reasons set forth above:

1. Plaintiff's motion for a temporary restraining order (Doc. No. 3) is granted;
2. The court sets the following schedule with respect to plaintiff's motion for preliminary injunction:
   a. Plaintiff shall file its motion for preliminary injunction by **August 7, 2020**;
   b. Defendants shall file their oppositions to the motion by **August 21, 2020**;
   c. Plaintiff shall file any reply to the oppositions by **August 28, 2020**;
   d. The motion for preliminary injunction shall be heard by the court on **September 2, 2020 at 10:00 a.m.** in Courtroom 5, Seventh Floor of the United States District Court for the Eastern District of California, 2500 Tulare Street, Fresno, California;
3. The court orders that, pending the hearing and determination of the motion for preliminary injunction, defendants shall be required to take the following actions:
   a. Show cause why this court should not issue a preliminary injunction extending such temporary relief pending a final adjudication on the merits;
   b. Report to plaintiff any new business activity;
   c. Provide a copy of this order to their employees and affiliates; and

1          d.      Suspend the collection of accounts for the products covered by this temporary restraining order;

4.    The court orders that, pending the hearing and determination of the motion for preliminary injunction, defendants and all owners, officers, directors, shareholders, employees, agents, bankers, subsidiaries, successors, assignees, principals, assignors, attorneys, and persons acting in concert with them, shall be restrained and prevented from engaging in, committing, or performing directly and indirectly, any and all of the following acts:

    a.    Further violations of 15 U.S.C. §§ 45(a), 52, as alleged in the complaint;

    b.    Destroying or disposing of business records or clinical tests or studies; and

    c.    Releasing consumers' personal information;

5.    No bond shall be required to be posted by plaintiff pursuant to Rule 65(c) of the Federal Rules of Civil Procedure;

6.    Defendants are further notified of their right to apply to the court for modification or dissolution of this temporary restraining order, if appropriate and supported by a showing of good cause, on two (2) days' notice or such shorter notice as the court may allow. *See* Fed. R. Civ. P. 65(b)(4) and Local Rule 231(c)(8).

IT IS SO ORDERED.

Dated: **August 5, 2020**

                                    UNITED STATES DISTRICT JUDGE