EDWARD HYNES (New York 4887584)
ehynes@ftc.gov; (214) 979-9381
REID A. TEPFER (Texas 24079444)
rtepfer@ftc.gov; (214) 979-9385
Federal Trade Commission
1999 Bryan Street, Suite 2150
Dallas, Texas 75201
Fax: (214) 953-3079

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **FEDERAL TRADE COMMISSION**, | ) Case No.: 1:20-cv-01060-DAD-SKO |
| | ) |
| Plaintiff, | ) **PLAINTIFF FEDERAL TRADE** |
| | ) **COMMISSION'S NOTICE OF MOTION** |
| v. | ) **FOR SUMMARY JUDGMENT AND** |
| | ) **MEMORANDUM IN SUPPORT** |
| **GOLDEN SUNRISE NUTRACEUTICAL,** | ) |
| **INC.**, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

## NOTICE OF MOTION

PLEASE TAKE NOTICE that on November 2, 2021, at 9:30am PT, or as soon thereafter as the matter may be heard, in Courtroom 5, Seventh Floor, of the above-entitled Court (Hon. Dale Drozd presiding), located at 2500 Tulare Street, Fresno, California 93721, Plaintiff Federal Trade Commission ("FTC") will move for summary judgment, as set forth below.

## MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 260, the FTC respectfully submits this motion for summary judgment as to Defendants Golden Sunrise Nutraceutical, Inc. ("GSN"), Golden Sunrise Pharmaceutical, Inc. ("GSP"), and Huu Tieu ("Tieu," and, collectively, "Defendants").

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

     This motion is based on the following memorandum, on the supporting evidence filed concurrently herewith, on the arguments of counsel that may be made at any hearing on this matter, and on all relevant documents on file in this action.

     Pursuant to this Court's Scheduling Order (Doc. No. 45), the parties met and conferred regarding the filing of this motion on September 21, 2021. Defendants do not agree to the submitted statement of undisputed facts.

TABLE OF CONTENTS

Table of Authorities ........................................................................................................ iv

I.     Introduction ........................................................................................................... 1

II.    Procedural History ................................................................................................ 3

III.   The Parties ............................................................................................................ 5

       a. Plaintiff .......................................................................................................... 5

       b. Defendants ..................................................................................................... 5

       c. Jurisdiction, Venue, and Commerce .............................................................. 6

IV.    Legal Standard ...................................................................................................... 6

       a. Summary Judgment ........................................................................................ 6

       b. This Court is Authorized to Permanently Enjoin the Alleged Practices ......... 7

       c. Deceptive FDA Claims Violate Sections 5 and 12 of the FTC Act ................. 7

V.     Defendants' Undisputed Acts Were Deceptive Under Sections 5 and 12 ........... 8

       a. Defendants Explicitly Represented that Their Plans of Care Could Cure COVID-19,
       Cancer, and Parkinson's Disease, and Were FDA-Approved ........................... 9

       b. Defendants' Representations Were Likely to Mislead Consumers ............... 12

       c. Defendants' Representations Were Material ................................................. 19

       d. The Undisputed Facts Establish that Defendants' Claims Violate the FTC Act .......... 20

VI.    The Proposed Order Provides Appropriate Permanent Equitable Relief to Remedy
       Defendants' Violations of Law ........................................................................... 21

       a. Permanent Injunction Against Defendants' False and Baseless Claims is Needed ...... 21

       b. The FTC's Proposed Injunctive Relief is Appropriate and Necessary .......... 22

       c. GSN and GSP are Jointly and Severally Liable as a Common Enterprise .......... 23

       d. Tieu is Individually Liable ........................................................................... 24

VII.   Conclusion .......................................................................................................... 24

       Certificate of Service ......................................................................................... 26

TABLE OF AUTHORITIES

## Cases

*AMG Capital Mgmt., LLC v. FTC*, 593 U.S. ___, 141 S. Ct. 1341, 1343 (2021)...........................4

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................6

*Blair Foods, Inc. v. Ranchers Cotton Oil*, 610 F.2d 665 (9th Cir. 1980) ...............................6, 19

*Caneva v. Sun Cmtys. Operating Ltd. P'ship*, 550 F.3d 755 (9th Cir. 2008) ..............................6

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ......................................................6

*Cliffdale Assocs. Inc.*, 103 F.T.C. 110 (1984).......................................................20

*FTC v. Cardiff*, No. 18-cv-2104, 2020 U.S. Dist. LEXIS 210930 (C.D. Cal. Oct. 9, 2020)........13

*FTC v. CD Capital Invs., LLC*, 14-cv-1033, 2016 U.S. Dist. LEXIS 116989 (C.D. Cal. 2016)..23

*FTC v. Colgate-Palmolive Co.*, 380 U.S. 374 (1965)..................................................22

FTC v. Commerce Planet, Inc., 815 F.3d 593 (9th Cir. 2016) ........................................9

*FTC v. Commerce Planet, Inc.*, 878 F. Supp. 2d. 1048 (C.D. Cal. 2012) ...............................9

*FTC v. Cyberspace.com LLC*, 453 F.3d 1196 (9th Cir. 2006)....................................9, 20

*FTC v. Dinamica Financiera LLC*, 2010 U.S. Dist. LEXIS 88000 (C.D. Cal. Aug. 19, 2010)...23

*FTC v. Fed. Loan Modification Law Ctr.*, LLP, 09-cv-00401, 2010 U.S. Dist. LEXIS 146694 (C.D. Cal. Nov. 17, 2010)......................................................................23

*FTC v. Garvey*, 383 F.3d 89 (9th Cir. 2004)....................................................13, 24

*FTC v. Gill*, 265 F.3d 944 (9th Cir. 2001) ....................................................8, 9

*FTC v. Grant Connect, LLC*, 763 F.3d 1094 (9th Cir. 2014).........................................22

*FTC v. H. N. Singer, Inc.*, 668 F.2d 1107 (9th Cir. 1982) .........................................7

*FTC v. Health Formulas, LLC*, No. 2:14-cv-01659, 2015 U.S. Dist. LEXIS 59387 (D. Nev. May 6, 2015) ...............................................................................23

*FTC v. Innovative Designs, Inc.*, No. 16-cv-1669, 2020 U.S. Dist. LEXIS 175435 (W.D. Pa. Sept. 24, 2020) ...........................................................................15

*FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052 (C.D. Cal 2012).....................23

*FTC v. Lights of Am., Inc.*, No. 10-cv-013332013, U.S. Dist. LEXIS 133040 (C.D. Cal. Sept. 17, 2013) .........................................................................9, 13, 14

*FTC v. Nat. Sol. Inc.*, No. 06-cv-6112, 2007 WL 8315533 (C.D. Cal. Aug. 7, 2007) ................18

*FTC v. Nat'l Urological Grp.*, 645 F. Supp. 2d 1167 (N.D. Ga. 2008)................................18

*FTC v. Natural Solution, Inc.*, No. 06-cv-6112, 2007 U.S. Dist. LEXIS 60783, *9 (C.D. Cal. Aug. 7, 2007) .......................................................................13

*FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127 (9th Cir. 2010) ................................23

*FTC v. Pacific Medical Clinics Management, Inc.*, No. 90-1277, 1992 U.S. Dist. LEXIS 6247 (S.D. Cal. 1992) ........................................................................................................... 8

*FTC v. Pantron I Corp.*, 33 F.3d 1088 (9th Cir. 1994) ......................................................... passim

*FTC v. Publ'g Clearing House*, 104 F.3d 1168 (9th Cir. 1997) ................................................. 7

*FTC v. Publishing Clearing House, Inc.*, 104 F.3d 1168 (9th Cir. 1997) ................................... 24

*FTC v. QT, Inc.*, 448 F. Supp. 2d 908 (N.D. Ill. 2006) ............................................................. 15

*FTC v. Stefanchik*, 559 F.3d 924 (9th Cir. 2009) ................................................................... 8, 9

*FTC v. Wellness Support Network, Inc.*, No. 10-cv-04879, 2014 U.S. Dist. LEXIS 21449 (N.D. Cal. Feb. 19, 2014) ................................................................................................. 20

*Kraft, Inc. v. FTC*, 970 F.2d 311 (7th Cir. 1992) ................................................................... 20

*Litton Indus., Inc., v. FTC*, 676 F.2d 364 (9th Cir. 1982) ....................................................... 22

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) .............................. 6, 7

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099 (9th Cir. 2000) ............................ 6

*POM Wonderful, LLC v. FTC*, 777 F.3d 478 (D.C. Cir. 2015) ................................................. 13

*Porter & Dietsch, Inc.*, 90 F.T.C. 770 (1977) ....................................................................... 13

*Sears, Roebuck & Co. v. FTC*, 676 F.2d 385 (9th Cir. 1982) .................................................. 21

*Simeon Mgmt. Corp. v. FTC*, 579 F.2d 1137 (9th Cir. 1978) ................................................... 8

*Taylor v. List,* 880 F.2d 1040 (9th Cir. 1989) ....................................................................... 7

*Thompson Med. Co. v. FTC*, 791 F.2d 189 (D.C. Cir. 1986) ....................................... 13, 14, 15

*Trans World Accounts, Inc. v. FTC*, 594 F.2d 212 (9th Cir. 1979) .......................................... 23

*United States v. W.T. Grant Co.*, 345 U.S. 629 (1953) ........................................................... 21

**Statutes**

15 U.S.C. § 44 ........................................................................................................................ 6

15 U.S.C. § 45(a) .......................................................................................................... 3, 5, 7, 20

15 U.S.C. § 52(b) ................................................................................................................... 8

15 U.S.C. § 53(b) ............................................................................................................. 4, 6, 7

15 U.S.C. § 55 ........................................................................................................................ 7

15 U.S.C. § 55(c) ................................................................................................................... 7

15 U.S.C. §52 ............................................................................................................... 3, 5, 7, 20

28 U.S.C. § 1331 ................................................................................................................... 6

28 U.S.C. § 1391 ................................................................................................................... 6

28 U.S.C. §1337(a) ............................................................................................................... 6

28 U.S.C. §1345 ................................................................................................................... 6

**Rules**

FED. R. CIV. P. 56(a) ................................................................................................................. 6

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I.    INTRODUCTION



[1]

Defendants peddled sham treatments for some of the most harrowing medical aliments of our time, including COVID-19, cancer, and Parkinson's disease. They promoted "plans of care"—self-devised concoctions consisting primarily of herbs like turmeric, garlic, and mistletoe—with unsubstantiated promises of health improvement and false Food and Drug Administration ("FDA") approval claims. These claims were disseminated through any means Defendants could find: social media, YouTube videos, websites, and even a dozen or more billboards, such as the one shown above. Defendants charged consumers, many of whom were ill or fearful of becoming ill during a global pandemic, as much as $170,000 to purchase their products.

The FTC brought this action to halt these practices, alleging that the Defendants violated the FTC Act by making false and unsubstantiated claims that their plans of care could effectively treat, mitigate the symptoms of, or cure COVID-19, cancer, and Parkinson's disease, and that their products had FDA approval.

In issuing a temporary restraining order ("TRO") at the start of this case, (Doc. No 16), this Court found that the FTC was likely to prevail in this matter because Defendants "completely lack[ed] the requisite substantiation" to make health claims. (Doc. No. 16, at 12 ¶6-7.) Discovery

---

[1] *See* Statement of Undisputed Facts ("SUF") No. 79.

only confirmed this undisputed fact. The FTC's expert evidence establishes that Defendants' claims are baseless: three experts each conclude that there is no scientific evidence to substantiate Defendants' claims that their plans of care, or any of their constituent ingredients, treats, mitigates the symptoms of, or cures COVID-19, cancer, or Parkinson's disease. *See* SUF No. 103-110; 176-184; 216-223.[2]

Even though Defendants' claims required human clinical trials to support them, as each expert opines, no such trials existed. Defendants admitted as much, first in response to requests for admission and again in a deposition. The absence of any such trials was further confirmed by former Defendant Dr. Stephen Meis[3] in a sworn declaration filed with this motion.

Likewise undisputed is that Defendants have no evidence to support their claim that their products had FDA approval.[4] Defendants' own evidence shows as much: in discovery, they produced five written communications they received from the FDA, each of which unambiguously informs Defendants that their products do not have FDA approval. Two FDA officials have confirmed under oath that Defendants' products do not have FDA approval. *Id.* at No. 244-246.[5]

Defendants disregarded these communications from the FDA and continued making false

---

[2] On file with the Court is also a declaration from Dr. Richard Bruce van Breemen, a professor of pharmaceutical sciences and principal investigator at the Linus Institute at Oregon State University, which the FTC submitted in support of its application for a TRO. *See* SUF No. 95-102. Like Dr. John Schoggins, who was disclosed as an expert during discovery, Dr. van Breemen is of the opinion that human clinical trials are a prerequisite to making COVID-19 claims.

[3] FTC settled its claims against Defendant Meis through a stipulated injunction, which the Court entered on June 11, 2021. *See* (Doc. No. 52.)

[4] Defendants may attempt to claim that someone from the FDA once verbally told them that they have FDA approval, but there is no admissible evidence to support this self-serving hearsay, and a mountain of documentary evidence establishes otherwise.

[5] These declarations, by Howard R. Philips, Supervisory Regulatory Counsel, and Christopher Joneckis, Associate Director for Review Management, were previously provided to this Court with Plaintiff's TRO and Preliminary Injunction applications.

FDA approval claims. Defendants likewise disregarded a warning letter that the FTC sent to them before filing this lawsuit, which directed them to stop making false and unsubstantiated COVID-19 claims.

Defendants had numerous opportunities to come forward with evidence that they have the requisite substantiation for their health claims or that they have FDA approval, but they failed to do so. They failed to take any depositions, failed to produce any clinical trials or other scientific studies, failed to produce any evidence of FDA approval, and failed to disclose an expert to offer opinions in their defense. In short, they failed to raise a genuine issue of material fact.

Given the undisputed facts, this Court should enter judgment against the Defendants for violating Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52, as alleged in the Complaint. The FTC requests that the Court enter a permanent injunction to extend the preliminary relief it granted in the TRO and preliminary injunction (Doc. Nos. 29 and 30).[6]

II.    PROCEDURAL HISTORY

On July 30, 2020, the FTC filed its Complaint (Doc. No. 2,) alleging that Defendants violated Sections 5 and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52, by making false and unsubstantiated health claims, specifically by claiming that: (Count I) their Emergency D-Virus plan could effectively treat, mitigate the symptoms of, or cure COVID-19; (Count II) their Metabolic and Cancer plans could effectively treat, mitigate the symptoms of, or cure cancer; (Count III) their Metabolic plan could effectively treat, mitigate the symptoms of, or cure Parkinson's disease; and (Count IV) these plans contained products that had FDA approval. The

---

[6] A proposed order for permanent injunctive relief is submitted with this brief.

Complaint seeks permanent injunctive relief for these violations.[7]

The following day, August 1, 2020, the FTC filed a motion for TRO with respect to Counts I (deceptive Covid claims) and IV (deceptive FDA claims)[8] of the Complaint, *see* (Doc. No. 3), which the Court granted on August 5, 2020. *See* (Doc. No. 16.) In its TRO, the Court made extensive findings regarding the Defendants' illegal conduct and held that the FTC was likely to prevail on the merits of those counts. *Id.* at 8-13. Defendants then stipulated to preliminary injunctions, which the Court entered on August 27, 2020. *See* (Doc. Nos. 29 and 30.)

Since the preliminary injunctions, Defendants have answered the Complaint, *see* (Doc. Nos. 33, 35, and 40), responded to requests for admissions, and produced discovery responses, including a document production containing written correspondence between Defendants and the FDA. Defendant Tieu also testified at his deposition. This evidence demonstrates that there are no disputed material facts in this matter. Specifically, Defendants *admit*:

    a.  Regarding Count I, that they marketed and sold an "Emergency D-Virus Plan of Care" by claiming that the product could treat, mitigate the symptoms of, or cure COVID-19, and that no clinical studies support these claims;

    b.  Regarding Count II, that they marketed and sold a "Metabolic Plan of Care" and a "Cancer Plan of Care" by claiming that the products could treat, mitigate the symptoms of, or cure cancer, and that no clinical studies support their claims;

    c.  Regarding Count III, that they marketed and sold the Metabolic Plan of Care by claiming that the product could treat, mitigate the symptoms of, or cure

---

[7] The FTC no longer seeks monetary relief. *See AMG Capital Mgmt., LLC v. FTC*, 593 U.S. ___, 141 S. Ct. 1341, 1343 (2021) (holding that Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), does not authorize the FTC to obtain court-ordered monetary relief in federal court).

[8] The FTC sought a TRO only for the two COVID-19-related counts, I and IV, due to the urgency of the pandemic.

Parkinson's disease, and that no clinical studies support these claims; and

d. Regarding Count IV, that they represented their treatments (i) to have approval from the FDA, (ii) to be designated by the FDA as Regenerative Medicine Advanced Therapies ("RMATs"), and (iii) to be deemed safe and effective by the FDA. While admitting these facts, Defendants have produced discovery responses in which the FDA repeatedly advised them that they do not have any form of FDA approval nor could they market their products as having any FDA approval—responses that corroborate the FDA declarations submitted in support of Plaintiff's TRO stating Defendants did not have any form of FDA approval.

III.   THE PARTIES

   a.  *Plaintiff*

The FTC, an independent agency of the United States Government, enforces both Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices and Section 12 of the FTC Act, 15 U.S.C. § 52, which prohibits false advertisements for food, drugs, devices, services, or cosmetics. *See* SUF No. 3-6.

   b.  *Defendants*

Defendant GSN and Defendant GSP are corporations with their principal places of business in Porterville, California. *Id.* at No. 7, 9.

GSN and GSP admit, and the evidence substantiates, that GSN and GSP operated as a common enterprise while engaging in the deceptive acts and practices alleged below. *Id.* at No. 15-32. Specifically, GSN and GSP have conducted the business practices through an interrelated network of companies that have common ownership, officers, managers, business functions, employees, and office locations. *Id.*

Tieu admits he was the President and Chief Executive Officer of both GSN and GSP, *see*

SUF No. 12, and, acting alone or in concert with others, formulated, directed, controlled, had the authority to control, or participated in the acts and practices of GSN and GSP during all times relevant to this lawsuit. *Id.* at No. 247-281.

### c.  *Jurisdiction, Venue, and Commerce*

This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345; *see* SUF No. 1, and venue is proper under 28 U.S.C. § 1391 (b)(1), (b)(2), and (c)(1); and 15 U.S.C. § 53(b). *Id.* at No. 2. Defendants have maintained a substantial course of trade in or affecting "commerce," as defined in Section 4 of the FTC Act, 15 U.S.C. § 44. *Id.* at No. 8.

### IV.    LEGAL STANDARD

### a.  *Summary Judgment*

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("[T]he record taken as a whole could not lead a rational trier of fact to find for the nonmov[ant].")

In a motion for summary judgment, the movant must "identify[] those portions of the pleadings, depositions, answers to interrogatories . . . together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations omitted); *Caneva v. Sun Cmtys. Operating Ltd. P'ship*, 550 F.3d 755, 761 (9th Cir. 2008). Once the movant establishes the lack of a factual dispute, the opposing party must produce facts—supported by admissible evidence—showing a dispute exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1103 (9th Cir. 2000). Hearsay evidence may not be considered. *Blair Foods, Inc. v. Ranchers Cotton Oil*, 610 F.2d 665, 667 (9th Cir. 1980).

A motion for summary judgment "cannot be defeated by relying solely on conclusory

allegations unsupported by factual data." *Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir. 1989).

The non-moving party "must do more than simply show that there is some metaphysical doubt as

to the material facts." *Matsushita*, 475 U.S. at 586. Indeed, "[o]nce the FTC has made a prima

facie case for summary judgment, the defendant cannot rely on general denials; she must

produce significant probative evidence that demonstrates that there is a genuine issue of material

fact for trial." *FTC v. Publ'g Clearing House*, 104 F.3d 1168, 1170 (9th Cir. 1997).

> ### b.  *This Court is Authorized to Permanently Enjoin the Alleged Practices*

Section 13(b) of the FTC Act allows the FTC to seek permanent injunctive relief with

respect to any person, partnership, or corporation. 15 U.S.C. § 53(b); *FTC v. H. N. Singer, Inc.*,

668 F.2d 1107, 1113 (9th Cir. 1982).

The FTC brought this action under 13(b) to seek relief for violations of Sections 5(a) and

12 of the FTC Act. *See* (Doc. No. 2); 15 U.S.C. §§ 45(a) and 52. Section 5(a) declares unlawful

"unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a). Section 12

prohibits the dissemination of any false advertisement in or affecting commerce for the purpose

of inducing the purchase of food, drugs, devices, services, or cosmetics. 15 U.S.C. §§ 52, 55.[9]

The Ninth Circuit has routinely granted relief under 13(b) for violations of Section 5(a) and 12.

*See FTC v. Pantron I Corp.*, 33 F.3d 1088, 1102-03 (9th Cir. 1994).

> ### c.  *Deceptive FDA Claims Violate Sections 5 and 12 of the FTC Act*

Courts have recognized that false representations about a product's FDA approval violate

Sections 5(a) and 12 of the FTC Act. *See, e.g., Simeon Mgmt. Corp. v. FTC*, 579 F.2d 1137,

---

[9] The products at issue are each a "drug" as defined in Section 15(c) of the FTC Act as they are "articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease." *See* 15 U.S.C. § 55(c); *see also* (Doc. No. 16 at 9.)

1145 (9th Cir. 1978) (upholding the Commission's finding that "the failure to disclose that the weight reduction treatments involve injection of a drug lacking FDA approval for such use renders the advertisements deceptive and thus in violation of § 5 of the FTCA"); *FTC v. Pacific Medical Clinics Management, Inc.*, No. 90-1277, 1992 U.S. Dist. LEXIS 6247, *6 (S.D. Cal. 1992) ("[T]he failure to disclose the absence of FDA approval of a drug's safety and efficacy is false and deceptive under sections 5 and 12.").

V.     DEFENDANTS' UNDISPUTED ACTS WERE DECEPTIVE UNDER SECTIONS 5 AND 12

Between their answers, responses to requests for admission, document production, and testimony given by Defendant Tieu, Defendants admit to all material conduct alleged in the Complaint. Specifically, Defendants do not dispute, as the evidence shows, that they represented (a) their Emergency D-Virus Plan of Care to treat, mitigate the symptoms of, or cure COVID-19; (b) their Metabolic and Cancer plans to treat, mitigate the symptoms of, or cure cancer; (c) their Metabolic plan to treat, mitigate the symptoms of, or cure Parkinson's disease; and (d) their treatments to be FDA approved.

The undisputed evidence further demonstrates that these claims were deceptive. Acts or practices are deceptive under Section 5(a) of the FTC Act if (a) there was a representation, (b) the representation was likely to mislead customers acting reasonably under the circumstances, and (c) the representation was material. *FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009); *Pantron I*, 33 F.3d at 1095; *see also* (Doc. No. 16 at 9-10) (applying standard).

Courts apply this same three-element test to determine if a party has disseminated a false ad under Section 12 as they do to determine if an ad is deceptive under Section 5(a). *See Pantron I*, 33 F.3d at 1095; *Stefanchik*, 559 F.3d at 928; *FTC v. Gill*, 265 F.3d 944, 950 (9th Cir. 2001). A violation of Section 12 is also a violation of Section 5(a). 15 U.S.C. § 52(b).

As discussed below, the undisputed facts, together with Defendants' conceded failure to substantiate any of the health claims at issue, establish the three elements of deception under Sections 5(a) and 12.

> a. *Defendants Explicitly Represented that Their Plans of Care Could Cure COVID-19, Cancer, and Parkinson's Disease, and Were FDA-Approved*

To determine the representation made, courts consider the overall net impression of the materials at issue. *See Stefanchik*, 559 F.3d at 928.[10] Courts will deem a claim to be made if consumers, acting reasonably under the circumstances, would interpret the statements to contain that message. *See FTC v. Lights of Am., Inc.*, No. 10-cv-013332013, U.S. Dist. LEXIS 133040, *102 (C.D. Cal. Sept. 17, 2013). Defendants do not contest that they made the representations that the FTC challenges in the Complaint.

As detailed within, Defendants marketed or sold several different products that they claimed could treat, mitigate the symptoms of, or cure a variety of diseases, or claimed had FDA approval. They broadly spread these claims, which reasonable consumers would understand to mean what the claims said: Defendants' products could counteract a number of terminal illnesses and that Defendants had FDA approval to sell these cures. Far from being incidental representations, Defendants made these representations about several different products and diseases, across a variety of different media. Defendants admit all of this, and the uncontroverted evidence shows as much.

<u>*Count I: Unsubstantiated COVID Claims.*</u> Defendants' claims that their Emergency D-

---

[10] *See also FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006) (evaluating "the net impression [a solicitation] creates even though the solicitation also contains truthful disclosures"); *Gill*, 265 F.3d at 956 (FTC showed that defendant's statements created false overall "net impression"); *FTC v. Commerce Planet, Inc.*, 878 F. Supp. 2d. 1048, 1063 (C.D. Cal. 2012) (courts consider the common sense "net impression" of the act as a whole), *aff'd in part, vacated in part*, 815 F.3d 593 (9th Cir. 2016).

Virus Plan of Care could treat COVID-19 include:

a) At least four roadside billboards in California that boasted, "NEW COVID 19 Treatment Emergency D Virus Plan of Care," followed by the GSN logo and telephone number.[11] *See* SUF No. 79.

b) The below public posting to Defendants' Facebook accounts:

> There is one company with a proven cure. WHO and CDC don't want to use it because it is not in vaccine form but an oral formula. Golden Sunrise Pharmaceutical/Golden Sunrise Nutraceutical https://goldensunrisenutraceutical.com/golden-sunrise-1 Tested and proven in Wuhan. Contact me for more information.

*Id.* at No. 74.

c) A banner advertisement on the GSN website homepage stating "NEW COVID-19 TREATMENT EMERGENCY D-Virus Plan of Care" that, if clicked on, directs consumers to an Emergency D-Virus Plan of Care product description document. *Id.* at No. 88. The statements in this product description document include an endorsement from a medical provider claiming Defendants' products are "uniquely qualified to treat and modify the course of the Coronavirus epidemic in CHINA and other countries." (Emphasis in original.) *Id.* at No. 68.[12]

*Count II: Unsubstantiated Cancer Claims.* Defendants likewise made the following representations that their Metabolic and Cancer plans could treat or cure cancer:

a) At least eight roadside billboards in California that proclaimed "CANCER BREAKTHROUGH" followed by the GSN logo. *Id.* at No. 117.

---

[11] A picture of one such billboard is on page 1 of this brief.

[12] Before initiating litigation, the FTC issued a warning letter to the Defendants concerning their false and unsubstantiated COVID-19 health claims, *see* SUF No. 80, and Defendants responded by merely replacing the "COVID-19 virus" term in their Emergency D-Virus product description document with terms such as "the virus," "viral," or "the viral pandemic." *Id.* at No. 81.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

b)  A "Testimonial" section on the GSN website that links to that company's YouTube account featuring six videos promoting Defendants' products as cures for cancer. Two of these promotional videos feature an endorsement by a now-deceased former NFL quarterback who was diagnosed with cancer and who claimed that Defendants' plan is superior to chemotherapy as a cancer treatment. *Id.* at No. 119, 121.

c)  A video posted on the GSP Facebook page with the caption, "A stage four colon cancer patient shares his revolutionary experience of how a new herbal treatment helped save his life." *Id.* at No. 150.

d)  Purported cancer survival rates on the GSN website that compared Defendants' cancer treatment plan favorably to chemotherapy. *Id.* at No. 169-170.

e)  Assertions on the GSN Facebook page that the Metabolic treatment plan "is a preventive agent for cancer." *Id.* at No. 175

*Count III: Unsubstantiated Parkinson's Disease Claims.* Defendants also claimed that the Metabolic Plan of Care could treat or cure Parkinson's disease:

a)  A post on the GSN Facebook page that stated that Defendants' products treat, mitigate the symptoms of, or cure Parkinson's disease. *Id.* at No. 215.

b)  A post on the GSN Facebook page declared that the "METABOLIC Nursing Plan is a carefully planned treatment plan that uses herbal treatments to treat chronic diseases such as…Parkinson's disease." *Id.* at No. 214.

c)  A video titled "Parkinson's Breakthrough with ImunStem and Aktiffvate"[13] on

---

[13] ImunStem and Aktiffvate are the two main products in the Metabolic Plan of Care. *See* SUF No. 40.

the GSN YouTube channel and GSN website in which a well-known musician stated that he saw an immediate improvement in his Parkinson's disease condition after taking Defendants' products. *Id.* at No. 197.

*Count IV: False Claims of FDA Approval.* To bolster their treatment and cure claims, Defendants represented that their treatments had FDA approval. In particular, they:

    a) Asserted on the GSN website that one of their products had just been approved by the FDA to treat serious life-threatening conditions. *Id.* at No. 228.

    b) Declared in their product description documents and on their website that their treatment were "the only product of its kind to go through the FDA approval process," have been "approved as a prescription medicine," "have proven themselves," were "in compliance with [FDA] regulations," that "necessary documentation on each of the products was submitted to the FDA," and had been "reviewed by the FDA." *Id.* at No. 131, 227, 229, 230, 233, 234.

    c) Boasted in their product description documents, which were available through the GSN website, that their treatments were "designated as a Regenerative Medicine Advance Therapy (RMAT) by the [FDA]" and that the "[FDA] acknowledges not only the effectiveness of these herbs . . . but also [that they] caus[e] no side effects." *Id.* at No. 231, 234.

    d) Claimed in promotional videos that their treatments "go through the FDA approval process. It's safe, it's effective." *Id.* at No. 131.

    **b.** *Defendants' Representations Were Likely to Mislead Consumers*

Defendants' representations, catalogued above, were both baseless and untrue. Representations are deceptive if (a) the advertiser had no "reasonable basis" to assert the claims as true or (b) the claims are false. *Pantron I*, 33 F.3d at 1096; *see also* (Doc. No. 16 at 10.)

Courts in this Circuit, including this Court in granting the TRO, apply the "reasonable basis" test to determine whether health claims are deceptive under Sections 5 and 12 of the FTC Act. *See FTC v. Cardiff*, No. 18-cv-2104, 2020 U.S. Dist. LEXIS 210930, *43 (C.D. Cal. Oct. 9, 2020); *see also* (Doc. No. 16 at 10-11.)[14] The "reasonable basis" test is an "objective standard," *FTC v. Natural Solution, Inc.*, No. 06-cv-6112, 2007 U.S. Dist. LEXIS 60783, *9 (C.D. Cal. Aug. 7, 2007), and "does not require the FTC to prove that the message was false in order to prevail." *FTC v. Garvey*, 383 F.3d 891, 901 (9th Cir. 2004). Moreover, "[b]ecause the statute does not require an intent to deceive, the subjective good faith of the advertiser is not a valid defense to an [FTC] enforcement action brought under section 5(a)." *Lights of Am., Inc.*, U.S. Dist. LEXIS 133040 at *138.

Courts applying the "reasonable basis" test first "determine what level of substantiation the advertiser is required to have" for the claims and then "determine whether the advertiser possessed that level of substantiation." *Pantron I*, 33 F.3d at 1096; *accord.* (Doc. No. 16 at 10-11) (applying standard).[15]

Courts evaluate the following six factors to determine the level of substantiation the

---

[14] Courts have recognized two types of health claims that are subject to review under the FTC Act. An "efficacy" claim conveys that a product successfully yields the advertised benefit. *See Thompson Med. Co. v. FTC*, 791 F.2d 189, 194 (D.C. Cir. 1986); *POM Wonderful, LLC v. FTC*, 777 F.3d 478, 490 (D.C. Cir. 2015). An "establishment" claim conveys that scientific authority, such as studies or clinical evidence, exists that supports a given health claim. The claims at issue here are efficacy claims because they represent the products to treat the medical conditions at issue: COVID-19 (Count I), cancer (Count II), and Parkinson's disease (Count III).

[15] The *Pantron* court did not rule on the "reasonable basis" test because it was not raised on appeal but instead noted that applying the reasonable basis test would "appear to compel the conclusion that Pantron should be required to possess some controlled clinical evidence." *Pantron I*, 33 F.3d at 1096 n.23. The court reached this conclusion due to, among other things, "the nature of the product claims, *see Porter & Dietsch, Inc.*, 90 F.T.C. 770, 885 (1977) (stating that claims that any food, drug, or device can help a user achieve any result, such as weight loss, require 'competent scientific or medical tests or studies.')." *Pantron I*, 33 F.3d at 1096 n.23.

1  advertiser must have: "(1) the product involved; (2) the type of claim; (3) the benefits of a

2  truthful claim; (4) the ease of developing substantiation for the claim; (5) the consequences of a

3  false claim; and (6) the amount of substantiation experts in the field would agree is reasonable."

4  *Lights of Am., Inc.*, 2013 U.S. Dist. LEXIS 133040 at *104-05 (*citing Thompson Med. Co.*, 1984

5  FTC LEXIS 6, at *387); *accord.* (Doc. No. 16 at 10-11).

6          The first five *Thompson Medical* factors favor requiring a high degree of substantiation

7  for Defendants' health claims:

8

9          1)  <u>Product Involved</u>. The products are presented as medicinal treatments or cures.[16]

10         2)  <u>Type of Claim</u>. The representations at issue claim the products treat, mitigate the

11             symptoms of, or cure potentially life-threatening and life-altering diseases.[17]

12         3)  <u>Benefits of a Truthful Claim</u>. The benefits of a successful treatment for these

13             diseases would have been profound and life-altering for countless individuals and

14             society in general.

15         4)  <u>Ease of Developing Substantiation</u>. Conducting the requisite clinical trials would

16             be expensive but justified in light of the benefits of a truthful claim, discussed

17             above, and the serious consequences of a false claim, described below.[18]

18         5)  <u>Consequences of a False Claim</u>. The consequences of a false claim here could not

19

20

21

22 [16] *See Thompson Med. Co.*, 1984 FTC LEXIS 6, at *388 (holding that "the product is a drug whose application is supposed to improve the physical welfare of its users by reducing pain and the other symptoms of minor arthritis. In past cases involving health or safety issues, we have required a relatively high level of substantiation, typically scientific tests").

23 [17] *See Pantron I*, 33 F.3d at 1096 n.23 ("[C]laims that any food, drug, or device can help a user achieve any result, such as weight loss, require competent scientific or medical tests or studies").

24 [18] *See Thompson Med. Co.*, 1984 FTC LEXIS 6, at *391-392 (holding that "[w]e often consider the third and fourth [] factors in conjunction with each other… In view of the large potential market and likely high demand for analgesics suitable for treating arthritis symptoms, these costs [associated with conducting well-controlled clinical trials] should not deter the development or advertising of new arthritis remedies.")

be higher. In addition to losing hundreds to thousands of dollars purchasing the products,[19] some consumers may not seek proper medical care believing they have already found a cure. Forgoing proper treatment for cancer or Parkinson's disease could mean needless pain and suffering, even death. Regarding COVID-19, consumers may forgo vaccination or not adhere to social and safety measures regarding mask wearing, social distancing, and other activities that keep themselves and others safe, thereby causing the virus and its variants to spread, hospital beds be occupied, and countless to needlessly suffer or die.

With regard to the sixth *Thompson Medical* factor, the amount of substantiation experts in the field would agree is reasonable, Courts have consistently found that a reasonable basis or the proper level of substantiation for health efficacy claims requires "competent scientific or medical tests or studies," *see, e.g., Pantron I*, 33 F.3d at 1096 n.23, and rely on experts in a given field to identify the level of substantiation that would provide a reasonable basis for claims about a product's effectiveness. *See, e.g., FTC v. Innovative Designs, Inc.*, No. 16-cv-1669, 2020 U.S. Dist. LEXIS 175435, *50 (W.D. Pa. Sept. 24, 2020) ("Reasonable basis is an objective standard that calls for the court to evaluate whether [defendants] had sufficient scientific evidence to satisfy an expert in the relevant field that the claim is true").[20]

Here, three expert witnesses have opined in discovery that human clinical trials are the level of substantiation required to make the types of health claims Defendants were making. (A fourth expert, Dr. Richard Bruce van Breemen, whose declaration was made in support of the

---

[19] *Id*. at 393 (holding that "the failure to treat arthritis with effective remedies can cause significant economic harm to the consumer. Those costs result from the repeated purchase of an ineffective product by consumers who are unable to evaluate drug efficacy in an easy manner.")

[20] "[T]he FTC need not conduct or present clinical studies showing that the product does not work as claimed." *FTC v. QT, Inc.*, 448 F. Supp. 2d 908, 959 (N.D. Ill. 2006).

TRO, shares this opinion.)

*Count I: Unsubstantiated COVID Claims.* Dr. John Schoggins, an Associate Professor in the Department of Microbiology at the University of Texas Southwestern Medical Center who conducts research into SARS-CoV-2 and COVID-19, opines that in the relevant scientific community, competent and reliable scientific evidence means randomized, double-blind, placebo-controlled human clinical trials using the product at issue. *See* SUF No. 109. This opinion is consistent with what the FDA requires. A month after this lawsuit was filed, the FDA denied Defendants' application for approval to treat COVID-19 with their products. *Id.* at No. 242. As the basis for this denial, the FDA advised Defendants that "product development for COVID-19 will need to be supported by randomized controlled trials to ensure that the therapeutic options that reach widespread use safely and effectively treat patients." *Id.*

As Dr. Schoggins noted, and Defendants have conceded,[21] there are no such controlled clinical trials that scientifically support the claim that the Emergency D-Virus Plan of care can mitigate, treat, or cure COVID-19.[22] Defendants thus lacked the requisite substantiation to make their COVID-19 health claims.

*Count II: Unsubstantiated Cancer Claims.* Dr. Katherine Tkaczuk, a Professor of

---

[21]     Q: So were any randomized clinical trials ever done to substantiate the claim that the Emergency-D Virus Plan of Care could treat COVID-19?
        A: No.
        Q: Were any randomized clinical trials ever done to substantiate the claim that the Emergency-D Virus Plan of Care could mitigate the symptoms of COVID-19?
        A: No.
        *See* SUF No. 111, Tieu Dep. pg. 99, lines 4-13
[22] In support of its request for a TRO, the FTC submitted a declaration from Dr. Richard Bruce van Breemen who also opined that defendants' claims regarding their products require validation from controlled, scientific trials establishing the product's ability to treat, mitigate the symptoms of, or cure COVID-19. (Doc. No. 3-10 at 83–85.) Dr. van Breemen, like Dr. Schoggins, noted that there are no valid scientific studies substantiating any of Defendants' claims. SUF No. 101.

Medicine and Oncology at the University of Maryland School of Medicine and a clinical investigator who has worked on more than 100 cancer clinical trials, opines that in the relevant scientific community, competent and reliable scientific evidence for claims about treating, mitigating the symptoms of, or curing cancer should, at a minimum, consist of two-to-three prospective clinical trials. *Id.* at No. 183. These trials must go through three phases of testing, and the results should be published in a scientific research peer-reviewed article that undergoes critical review by independent scientists having expertise in oncology. *Id.*

As Dr. Tkaczuk notes, and as Defendants concede,[23] there is no reliable scientific research, in the form of clinical trials, peer-reviewed research, or otherwise, that scientifically supports the claim that the Metabolic Plan of Care or Cancer Plan of Care can treat, mitigate the symptoms of, or cure cancer in humans. Defendants thus lack the requisite substantiation to make cancer health claims.

*Count III: Unsubstantiated Parkinson's Disease Claims.* Dr. Ramsey Falconer, the Director of the Parkinson's & Movement Disorders Center at Inova Medical Group Neurology and Associate Professor of Neurology at the University of Virginia School of Medicine, opines that in the relevant scientific community for Parkinson's disease efficacy claims, competent and reliable scientific evidence means having two or more randomized, double-blind, placebo-controlled human clinical trials that go through three phases of testing using the product at issue. *Id.* at No. 222.

As Dr. Falconer notes, and Defendants concede, there is no reliable scientific research, in the form of clinical trials, peer-reviewed research, or otherwise, that scientifically supports the

---

[23] "Q: Were any clinical trials done to substantiate any of the claims made about the CANCER Plan of Care? A: No." *Id.* at No. 187, Tieu Dep. pg. 189, lines 16-19.

1  claim that the Metabolic Plan of Care can treat, mitigate the symptoms of, or cure Parkinson's

2  disease. Defendants thus lack the requisite substantiation to make Parkinson's disease health

3  claims.

4       In short, these experts agree that clinical trials are required before such health-related

5  claims can be made–the same standard that this Court endorsed with respect to COVID-19

6  claims in the TRO, *see* (Doc. No. 16 at 11-12,) and that courts generally have endorsed for health

7  claims. *See, e.g., Pantron I*, 33 F.3d at 1096 n.23("[C]laims that any food, drug, or device can

8  help a user achieve any result, such as weight loss, require competent scientific or medical tests

9  or studies."); *FTC v. Nat. Sol. Inc.*, No. 06-cv-6112, 2007 WL 8315533, at *4 (C.D. Cal. Aug. 7,

10  2007) (granting FTC's motion for summary judgment and applying the competent and reliable

11  scientific evidence standard to defendants' cancer prevention and treatment claims); *FTC v. Nat'l*

12  *Urological Grp.*, 645 F. Supp. 2d 1167, 1202 (N.D. Ga. 2008) (granting FTC's motion for

13  summary judgment and applying the competent and reliable scientific evidence standard to

14  defendants' weight loss and erectile function claims). Here, Defendants readily admit that they

15  lack the requisite competent and reliable scientific evidence. *See* SUF No. 111-112, 187-188,

16  224-225

17       *Count IV: False Claims of FDA Approval.* Whether a product has FDA approval is a

18  matter of fact: it is either true or false. Here, Defendants' claims that their products had FDA

19  approval were demonstrably false.

20       All the evidence shows, and Defendant Tieu admits, that the FDA repeatedly advised

21  Defendants that their products lacked FDA approval and that they could not market their

22  products as having FDA approval. Specifically, Defendants produced, and Defendant Tieu

23  admitted to receiving, five separate communications from the FDA advising Defendants that

their products lacked FDA approval, that they could not market their products as having FDA

approval, and that they needed to conduct clinical trials in order to obtain FDA approval. *Id.* at

No. 235-242.[24] Tieu admitted that no documents show Defendants had FDA approval,[25] and, to

the contrary, that all documentary evidence shows their products lacked such approval. *Id.* at No.

235-240, 241.[26]

The FDA has confirmed in sworn testimony that Defendants lacked its approval.  FDA

officials Howard R. Philips, Supervisory Regulatory Counsel, and Christopher Joneckis,

Associate Director for Review Management, have attested in sworn declarations that

Defendants' products do not have any FDA approval, *Id.* at No. 244-246, further corroborating

what the FDA directly told Defendants. Therefore, Defendants' FDA claims, like their other

health claims, are not only unsubstantiated, but also false.

As this Court noted when it granted TRO "[b]ecause defendants' representations completely

lack the requisite substantiation, they are likely to mislead consumers." (Doc. No. 16 at pg. 12, lines

6-7.)

### c.  *Defendants' Representations Were Material*

Finally, Defendants' representations were material, and there is no issue of fact

otherwise. To determine whether a representation is material, courts look to whether the

representation "'involves information that is important to consumers and, hence, likely to affect

---

[24] For example, on November 15, 2018, the FDA wrote GSP and Tieu stating that their application for FDA approval for ImunStem, the main ingredient in all their plans of care, "was never approved and cannot be used as a marketing authorization for the listed product." SUF No. 238.

[25] "Q: And you would agree, though, you don't have any written -- anything in writing from the FDA that says any GSN or GSP products were FDA approved in any way, shape, or form? A: Correct." SUF No. 243, pg. 178, lines 3- 7.

[26] Any attempt by Defendants to claim that someone from the FDA once verbally advised them that they had FDA approval should be disregarded as inadmissible hearsay, *see* e.g., *Blair Foods, Inc.*, 610 F.2d at 667, in addition to being self-serving, and contradicted by all the documentary evidence.

their choice of, or conduct regarding, a product.'" *Cyberspace.com*, 453 F.3d at 1201 (quoting *Cliffdale Assocs. Inc.*, 103 F.T.C. 110, 165 (1984)).

Defendants' claims about their plans of care and FDA-approval status are express and therefore presumed to be material. *Pantron I*, 33 F.3d at 1095-96. Likewise presumed material are claims, like those at issue here, that "significantly involve[s] health," including the safety and efficacy of the products at issue through alleged FDA approval. *See Kraft, Inc. v. FTC*, 970 F.2d 311, 322-323 (7th Cir. 1992) (citations omitted); *FTC v. Wellness Support Network, Inc.*, No. 10-cv-04879, 2014 U.S. Dist. LEXIS 21449, *56 (N.D. Cal. Feb. 19, 2014); *see also* (Doc. No. 16 at 12) ("all of defendants' representations are material because they concern consumer health").

Defendants' health claims, which are central to Defendants' advertisements and marketing, are of utmost importance to consumers as they involve life-or-death situations, quality of life issues for those suffering from disease, and in the case of the Emergency D-Virus treatment plan, a global pandemic. Consumers spent tens to hundreds of thousands of dollars on Defendants' products precisely because Defendants made these health-related claims. As this Court determined in granting the TRO, these claims were undoubtedly material to consumers' decisions.

### d.  The Undisputed Facts Establish that Defendants' Claims Violate the FTC Act

As the foregoing analysis demonstrates, the undisputed facts establish that Defendants' claims are deceptive in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52. No genuine issue of material fact exists that:

1) Defendants widely disseminated express claims that their plans of care could treat, mitigate the symptoms of, or cure COVID-19, cancer, and Parkinson's disease, and were FDA approved;

2) These claims were unsubstantiated, and Defendants' FDA approval claims were false; and

3)  These claims were material to consumers' choices in determining whether to
purchase these products.

Thus, Defendants' claims violate Sections 5(a) and 12, and summary judgment is
warranted on all counts in the FTC's Complaint.

VI.   THE PROPOSED ORDER PROVIDES APPROPRIATE PERMANENT EQUITABLE RELIEF TO
REMEDY DEFENDANTS' VIOLATIONS OF LAW

a.   PERMANENT INJUNCTION AGAINST DEFENDANTS' FALSE AND BASELESS CLAIMS IS
NEEDED

Injunctive relief against defendants is appropriate where, as here, there is risk that harm
will recur. *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) ("The purpose of an
injunction is to prevent future violations."). In assessing the likelihood of future violations, a
court considers two factors: "the deliberateness and seriousness of the present violation, and the
violator's past record with respect to unfair advertising practices." *Sears, Roebuck & Co. v. FTC*,
676 F.2d 385, 392 (9th Cir. 1982).

Here, Defendants' violations are serious, involving steering consumers, many of whom
were ill or fearful of becoming ill, away from proven medical care and treatment, toward
unsubstantiated products that cost hundreds to tens of thousands of dollars. Without an
injunction, Defendants will be able to continue marketing their products in the same or similar
manner while lacking the requisite substantiation, swindling consumers out of money and putting
their health at risk. Moreover, Defendants could easily change their product names, the diseases
for which they make their baseless claims, or formulation of ingredients, underscoring the need
for injunctive relief that extends beyond the precise claims made here. *See id.* ("Other
circumstances may be weighed [in assessing likelihood of future violations], including the
adaptability or transferability of the unfair practice to other products.").

Defendants' violations also were deliberate. Defendants knew their products lacked adequate substantiation and FDA approval, but continued to make those claims even after receiving an FTC warning letter and numerous communications from the FDA advising them their products did not have FDA approval and could not be marketed as having FDA approval.

Given their past record of disregard for the law, and for the reasons described above, Defendants likely will violate the law again if not enjoined.

### b. The FTC's Proposed Injunctive Relief is Appropriate and Necessary

The Commission's proposed injunction bears a direct and reasonable relation to their unlawful practices and would prevent Defendants from engaging in similar illegal practices in the future. The proposed injunctive relief reflects the scope of Defendants' deceptive practices, addressing their marketing of sham treatments that they claimed not only treated serious diseases but also to had FDA approval.

Specifically, FTC's proposed order contains provisions prohibiting the making of false or unsubstantiated health claims about the treatments at issue in the Complaint and other products Defendants market. Numerous courts, including the Supreme Court, have confirmed the FTC's authority to obtain injunctive relief covering challenged claims and also covering products and claims similar, but not identical, to the product at issue, when an advertiser has violated the FTC Act. *See*, *e.g.*, *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 395 (1965) ("The Commission is not limited to prohibiting the illegal practices in the precise form in which it is found to have existed in the past. Having been caught violating the [FTC] Act, respondents must expect some reasonable fencing in."); *Litton Indus., Inc., v. FTC*, 676 F.2d 364, 370 (9th Cir. 1982) (reasonable fencing-in provisions serve to "close all roads to the prohibited goal, so that (the FTC's) order may not be by-passed with impunity"); *FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1097 (9th Cir. 2014) ("[T]ose caught violating the FTC Act must expect some fencing

in."); *Trans World Accounts, Inc. v. FTC*, 594 F.2d 212, 215 (9th Cir. 1979) ("the FTC has authority to frame an order which extends beyond the immediate facts of the decided case. These 'fencing in' provisions are needed to prevent similar and related violations from occurring in the future.") (citation omitted).

Finally, the proposed order contains provisions to ensure enforceability. Courts have included such provisions to ensure compliance with permanent injunctions in FTC cases. *FTC v. CD Capital Invs., LLC*, 14-cv-1033, 2016 U.S. Dist. LEXIS 116989, at *17 (C.D. Cal. 2016) (order included permanent ban on advertising certain products, fencing-in relief, and compliance reporting and recording keeping provisions); *FTC v. Dinamica Financiera LLC*, 2010 U.S. Dist. LEXIS 88000, *48 (C.D. Cal. Aug. 19, 2010) (granting injunction and "barring defendants from offering loan modification or foreclosure relief services, as well as from making material misrepresentations in connection with the sale of any good or service.").

### c.  *GSN and GSP are Jointly and Severally Liable as a Common Enterprise*

When one or more business entities operate as part of a common enterprise, each may be held liable for the deceptive acts and practices of the others under the FTC Act. *See*, *e.g.*, *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1142-43 (9th Cir. 2010). Factors that determine the existence of a common enterprise include whether the companies were under common ownership and control; whether they pooled resources and staff; whether they shared phone numbers, employees, and email systems; and whether they jointly participated in a "common venture" in which they benefited from a shared business scheme or referred customers to one another.[27]

---

[27] *FTC v. Fed. Loan Modification Law Ctr.*, LLP, 09-cv-00401, 2010 U.S. Dist. LEXIS 146694, *12 (C.D. Cal. Nov. 17, 2010) (granting summary judgment where "the corporate Defendants were interrelated, commonly owned, operated by the same individual Defendants, and shared office space."); *see also FTC v. Health Formulas, LLC*, No. 2:14-cv-01659, 2015 U.S. Dist. LEXIS 59387, *18 (D. Nev. May 6, 2015); *FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1082 (C.D. Cal 2012).

1    Here, Defendants admit, and the evidence shows, that GSN and GSP operated as a

2 common enterprise, including through shared offices, managers, employees, stockholders, and

3 bank accounts with the same signatory. *See* Section III.B, *supra*. Because GSN and GSP meet

4 the common enterprise threshold, the Court should hold them jointly and severally liable for the

5 violations that have occurred.

6
       *d.   Tieu is Individually Liable*

7    An individual will be subject to injunctive relief if the FTC can prove that the individual

8 "participated directly" in the acts in question or "had authority to control them." *FTC v. Garvey*,

9
10 383 F.3d 891, 900 (9th Cir. 2004) (citing *FTC v. Publishing Clearing House, Inc.*, 104 F.3d 1168

11 (9th Cir. 1997)).

12    Tieu meets both these criteria. Tieu admits to having operated and controlled the common

13 enterprise, including through making the claims at issue in the Complaint. *See* SUF No. 247-258.

14
   He participated directly in the creation, design, development and implementation of the
15
   advertisement of each of the products at issue, and those advertisements could not have been
16
17 made without his approval. *Id*. Although knowledge is not required to obtain injunctive relief, he

18 admits to knowing that the efficacy claims at issue in this case were unsupported by clinical

19 studies. *Id.* at No. 111 (COVID-19), 185, 187 (cancer), 224 (Parkinson's disease). And he admits

20 that he was repeatedly advised by the FDA that Defendants' products did not have FDA

21 approval. *Id.* at No. 235-242. Despite this knowledge, he allowed unsubstantiated and false
22
   claims to be made when he had the authority and control to prevent them from being
23
   disseminated. *Id.* at No. 248, 250, 255.  Given these undisputed facts, the Court should hold Tieu
24
25 liable for these violations.

26    VII.   CONCLUSION

27    Because no genuine issue of material fact remains in dispute, the Court should enter

28

summary judgment in the FTC's favor, and grant relief in the form of the FTC's proposed final order.

Respectfully submitted,

Dated:  October 1, 2021

/s/Edward Hynes
EDWARD HYNES
New York Bar No. 4887584
ehynes@ftc.gov; (214) 979-9381
REID A. TEPFER
Texas Bar No. 24079444
rtepfer@ftc.gov; (214) 979-9395
Federal Trade Commission
1999 Bryan St. Ste. 2150
Dallas, Texas 75201
Fax: (214) 953-3079
Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

1

**CERTIFICATE OF SERVICE**

2

I, Edward Hynes, hereby certify that on October 1, 2021, I caused a copy of the foregoing

3

to be served upon counsel of record in a manner authorized by Rule 5(b)(2) of the Federal Rules

4

of Civil Procedure.

5

6

<u>/s/Edward Hynes</u>
Edward Hynes

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  EDWARD HYNES (New York 4887584)
   ehynes@ftc.gov; (214) 979-9381
2  REID A. TEPFER (Texas 24079444)
   rtepfer@ftc.gov; (214) 979-9385
3  Federal Trade Commission
   1999 Bryan Street, Suite 2150
4  Dallas, Texas 75201
   Fax: (214) 953-3079
5

6

7                  **UNITED STATES DISTRICT COURT**
                   **EASTERN DISTRICT OF CALIFORNIA**
8

   **FEDERAL TRADE COMMISSION**,            )   Case No.: 1:20-cv-01060-DAD-SKO
9                                            )
              Plaintiff,                     )   **PLAINTIFF FEDERAL TRADE**
10                                           )   **COMMISSION'S STATEMENT OF**
                                             )   **UNDISPUTED FACTS IN SUPPORT OF**
11            v.                             )   **ITS MOTION FOR SUMMARY**
                                             )   **JUDGMENT AS TO DEFENDANTS**
12                                           )   **GOLDEN SUNRISE NUTRACEUTICAL,**
   **GOLDEN SUNRISE NUTRACEUTICAL,**         )   **INC., GOLDEN SUNRISE**
13 **INC.**, *et al.*,                       )   **PHARMACEUTICAL, INC., AND HUU**
                                             )   **TIEU**
14            Defendants.                    )
                                             )
15                                           )
16 _____

17         Plaintiff Federal Trade Commission ("FTC") respectfully submits the following

18 Statement of Undisputed Facts in support of its Motion for Summary Judgment as to Defendants

19
   Golden Sunrise Nutraceutical, Inc. ("GSN"), Golden Sunrise Pharmaceutical, Inc. ("GSP"), and
20
   Huu Tieu ("Tieu," and, collectively with GSN and GSP, "Defendants"), pursuant to Federal Rule
21
22 of Civil Procedure ("Rule") 56 and Local Rule 260.

23         //

24         //

25         //

26

27

28

| No. | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | **I.   Jurisdiction and Venue** | |
| 1. | This Court has subject matter jurisdiction. | 28 U.S.C. §§ 1331, 1337(a), and 1345; Defendants' Second Amended Answer ("Answer"), (Doc No. 40 at 2 ¶ 2.) |
| 2. | Venue is proper in this District. | 28 U.S.C. § 1391(b)(1), (b)(2), and (c)(1); 15 U.S.C. § 53(b); Answer, (Doc No. 40 at 2 ¶ 3.) |
| | **II.  The Parties** | |
| | **a)  The FTC** | |
| 3. | The FTC is an independent agency of the United States Government created by statute. | 15 U.S.C. §§ 41–58. |
| 4. | The FTC enforces Section 5(a) of the FTC Act, which prohibits unfair or deceptive acts or practices in or affecting commerce. | 15 U.S.C. § 45(a). |
| 5. | The FTC enforces Section 12 of the FTC Act, which prohibits false advertisements for food, drugs, devices, services, or cosmetics in or affecting commerce. | 15 U.S.C. § 52. |
| 6. | The FTC is authorized to initiate federal district court proceedings by its own attorneys to enjoin violations of the FTC Act. | 15 U.S.C. § 53(b). |
| | **b)  Defendants** | |
| 7. | GSN is a Delaware corporation with its principal place of business at 219 North E Street, Porterville, California 93257. | Answer, (Doc No. 40 at 3 ¶ 6); MSJ App. at 326, line 21-327, line 8 (Tieu Dep. pg. 23, lines 21-pg. 24, line 8);[1] |

---

[1] Any references to Defendant Tieu's deposition will include cites to both where these specific pages can be located in Plaintiff's Appendix, as well as cites to the original deposition transcript, the entirety of which is being provided separately to the Court pursuant to Local Rules 133(j) and 250.1(a)

| No. | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
|  |  | Plaintiff's TRO Appendix ("TRO App.") at (Doc. No. 3-5 at 19.) |
| 8. | GSN has advertised, marketed, distributed, or sold products to consumers throughout the United States. | Answer, (Doc No. 40 at 3 ¶ 6); MSJ App. at 355, lines 12-19 (Tieu Dep. Pg. 84, lines 12-19.) |
| 9. | GSP is a California corporation with its principal place of business at 560 West Putnam Avenue, Suite 2, Porterville, California 93257. | TRO App., (Doc. No. 3-5 at 15.) |
| 10. | GSP transacts business at 219 North E Street, Porterville, California 93257. | MSJ App. at 38 ¶ 15; MSJ App. at 63 ¶ 15; MSJ App. at 88 ¶ 15; MSJ App. at 326, line 21-327, line 11 (Tieu Dep. pg. 23, lines 21-pg. 24, line 11.) |
| 11. | GSP has advertised, marketed, distributed, or sold products to consumers throughout the United States. | Answer, (Doc No. 40 at 3 ¶ 7.) |
| 12. | At all relevant times, Tieu was the President and Chief Executive Officer of GSN and GSP. | Answer, (Doc No. 40 at 3 ¶ 8); MSJ App. at 324, line 10-pg. 325, line 1 (Tieu Dep. pg. 17, line 10-pg. 18, line 1.) |
| 13. | Tieu has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of GSN and GSP. | Answer, (Doc No. 40 at 3 ¶ 8); MSJ App. at 332, line 15-333, line 6; 334 lines 8-12; 338, lines 18-20 (Tieu Dep. pg. 34, line 15-pg. 35, line 6; pg. 36, lines 8-12; pg. 41, lines 18-20.) |
| 14. | Tieu resides in this District and transacts or has transacted business in this District and throughout the United States. | Answer, (Doc No. 40 at 3 ¶ 8); |

| NO. | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|-----|-----------------|---------------------|
|     |                 | MSJ App. at 323, lines 6-13 (Tieu Dep. pg. 8, lines 6-13.) |
| *i.    Defendants' Common Enterprise* | | |
| 15. | GSN and GSP have operated as a common enterprise. | *See* Answer, (Doc No. 40 at 3 ¶ 10.) |
| 16. | GSN and GSP shared two principal stockholders. | *See* MSJ App. at 37 ¶ 2-3 (Loeffler and Ayala); |
|     |                 | MSJ App. at 62 ¶ 2-3 (Loeffler and Ayala); |
|     |                 | MSJ App. at 87 ¶ 2-3 (Loeffler and Ayala); |
|     |                 | MSJ App. at 7; |
|     |                 | MSJ App. at 22; |
|     |                 | MSJ App. at 328, lines 22-24 (Tieu Dep. Pg. 25, lines 22-24.) |
| 17. | GSN and GSP shared a board member. | MSJ App. at 37 ¶ 4 (Loeffler); |
|     |                 | MSJ App. at 62 ¶ 4 (Loeffler); |
|     |                 | MSJ App. at 87 ¶ 4 (Loeffler); |
|     |                 | MSJ App. at 7; |
|     |                 | MSJ App. at 22; |
|     |                 | MSJ App. at 330, lines 3-7 (Tieu Dep. pg. 30, lines 3-7.) |
| 18. | The sole two corporate officers of GSP were corporate officers of GSN. | MSJ App. at 37 ¶¶ 5-6 (Tieu and Loeffler); |
|     |                 | MSJ App. at 62 ¶¶ 5-6 (Tieu and Loeffler); |
|     |                 | MSJ App. at 87 ¶¶ 5-6 (Tieu and Loeffler); |
|     |                 | MSJ App. at 22. |

| No. | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| 19. | GSN and GSP shared common managers. | MSJ App. at 37 ¶ 7;<br>MSJ App. at 62 ¶ 7;<br>MSJ App. at 87 ¶ 7. |
| 20. | GSN and GSP maintained the same accountant, who owned at least 10 percent of non-voting equity in GSN. | MSJ App. at 37 ¶ 8;<br>MSJ App. at 62 ¶ 8;<br>MSJ App. at 87 ¶ 8;<br>MSJ App. at 20;<br>MSJ App. at 331, lines 9-13 (Tieu Dep. pg. 31, lines 9-13.) |
| 21. | GSN and GSP shared at least five employees. | MSJ App. at 38 ¶ 13 (Aerzbak);<br>MSJ App. at 63 ¶ 13 (Aerzbak);<br>MSJ App. at 88 ¶ 13 (Aerzbak);<br>MSJ App. at 7 (Tieu and Loeffler); 17 (Nungaray and Salazar) MSJ App. at 22 (Tieu and Loeffler); 32 (Nungaray and Salazar.) |
| 22. | GSN and GSP both operated from 219 North E Street, Porterville, California 93257. | MSJ App. at 38 ¶ 15;<br>MSJ App. at 63 ¶ 15;<br>MSJ App. at 88 ¶ 15;<br>MSJ App. at 325 line 21-326, line 11 (Tieu Dep. pg. 23, line 21-pg. 24, line 11.) |
| 23. | GSN and GSP shared a post office box at P.O. Box 510 Porterville, California 93258. | MSJ App. at 38 ¶ 16;<br>MSJ App. at 63 ¶ 16;<br>MSJ App. at 88 ¶ 16;<br>MSJ App. at 327, lines 16-18 (Tieu Dep. pg. 24, lines 16-18.) |

| No. | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| 24. | GSN and GSP jointly operated a website at the URL https://goldensunrisenutraceutical.com/. | MSJ App. at 38 ¶¶ 17-18; MSJ App. at 63 ¶¶ 17-18; MSJ App. at 88 ¶¶ 17-18; MSJ App. at 332, lines 15-20 (Tieu Dep. pg. 34, lines 15-20.) |
| 25. | GSN and GSP jointly operated a website at the URL https://goldensunrisepharmaceutical.com/. | MSJ App. at 39 ¶¶ 23-24; MSJ App. at 64 ¶¶ 23-24; MSJ App. at 89 ¶¶ 23-24; MSJ App. at 333, lines 7-9 (Tieu Dep. pg. 35, lines 7-9.) |
| 26. | GSN and GSP operated or participated in operating a Facebook social media account at the following URL: https://www.facebook.com/GoldenSunriseNutraceutical/. | MSJ App. at 40 ¶¶ 29-30; MSJ App. at 65 ¶¶ 29-30; MSJ App. at 90 ¶¶ 29-30; MSJ App. at 334, lines 13-16 (Tieu Dep. pg. 36, lines 13-16.) |
| 27. | GSN and GSP operated or participated in operating a Facebook social media account at the following URL: https://www.facebook.com/goldensunrisepharma/. | MSJ App. at 41 ¶¶ 35-36; MSJ App. at 66 ¶¶ 35-36; MSJ App. at 337, lines 18-21 (Tieu Dep. pg. 40, lines 18-21.) |
| 28. | GSN and GSP operated or participated in operating a YouTube channel at the following URL: https://www.youtube.com/channel/UC_10G-V0hw4DPQLhl4LdyXg. | MSJ App. at 41-42 ¶¶ 41-42; MSJ App. at 66-67 ¶¶ 41-42; MSJ App. at 91-92 ¶¶ 41-42; MSJ App. at 338, lines 8-10 (Tieu Dep. pg. 41, lines 8-10.) |
| 29. | GSN and GSP's YouTube channel contained both "Golden Sunrise Nutraceutical" and "Golden Sunrise Pharmaceutical" branding. | *See* TRO App. (Doc. No. 3-10 at 60); |

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
|  |  | MSJ App. at 339, lines 19-21 (Tieu Dep. pg. 42, lines 19-21.) |
| 30. | GSN and GSP both advertised, marketed, offered for sale, or sold the same products for the treatment, mitigation of symptoms of, or cure of COVID-19. | MSJ App. at 43 ¶¶ 50-51; MSJ App. at 68 ¶¶ 50-51; MSJ App. at 346, line 22-347, line 4 (Tieu Dep. pg. 67, line 22-pg. 68, line 4.) |
| 31. | GSN and GSP both advertised, marketed, offered for sale, or sold the same products for the treatment, mitigation of symptoms of, or cure of cancer. | MSJ App. at 43-44 ¶¶ 52-53 MSJ App. at 68-69 ¶¶ 52-53; MSJ App. at 346, line 22-347, line 4 (Tieu Dep. pg. 67, lines 22-pg. 68, line 4.) |
| 32. | GSN and GSP both advertised, marketed, offered for sale, or sold the same products for the treatment, mitigation of symptoms of, or cure of Parkinson's disease. | MSJ App. at 44 ¶¶ 54-55; MSJ App. at 69 ¶¶ 54-55; MSJ App. at 346, line 22-347, line 4 (Tieu Dep. pg. 67, lines 22-pg. 68, line 4.) |
| | *ii.*    *Defendants' Products/Plans of Care* | |
| 33. | Defendants promoted and sold dietary supplement products between at least 2017 and the date Plaintiff filed the Complaint. | *See* Answer, (Doc No. 40 at 3-4 ¶ 12); *See* TRO App. (Doc. 3-5 at 94-95, 102-103, 105-111); MSJ App. at 345, lines 14-22; 346 line 22-347, line 4 (Tieu Dep. pg. 60, lines 14-22; pg. 67, line 22-pg. 68, line 4.) |
| 34. | Defendants claimed the products they sold provided numerous health benefits, including in the treatment of serious diseases. | Answer, (Doc No. 40 at 3-4 ¶ 12;) |

| No. | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|-----|-----------------|---------------------|
|     |                 | TRO App. (Doc. Nos. 3-5 at 21, 23, 26, 45, 46, 86, 123, 156; 3-6 at 8, 9.) |
| 35. | The GSN and GSP webpages advertised, marketed, offered for sale, or sold products to treat, mitigate the symptoms of, or cure COVID-19, cancer, and Parkinson's disease. | MSJ App. at 45-46 ¶¶ 62-66; MSJ App. at 70-71 ¶¶ 62-66; MSJ App. at 95-96 ¶¶ 62-66; MSJ App. at 343, line 25-344, line 10; 349, lines 19-21; 368, lines 14-17 (Tieu Dep. pg. 57, line 25—pg. 58, line 10; pg. 72, lines 19-21; pg. 125, lines 14-17); TRO App. (Doc. 3-5 at 21-23; 3-10 at 2.) |
| 36. | Defendants advertised, marketed, and sold a product line called the "Emergency D-Virus Plan of Care." | TRO App. (Doc. No. 3-5 at 59-60;) Answer, (Doc No. 40 at 3-4 ¶ 16.) |
| 37. | The Emergency D-Virus Plan of Care contained four products: ImunStem, Aktiffvate, AnterFeeron-1, and AnterFeeron-2. | MSJ App. at 46 ¶ 67; MSJ App. at 71 ¶ 67; MSJ App. at 96 ¶ 67; TRO App. (Doc. No. 3-5 at 57-60.) |
| 38. | Defendants sold the Emergency D-Virus treatment plan for up to $23,000, paid either through insurance or through customer payments. | MSJ App. at 247 ¶16 (denying producing a sample of the Emergency D-Virus Plan of Care because each set of products purportedly costs $23,000); MSJ App. at 354, lines 15-19 (Tieu Dep. pg. 78, lines 15-19.) |

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| 39. | Defendants advertised, marketed, and sold a product line called the "Metabolic Plan of Care." | Answer, (Doc No. 40 at 3-4 ¶ 16); TRO App. (Doc. 3.5 at 165); MSJ App. at 344, lines 6-10, 348, lines 14-17 (Tieu Dep. pg. 58, lines 6-10; pg. 125, lines 14-17.) |
| 40. | The Metabolic Plan of Care contained 14 products: ImunStem, Aktiffvate, AnterFeeron-1, AnterFerron-2, CrProtein, DetoxHerb-1, DetoxHerb-2, DetoxHerb-NR, DetoxHerb-PI, HyProtein-1, HyProtein-2, HyProtein-3, HyProtein-4, and LyProtein. | MSJ App. at 46 ¶ 68; MSJ App. at 71 ¶ 68; MSJ App. at 96 ¶ 68; TRO App. (Doc. 3.5 at 165.) |
| 41. | Defendants sold the Metabolic treatment plan for up to $170,000, paid either through insurance or through customer payments. | MSJ App. at 247 ¶16 (denying producing a sample of the Metabolic Plan of Care because each set of products purportedly costs $170,000); MSJ App. at 364, line 16-365, line 2 (Tieu Dep. pg. 117, lines 16-118, line 2); TRO App. (Doc. 3-5 at 100.) |
| 42. | Defendants advertised, marketed, and sold a product line called the "Cancer Plan of Care." | *See* Answer, (Doc No. 40 at 3-4 ¶ 16;) *See* TRO App. (Doc. 3-5 at 132;) MSJ App. at 343, line 25-344, line 5 (Tieu Dep. pg. 57, line 25—pg. 58, line 5.) |
| 43. | The Cancer Plan of Care contained 14 products: ImunStem, Aktiffvate, AnterFeeron-1, AnterFerron-2, CrProtein, KemoHerb-1, KemoHerb-2, KemoHerb-NR, KemoHerb-PI, HyProtein-1, HyProtein-2, HyProtein-3, HyProtein-4, and LyProtein. | MSJ App. at 46-47 ¶ 69; MSJ App. at 72 ¶ 69; MSJ App. at 97 ¶ 69; |

| No. | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | | TRO App. (Doc. 3-5 at 132.) |
| 44. | Defendants sold the Cancer Plan of Care for up to $170,000, paid either through insurance or through customer payments. | MSJ App. at 247 ¶16 (denying producing a sample of the Metabolic Plan of Care because each set of products purportedly costs $170,000); MSJ App. at 391, lines 13-23 (Tieu Dep. pg. 191, lines 13-23); TRO App. (Doc. 3-5 at 100.) |
| 45. | ImunStem's primary ingredients were 260mg of olive leaf extract, 52mg of yarrow extract, and 63mg of rosemary extract per serving. | MSJ App. at 47 ¶ 70; MSJ App. at 72 ¶ 70; MSJ App. at 97 ¶ 70; Answer, (Doc No. 40 at 5 ¶ 28;) TRO App. (Doc. 3-5 at 145.) |
| 46. | Aktiffvate's primary ingredients were 175mg of turmeric extract, 40mg of cayenne extract, and 20mg of eucalyptus extract per serving. | MSJ App. at 47 ¶ 71; MSJ App. at 72 ¶ 71; MSJ App. at 97 ¶ 71; Answer, (Doc No. 40 at 5 ¶ 28;) TRO App. (Doc. 3-5 at 146.) |
| 47. | AnterFeeron-1's primary ingredients were 40mg of bilberry leaf, 120mg of graviola, and 80mg of goldenseal per serving. | MSJ App. at 47 ¶ 72; MSJ App. at 72 ¶ 72; MSJ App. at 97 ¶ 72; Answer, (Doc No. 40 at 5 ¶ 30); TRO App. (Doc. 3-5 at 137.) |

| No. | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| 48. | AnterFeeron-2's primary ingredients were 45mg of mistletoe, 20mg of astragalus, and 95mg of reishi per serving. | Answer, (Doc No. 40 at 5 ¶ 30); MSJ App. at 47 ¶ 73; MSJ App. at 72 ¶ 73; MSJ App. at 97 ¶ 73; TRO App. (Doc. 3-5 at 138.) |
| 49. | CrProtein's primary ingredients were 35mg of cat's claw, 10mg of selfheal, and 20mg of rosemary per serving. | Answer, (Doc No. 40 at 5 ¶ 32); MSJ App. at 47 ¶ 74; MSJ App. at 72 ¶ 74; MSJ App. at 97 ¶ 74; TRO App. (Doc. 3-5 at 139.) |
| 50. | DetoxHerb-1's primary ingredients were 100mg of poke weed, 65mg of graviola, and 17mg of turmeric per serving. | MSJ App. at 47 ¶ 75; MSJ App. at 72 ¶ 75; MSJ App. at 97 ¶ 75; Answer, (Doc No. 40 at 5 ¶ 32;) TRO App. (Doc. 3-5 at 166.) |
| 51. | DetoxHerb-2's primary ingredients were 110mg of olive leaf, 70mg of papaya leaf, and 120mg of vinca per serving. | MSJ App. at 47-48 ¶ 76; MSJ App. at 72-73 ¶ 76; MSJ App. at 97-98 ¶ 76; Answer, (Doc No. 40 at 5 ¶ 32;) TRO App. (Doc. 3-5 at 167.) |
| 52. | DetoxHerb-NR's primary ingredients were 60mg of gotu kola, 35mg of foti, and 45mg of vinca per serving. | MSJ App. at 48 ¶ 77; MSJ App. at 73 ¶ 77; MSJ App. at 98 ¶ 77; Answer, (Doc No. 40 at 5 ¶ 32;) |

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| | | TRO App. (Doc. 3-5 at 169.) |
| 53. | DetoxHerb-PI's primary ingredients were 40mg of bilberry, 120mg of graviola, and 50mg of goldenseal per serving. | MSJ App. at 48 ¶ 78; MSJ App. at 73 ¶ 78; MSJ App. at 98 ¶ 78; Answer, (Doc No. 40 at 5 ¶ 32;) TRO App. (Doc. 3-5 at 168.) |
| 54. | HyProtein-1's primary ingredients were 95mg of astralagus, 40mg of oregano, and 70mg of cat's claw per serving. | MSJ App. at 48 ¶ 79; MSJ App. at 73 ¶ 79; MSJ App. at 98 ¶ 79; Answer, (Doc No. 40 at 5 ¶ 32;) TRO App. (Doc. 3-5 at 140.) |
| 55. | HyProtein-2's primary ingredients were 40mg of green tea, 75mg of reishi, and 55mg of blood root per serving. | MSJ App. at 48 ¶ 80; MSJ App. at 73 ¶ 80; MSJ App. at 98 ¶ 80; Answer, (Doc No. 40 at 5 ¶ 32;) TRO App. (Doc. 3-5 at 141.) |
| 56. | HyProtein-3's primary ingredients were 60mg of garlic, 30mg of turmeric, and 45mg of ashwagandha per serving. | MSJ App. at 48 ¶ 81; MSJ App. at 73 ¶ 81; MSJ App. at 98 ¶ 81; Answer, (Doc No. 40 at 5 ¶ 32;) *See* TRO App. (Doc. 3-5 at 142.) |
| 57. | HyProtein-4's primary ingredients were 25mg of garlic, 30mg of reishi, and 50mg of St. John's wort per serving. | MSJ App. at 48 ¶ 82; MSJ App. at 73 ¶ 82; MSJ App. at 98 ¶ 82; |

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| | | Answer, (Doc No. 40 at 5 ¶ 32;) |
| | | TRO App. (Doc. 3-5 at 143.) |
| 58. | LyProtein's primary ingredients were 25mg of horse chestnut, 40mg of garlic, and 50mg of turmeric per serving. | MSJ App. at 48 ¶ 83; MSJ App. at 73 ¶ 83; MSJ App. at 98 ¶ 83; Answer, (Doc No. 40 at 5 ¶ 32;) TRO App. (Doc. 3-5 at 144.) |
| 59. | KemoHerb-1's primary ingredients were 40mg of bilberry leaf, 120mg of graviola, and 80mg of goldenseal per serving. | TRO App. (Doc. 3-5 at 133.) |
| 60. | KemoHerb-2's primary ingredients were 84mg of olive leaf, 112mg of papaya leaf, and 110mg of vinca per serving. | MSJ App. at 49 ¶ 85; MSJ App. at 74 ¶ 85; MSJ App. at 99 ¶ 85; *See* TRO App. (Doc. 3-5 at 134.) |
| 61. | KemoHerb-NR's primary ingredients were 60mg of gotu kola, 35mg of foti, and 45mg of vinca per serving. | MSJ App. at 49 ¶ 86; MSJ App. at 74 ¶ 86; MSJ App. at 99 ¶ 86; TRO App. (Doc. 3-5 at 136.) |
| 62. | KemoHerb-PI's primary ingredients were 40mg of bilberry, 120mg of graviola, and 50mg of goldenseal per serving. | MSJ App. at 49 ¶ 87; MSJ App. at 74 ¶ 87; MSJ App. at 99 ¶ 87; TRO App. (Doc. 3-5 at 135.) |

| No. | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | **III. Factual Background** | |
| *a)* | **Count One: Unsubstantiated Claims That the Emergency D-Virus Plan of Care Could Treat, Mitigate the Symptoms of, and Cure COVID-19** | |
| | *i.      Marketing and Advertising COVID-19 Claims* | |
| 63. | Defendants began advertising, marketing, offering for sale, or selling the Emergency D-Virus Plan of Care for the treatment, mitigation of symptoms of, or cure of COVID-19 in either March or early April, 2020. | MSJ App. at 113 ¶¶ 9-11; MSJ App. at 158 ¶¶ 9-11; MSJ App. at 203 ¶¶ 9-11; MSJ App. at 348, lines 1-6 (Tieu Dep. pg. 69, lines 1-6); TRO App. (Doc. 3-6 at 6-7.) |
| 64. | Defendants advertised or marketed the Emergency D-Virus treatment plan through websites, social media, and physical billboards. | MSJ App. at 115 ¶¶ 21-24; 118-19 ¶¶ 32-36 (websites and social media); MSJ App. at 160 ¶¶ 21-24; 163-64 ¶¶ 32-36 (websites and social media); MSJ App. at 205 ¶¶ 21-24; 208-09 ¶¶ 32-36 (websites and social media); MSJ App. at 350, lines 20-23; 353, line 23-354 line 13; 356, line 7-357, line 9 (Tieu Dep. pg. 73, lines 20-23; pg. 75, line 12-76, line13; pg. 86, line 7-87, line 9); Answer, (Doc No. 40 at 48) (physical billboards); TRO App (Doc. 3-5 at 21-46; Doc. 3.6 at 1-7; Doc. 3-10 at 69-72.) |
| 65. | Defendants advertised, marketed, offered for sale, or sold the Emergency D-Virus Plan of Care through the GSN website located at URL <https://goldensunrisenutraceutical.com/> and the GSP | MSJ App. at 115 ¶¶ 21-22; 118-19 ¶¶ 34-35; MSJ App. at 160 ¶¶ 21-22; 163-64 ¶¶ 34-35; |

| No. | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | website located at URL <https://goldensunrisepharmaceutical.com/>. | MSJ App. at 205 ¶¶ 21-22; 208-09 ¶¶ 34-35; TRO App. (Doc. 3-5 at 23; Doc. 3-10 at 2.) |
| 66. | Defendants' advertisements of their Emergency D-Virus treatment plan typically directed consumers to a product description document available on Defendants' GSN website. | MSJ App. at 356, line 2-357, line 9 (Tieu Dep. pg. 86, line 2-pg. 87, lines 9); MSJ App. at 403-414; TRO App. (Doc. 3-5 at 23; Doc. 3-6 at 4; Doc. 3-10 at 2, 6.) |
| 67. | Until approximately May 11, 2020, Defendants expressly claimed in the product description document for their Emergency D-Virus Plan of Care that the Emergency D-Virus plan could effectively treat COVID-19. | MSJ App. at 115-16 ¶¶ 25-27; MSJ App. at 160-62 ¶¶ 25-27; MSJ App. at 206-07 ¶¶ 25-27; Answer, (Doc No. 40 at 6 ¶ 40); TRO App. (Doc. 3-10 at 18.) |
| 68. | Until approximately May 11, 2020, Defendants stated in the Emergency D-Virus product description document that: "Stephen R. MEIS, M.D., Board Certified, I strongly recommend Golden Sunrise Nutraceutical Incorporation herbal products *ImunStem* and *Aktiffvate*, along with their *AnterFeerons* product, as uniquely qualified to treat and modify the course of the Coronavirus epidemic in CHINA and other countries." (Emphasis in original.) | Answer, (Doc No. 40 at 6 ¶ 40); TRO App. (Doc. 3-10 at 13.) |
| 69. | Until approximately May 11, 2020, Defendants expressly claimed in the Emergency D-Virus product description document that with increased use of one of the supplements included in the Emergency D-Virus treatment plan, "disappearance of viral symptoms is expected within two (2) to four (4) days." | Answer, (Doc No. 40 at 7 ¶ 40); TRO App. (Doc. 3-10 at 14.) |
| 70. | Until approximately May 11, 2020, Defendants expressly claimed in the Emergency D-Virus product description | Answer, (Doc No. 40 at 7 ¶ 40); |

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| | document that the recommended dietary supplements "are available now and once they are started, they will help alleviate the people immediately [sic] with the acute illness of the Coronavirus." | TRO App (Doc. 3-10 at 15.) |
| 71. | Until approximately May 11, 2020, Defendants expressly claimed in the Emergency D-Virus product description document, "Physicians have observed that using Emergency D-Virus Plan of Care provokes a significant response, i.e., a reduction in symptoms in patients with the COVID-19 virus." | Answer, (Doc No. 40 at 7 ¶ 40); TRO App. (Doc. 3-10 at 15.) |
| 72. | Until approximately May 11, 2020, Defendants expressly claimed in the Emergency D-Virus product description document, "Up until now, because there has been no effective treatment, the effort of controlling the ***COVID-19*** virus pandemic has necessitated a preventative approach . . . Now with the ***EMERGENCY D-Virus Plan of Care*** showing effective treatment for the ***COVID-19*** virus, the focus can change, at [sic] it should, from prevention to treatment. . . . Prompt administration of this treatment will significantly diminish the occurrence of serious cases and need for hospitalization." (Emphasis in original). | Answer, (Doc No. 40 at 6 ¶ 40); TRO App. (Doc. 3-10 at 18.) |
| 73. | Defendants advertised, marketed, offered for sale, or sold the Emergency D-Virus Plan of Care through Facebook. | MSJ App. at 115 ¶¶ 23-24; MSJ App. at 160 ¶¶ 23-24; MSJ App. at 205 ¶¶ 23-24; TRO App. (Doc. 3-6 at 4-7.) |
| 74. | In a March 3, 2020, post on their GSN Facebook page, Defendants posted materials they describe as "the best Coronavirus advice I have seen yet!" The materials claim: "There is one company with a proven cure. WHO and CDC don't want to use it because it is not in vaccine form but an oral formula. GSP /Nutraceutical [] Tested and Proven in Wuhan." | TRO App. (Doc. 3-6 at 6-7.) |
| 75. | In a March 18, 2020, post on their GSN Facebook page, Defendants claim that products in their Emergency D-Virus treatment plan, "ImunStem, Aktiffvate, and AnterFeeron are now on the market, especially in the current global situation of new coronavirus invasion, they will immediately help relieve patients with acute | TRO App. (Doc. 3-6 at 5.) |

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| | disease of coronavirus. . . . The efficacy of this product [i.e. treatment plan] has been witnessed by countless users!" | |
| 76. | In an April 9, 2020, post on their GSN Facebook page, reprinted was the text of and provide a link to an article in a local newspaper in which former Defendant Meis: Promotes ImunStem and Aktiffvate as potential treatments for COVID-19, with the article profiling a particular consumer who allegedly improved because of the treatment. | TRO App. (Doc. 3-6 at 2.) |
| 77. | In an April 9, 2020, post on their GSN Facebook page, Defendants reprinted the text of and provide a link to an article in a local newspaper in which Defendant Meis claims, "ImunStem, a dietary supplement, was approved by the Food and Drug Administration in 2018 as a treatment for serious, life threatening conditions." | TRO App. (Doc. 3-6 at 2.) |
| 78. | In an April 16, 2020, post on their GSN Facebook page, Defendants posted an advertisement containing an image substantially similar to their billboard advertisements, stating "GO GO CHECK THE TREATMENT" and providing a link to their GSN website. | TRO App. (Doc. 3-6 at 4.) |
| 79. | Defendants marketed the Emergency D-Virus treatment plan as a "NEW COVID-19 Treatment" through at least four billboards in California, each of which looks substantially similar to the following:<br><br> | MSJ App. at 352, line 1-353, line 9 (Tieu Dep. pg. 75, line1- pg. 76, line 9;)<br><br>MSJ App. at 399-404;<br><br>Answer, (Doc No. 40 at 7 ¶ 48);<br><br>TRO App. (Doc. 3-10 at 67 (¶¶ 3-4), 69-72.) |
| ii. | *Defendants Were Given an Opportunity to Correct Their COVID-19 Marketing and Advertising* | |
| 80. | The FTC issued a warning letter to GSP on April 29, 2020, giving GSP the opportunity to remove all | MSJ App. at 117 ¶ 29; |

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| | unsubstantiated claims that their product could prevent, treat, or cure COVID-19. | MSJ App. at 162 ¶ 29; MSJ App. at 207 ¶ 29; Answer, (Doc No. 40 at 6 ¶ 41); TRO App. (Doc. 3-6 at 29-30.) |
| 81. | After receipt of the FTC's warning letter, Defendants modified the Emergency D-Virus product description document to replace "COVID-19 virus" with terms such as "the virus," "viral," or "the viral pandemic." | MSJ App. at 117-18 ¶¶ 30-31; MSJ App. at 162-63 ¶¶ 30-31; MSJ App. at 207-08 ¶¶ 30-31; Answer, (Doc No. 40 at 6 ¶ 42;) MSJ App. at 359, lines 11-15; 361, lines 3-24 (Tieu Dep. pg. 98, lines 11-15; Pg. 101, line 3-24;) TRO App. (Doc. 3-5 at 49, 50, 55.) |
| 82. | In the modified Emergency D-Virus product description document, Defendants continued to represent that their Emergency D-Virus treatment plan can effectively treat COVID-19. | Answer, (Doc No. 40 at 6 ¶ 43); TRO App. (Doc. 3-5 at 49, 50, 52, 55.) |
| 83. | In the revised Emergency D-Virus product description document, Defendants represented, "Stephen R. MEIS, M.D., Board Certified (Dr. Meis), I strongly recommend GSN Incorporation herbal products *ImunStem* and *Aktiffvate*, along with their *AnterFeerons* product, as uniquely qualified to treat and modify the course of the **virus** epidemic in CHINA and other countries." (Emphasis in original). | Answer, (Doc No. 40 at 6 ¶ 43); TRO App. (Doc. 3-5 at 49.) |
| 84. | In the revised Emergency D-Virus product description document, Defendants represented that with increased use of one of the supplements included in the Emergency D-Virus treatment plan, "disappearance of viral symptoms is expected within two (2) to four (4) days." | Answer, (Doc No. 40 at 6 ¶ 43); TRO App. (Doc. 3-5 at 50.) |

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| 85. | In the revised Emergency D-Virus product description document, Defendants represented that the recommended dietary supplements "are available now and once they are started, they will help alleviate the people immediately [sic] with the acute illness of the virus." | Answer, (Doc No. 40 at 6 ¶ 43); TRO App. (Doc. 3-5 at 50.) |
| 86. | In the revised Emergency D-Virus product description document, Defendants represented, "Physicians have observed that using Emergency D-Virus Plan of Care provokes a significant response, i.e., a reduction in symptoms in patients with the virus." | Answer, (Doc No. 40 at 6 ¶ 43); TRO App. (Doc. 3-5 at 52.) |
| 87. | In the revised Emergency D-Virus product description document, Defendants represented, "Up until now, because there has been no effective treatment, the effort of controlling the viral pandemic has necessitated a preventative approach . . . Now with the **_EMERGENCY D-Virus Plan of Care_** showing effective treatment for the **virus**, the focus can change, at [sic] it should, from prevention to treatment. . . . Prompt administration of this treatment will significantly diminish the occurrence of serious cases and need for hospitalization." (Emphasis in original). | Answer, (Doc No. 40 at 6 ¶ 43); TRO App. (Doc. 3-5 at 55.) |
| 88. | Defendants installed and maintained a banner advertisement stating "NEW COVID-19 TREATMENT EMERGENCY D-Virus Plan of Care" on the GSP website homepage that directed consumers to the original Emergency D-Virus Plan of Care product description document. | MSJ App. at 119 ¶ 38; MSJ App. at 164 ¶ 38; MSJ App. at 209 ¶ 38; TRO App. (Doc. 3-5 at 4 and 12 (¶¶ 15 and 37); Doc. 3-10 at 2, 6.) |
| 89. | Defendants installed and maintained a banner advertisement stating "NEW COVID-19 TREATMENT EMERGENCY D-Virus Plan of Care" on the GSN website homepage that directed consumers to the original Emergency D-Virus Plan of Care product description document. | TRO App. (Doc. 3-5 at 4 and 12 (¶¶ 15 and 37); Doc. 3-10 at 2, 6.) |
| 90. | In response to the FTC's warning letter, Defendants reworded the banner advertisement on the GSP homepage to "Innovative Virus Treatment EMERGENCY D-Virus Plan of Care." | MSJ App. at 119-20 ¶¶ 39-41; MSJ App. at 164-65 ¶¶ 39-41; MSJ App. at 209-10 ¶¶ 39-41; |

| No. | Undisputed Fact | Supporting Evidence |
|-----|-----------------|---------------------|
| | | Answer, (Doc No. 40 at 7 ¶ 45);<br><br>TRO App. (Doc. 3-5 at 61.) |
| 91. | The reworded banner advertisement on the GSP homepage directed consumers to the revised product description document via hyperlink. | MSJ App. at 120-21 ¶¶ 43;<br><br>MSJ App. at 165-66 ¶¶ 43;<br><br>MSJ App. at 210-11 ¶¶ 43;<br><br>Answer, (Doc No. 40 at 7 ¶ 45);<br><br>TRO App. (Doc. 3-5 at 47-60.) |
| 92. | Defendants removed the banner advertisement from their GSP webpage on or about June 5, 2020. | MSJ App. at 121 ¶¶ 44-45;<br><br>MSJ App. at 166 ¶¶ 44-45;<br><br>MSJ App. at 211 ¶¶ 44-45;<br><br>Answer, (Doc No. 40 at 7 ¶ 46.) |
| 93. | Defendants maintained the "Innovative Virus Treatment EMERGENCY D-Virus Plan of Care" banner advertisement on their GSN homepage after June 5, 2020. | MSJ App. at 121 ¶ 46;<br><br>MSJ App. at 166 ¶ 46;<br><br>MSJ App. at 211 ¶ 46;<br><br>Answer, (Doc No. 40 at 7 ¶ 46);<br><br>TRO App. (Doc. 3-5 at 23.) |
| 94. | The "Innovative Virus Treatment EMERGENCY D-Virus Plan of Care" banner advertisement on their GSN homepage directed consumers to the revised product description document via hyperlink after June 5, 2020. | MSJ App. at 121-22 ¶¶ 46-47;<br><br>MSJ App. at 166-67 ¶¶ 46-47;<br><br>MSJ App. at 211-12 ¶¶ 46-47;<br><br>Answer, (Doc No. 40 at 7 ¶ 46);<br><br>TRO App. (Doc. 3-5 at 23.) |

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| | *iii.* **FTC Expert Testimony** | |
| | **1) Richard van Breemen, Ph.D.** | |
| 95. | Dr. Richard van Breemen is Professor of Pharmaceutical Sciences in the College of Pharmacy and serves as Principal Investigator of the Linus Pauling Institute at Oregon State University. | TRO App. (Doc. 3-10 at 77 ¶ 3.) |
| 96. | Dr. van Breemen has testified as an expert pharmacology or analytical chemistry witness nine times. | TRO App. (Doc. 3-10 at 78 ¶ 5.) |
| 97. | Dr. van Breemen obtained a Ph.D. in Pharmacology from the Johns Hopkins University School of Medicine. | TRO App. (Doc. 3-10 at 78 ¶ 6.) |
| 98. | Dr. van Breemen has authored or co-authored over 300 peer-reviewed articles, primarily relating to chemistry, medicinal chemistry, drug development, pharmacognosy, and pharmacology. | TRO App. (Doc. 3-10 at 78 ¶ 11.) |
| 99. | Based upon his education, training, and experience, Dr. van Breemen considers himself an expert in the fields of pharmacology and medicinal chemistry with a comprehensive knowledge in the safety and efficacy of dietary supplements. | TRO App. (Doc. 3-10 at 79 ¶ 15.) |
| 100. | The FTC consulted Dr. van Breemen to determine whether Defendants' COVID-19 claims are supported by the level of scientific evidence that experts in each field would require. | TRO App. (Doc. 3-10 at 79-81 ¶¶ 17-21.) |
| 101. | Dr. van Breemen states that experts in the community that study COVID-19 and related infectious diseases would require controlled clinical studies to have a reasonable basis to claim that a product treats, mitigates the symptoms of, or cures COVID-19. | TRO App. (Doc. 3-10 at 83-84 ¶ 30.) |
| 102. | After (a) reviewing the product ingredients and other evidence Defendants have produced and (b) conducting a literature review, Dr. van Breemen concluded that Defendants' efficacy claims are not supported by competent and reliable scientific evidence. | TRO App. (Doc. 3-10 at 84-85 ¶¶ 31-36.) |
| | **2) John Schoggins, Ph.D.** | |
| 103. | Dr. John Schoggins an Associate Professor and serves as the Principal Investigator of the Schoggins Lab at the University of Texas Southwestern Medical Center. | MSJ App. at 439-440 ¶ 4. |

| No. | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| 104. | Dr. Schoggins obtained his Ph.D. in Molecular Biology from Cornell University, followed by a postdoctoral fellowship in Virology and Infectious Diseases at the Rockefeller University. | MSJ App. at 439 ¶ 3. |
| 105. | Dr. Schoggins is a professor of immunology and molecular microbiology. | MSJ App. at 439-440 ¶ 4. |
| 106. | Dr. Schoggins is currently conducting research into the novel coronavirus, including preclinical studies on SARS-CoV-2, and a clinical trial investigating an FDA-approved drug as a potential therapeutic agent for COVID-19. | MSJ App. at 440 ¶ 8. |
| 107. | Dr. Schoggins has published over 50 peer-reviewed papers, including one peer-reviewed paper regarding COVID-19. | MSJ App. at 440 ¶ 7. |
| 108. | Based upon his education, training, and experience, Dr. Schoggins considers himself an expert in the fields of fields of virology and infectious diseases with a focus on how the immune system controls and modulates viral infections—including SARS-CoV-2, the virus that causes COVID-19 in humans. | MSJ App. at 441 ¶ 9. |
| 109. | Dr. Schoggins states that experts in the virology and infectious diseases would require randomized, double-blinded, and placebo-controlled clinical studies of humans that are peer-reviewed to have a reasonable basis to claim that a product treats, mitigates the symptoms of, or cures COVID-19. | MSJ App. at 447-448 ¶ 25. |
| 110. | After (a) reviewing the product ingredients and other evidence Defendants have produced and (b) conducting a literature review, Dr. Schoggins concluded that Defendants' efficacy claims are not supported by competent and reliable scientific evidence. | MSJ App. at 449-450 ¶¶ 29-32. |
| 111. | No randomized, clinical trials substantiate the claim that the Emergency D-Virus Plan of Care, or any of their constituent products, can treat, mitigate the symptoms of, or cure COVID-19. | MSJ App. at 122 ¶ 49; MSJ App. at 167 ¶ 49; MSJ App. at 212 ¶ 49; MSJ App. at 360, lines 9-13 (Tieu Dep. pg. 99, lines 9-13); MSJ App. at 438 ¶4. |

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| 112. | No peer-reviewed scientific literature or study substantiates the claim that the Emergency D-Virus Plan of Care, or any of their constituent products, can treat, mitigate the symptoms of, or cure COVID-19. | MSJ App. at 123 ¶ 55; MSJ App. at 168 ¶ 55; MSJ App. at 213 ¶ 55. |
| **b) Count Two: Unsubstantiated Claims That the Metabolic and Cancer Plans of Care Could Treat, Mitigate the Symptoms of, and Cure Cancer** | | |
| ***i.    Marketing and Advertising of Cancer Claims*** | | |
| 113. | Defendants marketed their Metabolic Plan of Care as a treatment for cancer. | MSJ App. at 124-25 ¶¶ 60-64; MSJ App. at 169-70 ¶¶ 60-64; MSJ App. at 214-15 ¶¶ 60-64; Answer, (Doc No. 40 at 7 ¶ 49); MSJ App. at 368, lines 14-17 (Tieu Dep. pg. 125, lines 14-17.) |
| 114. | Defendants marketed their Cancer Plan of Care as a treatment for cancer. | MSJ App. at 127 ¶¶ 77-81; MSJ App. at 172 ¶¶ 77-81; MSJ App. at 217-18 ¶¶ 77-81; Answer, (Doc No. 40 at 7 ¶ 49); MSJ App. at 343 line 25-344, line 5 (Tieu Dep. pg. 57, line 25—pg. 58, line 5); TRO App. (Doc. Doc. 3-5 at 121-146.) |
| 115. | Defendants have disseminated or caused to be disseminated advertisements and marketing materials for the Metabolic and Cancer treatment plans through their GSN and GSP websites. | MSJ App. at 129 ¶¶ 90-92 (Metabolic) and 130-31 ¶¶ 94-96 (Cancer); MSJ App. at 174-75 ¶¶ 90-92 (Metabolic) and 175-76 ¶¶ 94-96 (Cancer); |

| No. | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|-----|-----------------|---------------------|
|     |                 | MSJ App. at 219-20 ¶¶ 90-92 (Metabolic) and 220-21 ¶¶ 94-96 (Cancer); |
|     |                 | MSJ App. at 362, line 3-363, line 3 (Tieu Dep. pg. 105, line 3-pg. 106, line 3); |
|     |                 | TRO App. (Doc. Doc. 3-5 at 23.) |
| 116. | Defendants have disseminated or caused to be disseminated advertisements and marketing materials for the Metabolic and Cancer treatment plans through their GSN and GSP Facebook accounts. | MSJ App. at 131-32 ¶¶ 98-100 (Metabolic) and 132-33 ¶¶ 102-104 (Cancer); |
|     |                 | MSJ App. at 176-77 ¶¶ 98-100 (Metabolic) and 177-78 ¶¶ 102-104 (Cancer); |
|     |                 | MSJ App. at 222 ¶¶ 98-100 (Metabolic) and 222-23 ¶¶ 102-104 (Cancer); |
|     |                 | TRO App. (Doc. 3-6 at 1, 5.) |
| 117. | Defendants had at least eight billboards in California with "Cancer breakthrough" and the Golden Sunrise logo on, which attracted about 400 customers to Defendants' business. | MSJ App at. 387, line 19-389, line 23 (Tieu Dep. pg. 180, line 19- pg. 182, line 23); |
|     |                 | MSJ App. at 1256-1257. |
| 118. | Defendants have disseminated or caused to be disseminated advertisements and marketing materials for the Metabolic and Cancer treatment plans through a YouTube account. | MSJ App. at 133-34 ¶¶ 106-109; |
|     |                 | MSJ App. at 178-79 ¶¶ 106-109; |
|     |                 | MSJ App. at 223-24 ¶¶ 106-109; |
|     |                 | MSJ App. 362, line 3-363 line 8 (Tieu Dep. pg. 105, line 3- pg. 106 line 8); |
|     |                 | TRO App. (Doc. 3-5 at 180; 3-10 at 60.) |

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| 119. | The GSN website contains more than a dozen videos claiming that Golden Sunrise products treat, cure, or prevent serious disease, including six videos promoting Golden Sunrise products as cures for cancer. | MSJ App. at 134 ¶¶ 110-111; MSJ App. at 179 ¶¶ 110-111; MSJ App. at 224-25 ¶¶ 110-111; Answer, (Doc No. 40 at 7 ¶ 51); TRO App. (Doc. 3-5 at 180.) |
| 120. | The videos available on the GSN website are accessible on Defendants' GSN homepage by clicking on a "Testimonial" navigation menu option and are posted on their GSN YouTube account. | MSJ App. at 134-35 ¶¶ 112-113; MSJ App. at 179-80 ¶¶ 112-113; MSJ App. at 225 ¶¶ 112-113; Answer, (Doc No. 40 at 7 ¶ 51); TRO App. (Doc. 3-5 at 6 ¶ 21; 180.) |
| 121. | Two promotional videos that Defendants post online in mid-2017 feature an endorsement by a now-deceased former NFL quarterback who was diagnosed with cancer and who claims that Defendants' Cancer treatment plan is superior to chemotherapy as a cancer treatment. | MSJ App. at 135 ¶ 116-117; MSJ App. at 180 ¶ 116-117; MSJ App. at 225 ¶ 116-117; MSJ App. at 339, lines 3-18; 341, lines 13-15; 342, lines 21-25 (Tieu Dep. pg. 42, 3-18; pg. 44, lines 13-15; pg. 45, lines 20-25); Answer, (Doc No. 40 at 7 ¶ 52); TRO App. (Doc. 3-5 at 39.) |

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| 122. | The video titled "Rusty Hilger NFL Quarterback has Amazing Results with ImunStem & Aktiffvate for Cancer" on the GSN YouTube channel has been available on the GSN website under the title "Rusty HILGER Quarterback NFL Cancer Breakthrough 1 of 2." | MSJ App. at 136 ¶¶ 123; MSJ App. at 181 ¶¶ 123; MSJ App. at 227 ¶¶ 123; TRO App. (Doc. 3-5 at 39.) |
| 123. | The video titled "Rusty Hilger NFL Quarterback has Amazing Results with ImunStem & Aktiffvate for Cancer" on the GSN YouTube channel was posted to YouTube on March 2, 2017. | MSJ App. at 136 ¶ 122; MSJ App. at 181 ¶¶ 122; MSJ App. at 226-27 ¶ 122. |
| 124. | The video titled "Rusty Hilger NFL Quarterback has Amazing Results with KemoHerb for Cancer, Part 2" on the GSN YouTube channel has been available on the GSN website under the title "Rusty HILGER, NFL Quarterback has Results with KemoHerb." | MSJ App. at 135-36 ¶ 119; MSJ App. at 180 ¶ 119; MSJ App. at 226 ¶ 119. |
| 125. | The video titled "Rusty Hilger NFL Quarterback has Amazing Results with KemoHerb for Cancer, Part 2" on the GSN YouTube channel was posted to YouTube on June 23, 2017. | MSJ App. at 135 ¶ 118; MSJ App. at 180 ¶ 118; MSJ App. at 226 ¶ 118. |
| 126. | In the two videos titled "NFL Quarterback has Amazing Results with ImunStem & Aktiffvate for Cancer, Part 1" and "NFL Quarterback has Results with KemoHerb for Cancer, Part 2," the endorser represented, endorsed, promoted, marketed, or advertised that the Cancer Plan of Care is superior to chemotherapy as a cancer treatment. | MSJ App. at 135 ¶ 117; MSJ App. at 180 ¶ 117; MSJ App. at 225 ¶ 117. |
| 127. | In the video titled "NFL Quarterback has Results with KemoHerb for Cancer, Part 2," the endorser states, "I was able to take a product called KemoHerb which changed my life. My Kemo therapy was able to rip the skin off that, off my tumor and expose it so that the body and the white blood count which had been raised from the ImunStem and the Aktiffate could kill it. The KemoHerb, yeah, it set me back for a couple of days, but I flushed my system like it has never been flushed before. It was the most powerful detox I ever felt in my life." | Answer, (Doc No. 40 at 7 ¶ 52.) |
| 128. | In the video titled "NFL Quarterback has Amazing Results with ImunStem & Aktiffvate for Cancer, Part 1," the endorser states, "I was on the product from Golden Sunrise Pharmaceuticals for about three days; I told my | Answer, (Doc No. 40 at 7 ¶ 52.) |

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| | wife I don't feel the tumor anymore. Now, I'm not playing, and I wasn't trying to make her feel good at that point in time; previously I was. But this has been over ten days now and I have not felt the tumor inside my esophagus at all. There is no question in my mind, no doubt in my mind that the tumor is shrinking. I haven't had any pain." | |
| 129. | In the video titled "NFL Quarterback has Amazing Results with ImunStem & Aktiffvate for Cancer, Part 1," the endorser states, "I can't be more proud, I can't be more honest, and I can't be more truthful to tell you that I honest to goodness believe that I have been delivered from the hand of God with the help of Golden Sunrise Pharmaceuticals. We've cured cancer. I truly believe at this point. I can't feel it anymore; I haven't felt it in about six or seven days. I truly believe that the cancer has been cured. I've never felt better; I wake up every morning with zest." | Answer, (Doc No. 40 at 7 ¶ 52.) |
| 130. | In the video titled "NFL Quarterback has Amazing Results with ImunStem & Aktiffvate for Cancer, Part 1," the endorser states, "I am here to tell you that without any chemo, without any radiation, and without any surgery, I feel better today than I when I left the NFL in 1992." | Answer, (Doc No. 40 at 7 ¶ 52.) |
| 131. | In the video titled "NFL Quarterback has Results with KemoHerb for Cancer, Part 2," the endorser states, "There's an alternative - Golden Sunrise Pharmaceutical. I've been on the products for over 3 months. The ImunStem, just that product alone, it's the only product of its kind to go through the FDA approval process. It's safe, it's effective. It jump-started my immune system immediately. I started to feel it within a matter of minutes." | MSJ App. at 136 ¶ 120; MSJ App. at 181 ¶ 120; MSJ App. at 226 ¶ 120. |
| 132. | In the video titled "NFL Quarterback has Results with KemoHerb for Cancer, Part 2," the endorser states, ". . . and Norm and Kevin Young came to a little town in California named Porterville. They called me and told me that there was a cure here." | MSJ App. at 136 ¶ 121; MSJ App. at 181 ¶ 121; MSJ App. at 226 ¶ 121. |
| 133. | Another promotional video titled "Cancer Breakthroughs, Cancer Patient Successful Results with KemoHerb" on the GSN YouTube channel was available | MSJ App. at 137 ¶ 125; MSJ App. at 182 ¶ 125; |

| No. | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | on the GSN website under the title "Isabelle RUIZ, Cancer Breakthroughs with KemoHerb." | MSJ App. at 227 ¶ 125; Answer, (Doc No. 40 at 7 ¶ 53); *see also* TRO App. (Doc. 3-5 at 39.) |
| 134. | The promotional video titled "Cancer Breakthroughs, Cancer Patient Successful Results with KemoHerb" on the GSN YouTube channel was posted on June 27, 2017. | MSJ App. at 137 ¶ 124; MSJ App. at 181-82 ¶ 124; MSJ App. at 227 ¶ 124; Answer, (Doc No. 40 at 7 ¶ 53.) |
| 135. | In the video titled "Cancer Breakthroughs, Cancer Patient Successful Results with KemoHerb," a woman who claims to have been diagnosed with cancer says that Defendants' products purged cancer from her body. | MSJ App. at 137 ¶ 126; MSJ App. at 182 ¶ 126; MSJ App. at 227 ¶ 126; Answer, (Doc No. 40 at 7 ¶ 53.) |
| 136. | In the video titled "Cancer Breakthroughs, Cancer Patient Successful Results with KemoHerb," a woman who claims to have been diagnosed with cancer states she "called Golden Sunrise Pharmaceuticals to see what were some of the things coming out of me [from an unusual bowel movement after taking KemoHerb], and they said that it was the cancer. . . . and they said it was part of the healing, and I felt like a different person. I would like to thank GSP for giving me my life back." | Answer, (Doc No. 40 at 7 ¶ 53.) |
| 137. | A final set of three promotional videos claim that Defendants' products can treat cancer and reduce the side effects of chemotherapy. | Answer, (Doc No. 40 at 7 ¶ 54.) |
| 138. | The video titled "Cancer Breakthroughs, Another Cancer Patient Successful Results Treated with ImunStem & Aktiffvate" on the GSN YouTube channel has been available on the GSN website under the title "Cancer Breakthrough Successful Results – Part 1 of 3." | MSJ App. at 139 ¶ 135; MSJ App. at 184 ¶ 135; MSJ App. at 229 ¶ 135; TRO App. (Doc. 3-5 at 39.) |
| 139. | The video titled "Cancer Breakthroughs, Another Cancer Patient Successful Results Treated with ImunStem & | MSJ App. at 139 ¶ 134; |

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| | Aktiffvate" on the GSN YouTube channel was posted on August 7, 2016. | MSJ App. at 183-84 ¶ 134; MSJ App. at 229 ¶ 134. |
| 140. | The video titled "Cancer Breakthroughs, Another Cancer Patient Successful Results Treatment, Part 2 of 3" on the GSN YouTube channel has been available on the GSN website under the title "Cancer Breakthroughs Successful Results – Part 2 of 3." | MSJ App. at 138 ¶ 131; MSJ App. at 183 ¶ 131; MSJ App. at 228 ¶ 131; TRO App. (Doc. 3-5 at 39.) |
| 141. | The video titled "Cancer Breakthroughs, Another Cancer Patient Successful Results Treatment, Part 2 of 3" on the Golden Sunrise Nutraceutical YouTube channel was posted on January 19, 2017. | MSJ App. at 138 ¶ 130; MSJ App. at 183 ¶ 130; MSJ App. at 228 ¶ 130. |
| 142. | The video titled "Cancer Breakthroughs, Another Cancer Patient Successful Results Treated with KemoHerb, Part 3 of 3" on the GSN YouTube channel has been available on the GSN website under the title "Jeff O'NEAL, Cancer Breakthroughs with KemoHerb Part 3 of 3." | MSJ App. at 137 ¶ 128; MSJ App. at 182 ¶ 128; MSJ App. at 227-28 ¶ 128; TRO App. (Doc. 3-5 at 39.) |
| 143. | The video titled "Cancer Breakthroughs, Another Cancer Patient Successful Results Treated with KemoHerb, Part 3 of 3" on the GSN YouTube channel was posted on June 28, 2017. | MSJ App. at 137 ¶ 127; MSJ App. at 182 ¶ 127; MSJ App. at 227 ¶ 127. |
| 144. | The video titled "Cancer Breakthroughs, Another Cancer Patient Successful Results Treated with KemoHerb, Part 3 of 3" represents Defendants' Cancer treatment plan—specifically Defendants' KemoHerb product—to be an alternative to chemotherapy that treats cancer. | MSJ App. at 137-38 ¶ 129; MSJ App. at 182 ¶ 129; MSJ App. at 228 ¶ 129; Answer, (Doc No. 40 at 7 ¶ 54.) |
| 145. | In video titled "Cancer Breakthroughs, Another Cancer Patient Successful Results Treated with KemoHerb, Part 3 of 3," an individual who claims to have been diagnosed with cancer also says that Defendants' products purged cancer from his body. | Answer, (Doc No. 40 at 7 ¶ 54.) |
| 146. | In the video titled "Cancer Breakthroughs, Another Cancer Patient Successful Results Treated with KemoHerb, Part 3 of 3," an individual who claims to | Answer, (Doc No. 40 at 7 ¶ 54.) |

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| | have been diagnosed with cancer explains how Defendants told him that KemoHerb will "strip the edges off the tumors and expose them so that the body's own immune system can attack." | |
| 147. | In the video titled "Cancer Breakthroughs, Another Cancer Patient Successful Results Treated with KemoHerb, Part 3 of 3," an individual who claims to have been diagnosed with cancer states that an unusual bowel movement "sounds like the shell—like the mucus sac that the tumor is in . . . fifteen minutes later, another bowel movement happened, this time though it was this like brownish red, like a spider web-looking substance in the toilet, and I called them and I said 'all right,' I said, 'what is this?' and they said it sounds like the outside of the tumor's shell." | Answer, (Doc No. 40 at 7 ¶ 54.) |
| 148. | In the video titled "Cancer Breakthroughs, Another Cancer Patient Successful Results Treated with KemoHerb, Part 3 of 3," an individual who claims to have been diagnosed with cancer states that "Golden Sunrise Pharmaceuticals told me, they said as you continue to do KemoHerb, what's going to happen is, as your cancer cells get weaker, your body is going to start feeling stronger, and you will feel it. They said but what also will happen is your platelets will start going up and your white count will go up too, and what they said what that means is your immune system is taking over the cancer and basically being in control." | Answer, (Doc No. 40 at 7 ¶ 54.) |
| 149. | The other two videos, titled "Cancer Breakthrough Successful Results – Part 1 of 3" and "Cancer Breakthroughs, Another Cancer Patient Successful Results Treatment, Part 2 of 3," feature a cancer patient who claims that two products in Defendants' treatment plans—ImunStem and Aktiffvate—reduce the side effects of chemotherapy. | MSJ App. at 139 ¶ 136; MSJ App. at 184 ¶ 136; MSJ App. at 229 ¶ 136; Answer, (Doc No. 40 at 7 ¶ 55.) |
| 150. | The video titled "Cancer Breakthrough Successful Results – Part 1 of 3" was posted on the GSP Facebook page on October 22, 2016, with a caption that stated "A stage four colon cancer patient shares his revolutionary experience of how a new herbal treatment helped save his life." | MSJ App. at 135 ¶ 115; MSJ App. at 180 ¶ 115; MSJ App. at 225 ¶ 115; TRO App. (Doc. 3-6 at 1.) |

| No. | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| 151. | In video titled "Cancer Breakthrough Successful Results – Part 1 of 3," the endorser stated "During the meeting with Golden Sunrise, I was told that this product [i.e., the therapy] would do amazing things for me. . . . I was told was the product would rebuild my stem cells and make them larger like they were, like they were before." | Answer, (Doc No. 40 at 7 ¶ 55.) |
| 152. | In video titled "Cancer Breakthrough Successful Results – Part 1 of 3," the endorser stated, "I was also told that the stem, that the cells rebuild faster than the chemo could tear it apart, that it supersede the chemo and I probably would not lose my hair . . . They told me that the product [i.e., the therapy] would build my immune system up to where as I go through chemo, my side effects should be not much more than getting a flu shot or a mild flu." | Answer, (Doc No. 40 at 7 ¶ 55.) |
| 153. | In video titled "Cancer Breakthrough Successful Results – Part 1 of 3," the endorser states, "I left that day with the products [ImunStem and Aktiffvate], went home, started taking them, and this was three days prior to my next round of chemo; within two days, the sores in my mouth had cleared up; the pains in my hips and my neuropathy were a little bit less intense." | Answer, (Doc No. 40 at 7 ¶ 55.) |
| 154. | In video titled "Cancer Breakthrough Successful Results – Part 1 of 3," the endorser states, "After the next round of chemo, the third round of chemo, Golden Sunrise I called them up and I said 'do you have any suggestions for me?' and they said to increase your dosage—the day before chemo, during chemo triple your dosage the day after, it will kinda help to offset the side effects of the chemo. Well, as I did that, my mouth, the sores in my mouth cleared up instantly." | Answer, (Doc No. 40 at 7 ¶ 55.) |
| 155. | In video titled "Cancer Breakthrough Successful Results – Part 1 of 3," the endorser states, "When I asked Golden Sunrise about [wounds healing more quickly], they said that's because my immune system is being rebuilt by the oils, and my body heals more normally compared to somebody who suffers from chemo and their body does not, does not heal." | Answer, (Doc No. 40 at 7 ¶ 55.) |
| 156. | In video titled "Cancer Breakthrough Successful Results – Part 1 of 3," the endorser states, "As the Aktiffvate and ImunStem built up in my system, and repaired my | Answer, (Doc No. 40 at 7 ¶ 55.) |

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| | system, I was able to handle the chemo with very little side effects." | |
| 157. | In video titled "Cancer Breakthrough Successful Results – Part 1 of 3," the endorser states, "My body is tolerating the chemo very well, and I believe that's strictly because of Golden Sunrise products and the way they build a barrier against the chemo so I get the benefits but don't get the suffering. And without Golden Sunrise, I'd be very scared to know where I'd be right now." | Answer, (Doc No. 40 at 7 ¶ 55.) |
| 158. | In the video titled "Cancer Breakthroughs, Another Cancer Patient Successful Results Treatment, Part 2 of 3," the endorser states, "When I do chemo I'm not suffering, I don't have issues, I don't fear chemo because of Golden Sunrise products are saturating my system. I take the ImunStem and Aktiffvate multiple times a day during chemo and the day before chemo so I kind of prepare my body, and I go through it and there's not a whole lot of issue." | MSJ App. at 138 ¶ 132; MSJ App. at 183 ¶ 132; MSJ App. at 228-29 ¶ 132. |
| 159. | In the video titled "Cancer Breakthroughs, Another Cancer Patient Successful Results Treatment, Part 2 of 3," the endorser states, "Any issue I have, I can typically call Golden Sunrise, I can describe what problem I'm having, and they'll have a product to supplement my treatment to go along with the Aktiffvate and ImunStem that will correct the problem." | MSJ App. at 138-39 ¶ 133; MSJ App. at 183 ¶ 133; MSJ App. at 229 ¶ 133. |
| 160. | The GSN website contains a section titled "Testimonial" that includes a section of written testimonials where a person claims that his or her child with a brain tumor was given "no hope for my son to survive" by doctors but that "[w]hen GSN medical staff under the supervision of a GSN doctor came to my home and began to treat my son with GSN products, my son slowly, progressively improved and after one year of treatment, returned to school and graduated. My son has been taking GSN products since 2008 for the past seven years his health has improved greatly and now lives a normal life as well as he did before his medical diagnosis." | TRO App. (Doc. 3-5 at 39.) |
| 161. | The GSN website contains a section titled "Cancer is Primary [sic] a Metabolic Disease" that concludes by stating: | Answer, (Doc No. 40 at 7 ¶ 56); TRO App. (Doc. 3-5 at 23.) |

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| | "Golden Sunrise Nutraceutical dietary supplements have established their safety and efficacy in helping to reverse, modify, or heal ***Serious or Life-threatening*** conditions. They cause release of toxins out of the cells and at the same time the herbs supply the essential nutrients which the cells have been starving for. These nutrients serve as building blocks allowing the cells to repair and rejuvenate themselves and return the cells to perform the functions they were intended to perform." (Emphasis in original). | |
| 162. | The GSN website contains a section titled "Treatment," where the product description documents for the Emergency D-Virus treatment plan that claims the Metabolic Plan of Care "is a preventative for cancer, which primarily is a metabolic problem like our other diseases." | MSJ App. at 367, lines 18-22 (Tieu Dep. pg. 124, lines 18-22); Answer, (Doc No. 40 at 7 ¶ 57); TRO App. (Doc. 3-5 at 50.) |
| 163. | The GSN website contains a section titled "Treatment," where the product description documents for the Metabolic treatment plan that claims, "The ***METABOLIC Plan of Care*** is also designed as a preventative plan of care to arrest or reverse the metabolic abnormalities at the cellular level leading to the development of cancer cells." (Emphasis in original.) | Answer, (Doc No. 40 at 7 ¶ 57); TRO App. (Doc. 3-5 at 162.) |
| 164. | The GSN website contains a section titled "Treatment," where the product description documents for the Metabolic treatment plan that claims that the Metabolic treatment plan is "given to flush the system and aim at arresting the development of the metabolic disorders. The treatments are continued in order to support the elimination of metabolic disorders." | Answer, (Doc No. 40 at 7 ¶ 57); TRO App. (Doc. 3-8 at 27.) |
| 165. | The Golden Sunrise Nutraceutical website contains a section titled "Treatment," where the product description documents for the Cancer treatment plan that claims, "The administration of herbal (botanical) ***CANCER Plan of Care*** treatments for human health has led to the benefit of cancer treatments from plant based materials." (Emphasis in original.) | Answer, (Doc No. 40 at 7 ¶ 57); TRO App. (Doc. 3-5 at 123.) |
| 166. | The GSN website contains a section titled "Treatment," where the product description documents for the Cancer treatment plan that claims, "***CANCER Plan of Care*** | Answer, (Doc No. 40 at 7 ¶ 57); |

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| | treatment begins with the use of **ImunStem** and **Aktiffvate** to improve the immune system function. Then the administration of **KemoHerbs** are given to flush the system and attempt arresting the development of the cancer. The treatments are continued in order to support and attempt elimination of cancer cells." (Emphasis in original.) | TRO App. (Doc. 3-5 at 123.) |
| 167. | The GSN website contains a section titled "Treatment," where the product description documents for the Cancer treatment plan that claims that the Cancer treatment plan has the effect of "arrest[ing] the fermentation process and the cancer." | Answer, (Doc No. 40 at 7 ¶ 57); TRO App. (Doc. 3-5 at 131.) |
| 168. | The GSN website contains a section titled "The Evidence Our Science" that states: "The **_CANCER Plan of Care_** is the key for the effectiveness on the immune system and cellular metabolism.  They have immune-stimulating properties.  In-vivo studies on treated patients demonstrate increasing phagocytic activity and synthesis of helper cell function.  **_CANCER Plan of Care_** have shown to transform Deoxyribonucleic Acid / Ribonnucleic Acid (DNA / RNA) repair, before, during and after chemotherapy drugs, prescription drugs, toxic exposure and chemical induced damage.  The variety of Golden Sunrise Nutraceutical herbals / botanical[s] have many effects including antioxidants activity and anit-inflammatory [sic] properties." <br><br> *     *     * <br><br> **_METABOLIC Plan of Care_** possess a bipolarity and a lipophilicity that facilitates molecular diffusion through various permeable and selective membranes.  In-vivo studies on test subjects have indicated that the cell membrane integrity remains intact and is not disrupted or destroyed in the process of assimilating into the cell, thus ensuring long-term effectiveness.  The technology developed by Golden Sunrise Nutraceutical is the key for the effectiveness on immune system and cellular metabolism.  They have immune-stimulating properties.  In-vivo studies on treated patients demonstrate increasing phagocytic and synthesis of | Answer, (Doc No. 40 at 7 ¶ 58.) |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| | helper cell function. ***METABOLIC Plan of Care*** have shown to transform Deoxyribonucleic Acid / Ribonucleic Acid (DNA / RNA) repair, before during and after chemotherapy drugs, prescription drugs, toxic exposure and chemical induced damage.  The variety of these herbals / botanical[s] have many effects including antioxidant activity and anti-inflammatory properties." (Emphasis in original). | |
| 169. | The GSN website provides purported cancer survival rates that compare Defendants' Cancer treatment plan favorably to chemotherapy. | MSJ App. at 139 ¶ 137; MSJ App. at 184 ¶ 137; MSJ App. at 229-30 ¶ 137; MSJ App. at 391, lines 4-12 (Tieu Dep. pg. 191, line 4-12); Answer, (Doc No. 40 at 7 ¶ 59); TRO App. (Doc. 3-5 at 99-120.) |
| 170. | The GSN website's cancer survival rates present Defendants' Cancer treatment plan to yield a higher quality of life than chemotherapy. | MSJ App. at 139-40 ¶ 138; MSJ App. at 184 ¶ 138; MSJ App. at 230 ¶ 138; Answer, (Doc No. 40 at 7 ¶ 59); TRO App. (Doc. 3-5 at 99-120.) |
| 171. | The GSN website's cancer survival rates states, "A total of 27-patients have been treated for various cancer after chemotherapy, radiation and surgery had been treated with poor outcomes. Golden Sunrise Nutraceutical provided ***CANCER Plan of Care*** to these patients that improved their quality-of-life." (Emphasis in original.) | Answer, (Doc No. 40 at 7 ¶ 59); TRO App. (Doc. 3-5 at 100.) |
| 172. | The GSN website's cancer survival rates states in a chart with columns titled "Side-Effects" and "Quality of Life" that the Cancer treatment plan has no side effects and "good well-being" as the quality of life, while chemotherapy has "multiple toxic-effects and | Answer, (Doc No. 40 at 7 ¶ 59); TRO App. (Doc. 3-5 at 100.) |

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| | [h]ospitalization" as side-effects and "[p]oor overall-health" as quality of life. | |
| 173. | The GSN website's cancer survival rates states in a chart titled "***CANCER Plan of Care* STAGE-0, I, II, III, AND IV FOR ALL TYPE[S] OF CANCER**," that patients using their Cancer treatment plan have a two-year survival rate of 100% for Stage-I cancer, 86% for Stage-II cancer, 100% for Stage-III cancer, and 60% for Stage-IV cancer. To reach these percentages, Defendants use sample sizes ranging from one to seven purported patients. (Emphasis in original). | Answer, (Doc No. 40 at 7 ¶ 59); <br><br> TRO App. (Doc. 3-5 at 100.) |
| 174. | Defendants marketed their Metabolic and Cancer treatment plans as ways to treat, mitigate the symptoms of, or cure cancer through their GSN Facebook account. | MSJ App. at 131-32 ¶¶ 98-100 (Metabolic) and 102-104 (Cancer); <br><br> MSJ App. at 176-77 ¶¶ 98-100 (Metabolic) and 102-104 (Cancer); <br><br> MSJ App. at 222 ¶¶ 98-100 (Metabolic) and 102-104 (Cancer); <br><br> TRO App. (Doc. 3-6 at 1, 5.) |
| 175. | In a March 18, 2020 post on their GSN Facebook page, Defendants claim that their Metabolic treatment plan "is a preventive agent for cancer, and like other diseases it is mainly a metabolic problem." | TRO App. (Doc. 3-6 at 5.) |
| | *ii.     FTC Expert Testimony from Dr. Katherine Tkaczuk* | |
| 176. | Dr. Katherine Tkaczuk is Professor of Medicine and Oncology and the Director of the Breast Evaluation & Treatment Program at the University of Maryland Cancer Center. | MSJ App. at 832-833, ¶ 4. |
| 177. | Dr. Tkaczuk received her M.D. from Wroclaw Medical University in Wroclaw, Poland and completed a fellowship at the University of Texas MD Anderson Cancer Center in oncology. | MSJ App. at 832 ¶ 3. |
| 178. | Dr. Tkaczuk's role at the University of Maryland Cancer Center has included serving as the Principal Investigator for the majority of the cancer center's breast cancer-related clinical trials. | MSJ App. at 2833 ¶ 5. |

| No. | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|-----|-----------------|---------------------|
| 179. | Dr. Tkaczuk's research is focused on clinical drug development for breast cancer, including through more than 100 Phase 1-3 clinical trials. | MSJ App. at 833 ¶ 7. |
| 180. | Dr. Tkaczuk has authored or co-authored 63 peer-reviewed papers in the areas of oncology clinical drug development and breast cancer evaluation and treatment. | MSJ App. at 834 ¶ 8. |
| 181. | Based upon her education, training, and experience, Dr. Tkaczuk considers herself an expert in the field of cancer treatment, with a comprehensive knowledge in the medical and scientific standards governing the safety and efficacy of cancer treatment. | MSJ App. at 834 ¶ 10. |
| 182. | The FTC has consulted with Dr. Tkaczuk to determine whether Defendants' cancer claims are supported by the level of scientific evidence that experts in each field would require. | MSJ App. at 837 ¶ 13. |
| 183. | Dr. Tkaczuk states that it is generally accepted in the field by medical experts, that adequate scientific preclinical and clinical trial evidence proving the mechanism of action, safety, and efficacy of intervention agents for treating, mitigating the symptoms, or curing cancer should, at a minimum, consist of two-to-three prospective or more clinical trials that are peer-reviewed. | MSJ App. at 850-852 ¶ 59. |
| 184. | After (a) reviewing the product ingredients and other evidence Defendants have produced and (b) conducting a literature review, Dr. Tkaczuk concluded that there are no reported clinical studies on Defendants' Metabolic or Cancer plans of care or any of their constituent products. | MSJ App. at 852-854 ¶ 60-66. |
| 185. | No randomized, clinical trial substantiates the claim that the Metabolic Plan of Care, or any of their constituent products, can treat, mitigate the symptoms of, or cure cancer. | MSJ App. at 140 ¶ 140; MSJ App. at 185 ¶ 140; MSJ App. at 230 ¶ 140; MSJ App. at 368, lines 18-23; 369, lines 4-13 (Tieu Dep. pg. 125, lines 18-23; pg. 126, lines 4-13); MSJ App. at 438 ¶4. |
| 186. | No peer-reviewed scientific literature or study substantiates the claim that the Metabolic Plan of Care, | MSJ App. at 141 ¶ 145; MSJ App. at 186 ¶ 145; |

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| | or any of their constituent products, can treat, mitigate the symptoms of, or cure cancer. | MSJ App. at 231 ¶ 145. |
| 187. | No randomized, clinical trial substantiates the claim that the Cancer Plan of Care, or any of their constituent products, can treat, mitigate the symptoms of, or cure cancer. | MSJ App. at 142 ¶ 152; MSJ App. at 187 ¶ 152; MSJ App. at 232 ¶ 152; MSJ App. at 390, lines 15-19 (Tieu Dep. pg. 189, lines 15-19); MSJ App. at 438 ¶4. |
| 188. | No peer-reviewed scientific literature or study substantiates the claim that the Cancer Plan of Care, or any of their constituent products, can treat, mitigate the symptoms of, or cure cancer. | MSJ App. at 143 ¶ 158; MSJ App. at 188 ¶ 158; MSJ App. at 233 ¶ 158. |
| | **c)  Count Three: Unsubstantiated Claims That the Metabolic Plan of Care Could Treat, Mitigate the Symptoms of, and Cure Parkinson's Disease** | |
| | *i.    Marketing and Advertising of Parkinson's Disease Claims* | |
| 189. | Defendants also marketed the Metabolic Plan of Care as a way to treat, mitigate the symptoms of, or cure Parkinson's disease. | MSJ App. at 362, lines 3-21 (Tieu Dep. pg. 105, lines 3-21); Answer, (Doc No. 40 at 8 ¶ 61); TRO App. (Doc. 3-5 at 23, 27, 149.) |
| 190. | Defendants disseminated or caused to be disseminated advertisements and marketing materials through the GSN website located at URL <https://goldensunrisenutraceutical.com/> and the GSP website located at URL <https://goldensunrisepharmaceutical.com/> to endorse, promote, market, or advertise the Metabolic Plan of Care for the treatment, mitigation of symptoms of, or cure of Parkinson's disease. | MSJ App. at 145-46 ¶¶ 167-169; MSJ App. at 190 ¶¶ 167-169; MSJ App. at 235-36 ¶¶ 167-169; MSJ App. at 362, line 3-363, line 3 (Tieu Dep. pg. 105, line3 pg. 106, line 3); TRO App. (Doc. 3-5 at 21-24, 27, 39, 180.) |

| NO. | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | | |
| 191. | The GSN website, available at URL <https://goldensunrisenutraceutical.com/>, contained two videos endorsing, promoting, marketing, or advertising Golden Sunrise products for the treatment of, mitigation of symptoms of, or cure of Parkinson's disease. | MSJ App. at 147 ¶ 177; MSJ App. at 192 ¶ 177; MSJ App. at 237-38 ¶ 177; TRO App. (Doc. 3-5 at 180.) |
| 192. | The two videos endorsing, promoting, marketing, or advertising Golden Sunrise products for the treatment of, mitigation of symptoms of, or cure of Parkinson's disease that are available on the GSN website have been also available on the GSN YouTube channel. | MSJ App. at 147 ¶ 175-76 and 178; MSJ App. at 192 ¶ 175-76 and 178; MSJ App. at 237-38 ¶ ¶175-76 and ¶178. |
| 193. | The two videos relating to Parkinson's disease that have been available on the GSN website and GSN YouTube channel have represented, endorsed, promoted, marketed, or advertised the Metabolic Plan of Care to treat, mitigate the symptoms of, or cure Parkinson's disease. | MSJ App. at 148 ¶ 179; MSJ App. at 192-93 ¶ 179; MSJ App. at 238 ¶ 179; MSJ App. at 340, line 23-341, line 12; 342 lines 17-20 (Tieu Dep. pg. 43, line 23-pg. 44, line 12; pg. 45, lines 17-20.) |
| 194. | The two videos relating to Parkinson's disease contain endorsements by a well-known musician who was diagnosed with Parkinson's disease. | MSJ App. at 340, line 23-341, line 12; Tieu Dep. pg. 43, line 23-page 44 line 12; Answer, (Doc No. 40 at 7 ¶ 64.) |
| 195. | One Golden Sunrise video concerning Parkinson's disease was titled "Parkinson's Breakthrough, Earth Wind & Fire's Sheldon Reynolds with Great Positive Results" on the GSN YouTube channel. | MSJ App. at 148 ¶ 180; MSJ App. at 193 ¶ 180; MSJ App. at 238 ¶ 180. |
| 196. | The video titled "Parkinson's Breakthrough, Earth Wind & Fire's Sheldon Reynolds with Great Positive Results" was posted to YouTube on August 20, 2016. | MSJ App. at 148 ¶ 181; MSJ App. at 193 ¶ 181; |

| No. | Undisputed Fact | Supporting Evidence |
|-----|-----------------|---------------------|
| | | MSJ App. at 238 ¶ 181. |
| 197. | The Golden Sunrise video titled "Parkinson's Breakthrough, Earth Wind & Fire's Sheldon Reynolds with Great Positive Results" on the GSN YouTube channel was available on the GSN website under the title "Parkinson's Breakthrough with ImunStem and Aktiffvate." | MSJ App. at 148 ¶ 182; MSJ App. at 193 ¶ 182; MSJ App. at 238-39 ¶ 182; TRO App. (Doc. 3-5 at 39 and 180.) |
| 198. | In the video titled "Parkinson's Breakthrough with ImunStem and Aktiffvate," the musician states that he saw immediate improvement in his Parkinson's disease condition after taking Defendants' products. | MSJ App. at 148-49 ¶ 183; MSJ App. at 193 ¶ 183; MSJ App. at 239 ¶ 183; Answer, (Doc No. 40 at 8 ¶ 65.) |
| 199. | In the video titled "Parkinson's Breakthrough with ImunStem and Aktiffvate," the musician states, "When I started taking Aktiffvate, the stumbling actually stopped the same day I was taking it. . . . I did realize that every time I took it over the next few days, then I would stop stumbling, and I wouldn't get as much tremoring in my wrist and everything else." | MSJ App. at 149 ¶¶ 184, 186; MSJ App. at 193-94 ¶¶ 184,186; MSJ App. at 239-40 ¶¶ 184, 186; Answer, (Doc No. 40 at 8 ¶ 65.) |
| 200. | In the video titled "Parkinson's Breakthrough with ImunStem and Aktiffvate," the musician states, "The one product I've found really seemed to make a—at first an unexplainable difference but I can explain it now a bit better, was the product called Aktiffvate. I thank God for that." | MSJ App. at 149 ¶ 185; MSJ App. at 194 ¶ 185; MSJ App. at 239 ¶ 185. |
| 201. | In the video titled "Parkinson's Breakthrough with ImunStem and Aktiffvate," the musician states, "When I took Aktiffvate, all I can say honestly and it doesn't matter about star and celebrity and fame and all that, it's just a matter of—it helped, and I say take it, try it." | Answer, (Doc No. 40 at 8 ¶ 65). |
| 202. | In the video titled "Parkinson's Breakthrough with ImunStem and Aktiffvate," the musician states, "All I can do is say thank you to these people. I don't know who else out there is hearing this, [but] it's something to check out." | MSJ App. at 149-50 ¶ 187; MSJ App. at 194 ¶ 187; MSJ App. at 240 ¶ 187. |

| No. | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| 203. | In the video titled "Parkinson's Breakthrough with ImunStem and Aktiffvate," the musician states, "I just want to give a real good shout-out and thank-you to Golden Sunrise Pharmaceuticals, keep doing what you're doing. We need you." | MSJ App. at 150 ¶ 188; MSJ App. at 195 ¶ 188; MSJ App. at 240 ¶ 188. |
| 204. | Another Golden Sunrise video concerning Parkinson's disease was titled "Jackie's Groove Interview Sheldon Reynolds, Earth, Wind & Fire About Golden Sunrise Nutraceutical" on the GSN YouTube channel. | MSJ App. at 150 ¶ 189; MSJ App. at 195 ¶ 189; MSJ App. at 240 ¶ 189. |
| 205. | The video titled "Jackie's Groove: Interview Sheldon Reynolds, Earth, Wind & Fire About Golden Sunrise Nutraceutical" was posted to YouTube on March 23, 2017. | MSJ App. at 150 ¶ 190; MSJ App. at 195 ¶ 190; MSJ App. at 240-41 ¶ 190. |
| 206. | The Golden Sunrise video titled "Jackie's Groove: Interview Sheldon Reynolds, Earth, Wind & Fire About Golden Sunrise Nutraceutical" on the GSN YouTube channel was available on the GSN website under the title "Jackie's GROOVE Interview Sheldon Reynolds Earth Wind & Fire." | MSJ App. at 150 ¶ 191; MSJ App. at 195 ¶ 191; MSJ App. at 241 ¶ 191. |
| 207. | The Golden Sunrise video titled "Jackie's Groove: Interview Sheldon Reynolds, Earth, Wind & Fire About Golden Sunrise Nutraceutical" on the GSN YouTube channel contained an endorsement of Golden Sunrise products by a well-known musician who was diagnosed with Parkinson's disease. | MSJ App. at 150-51 ¶ 192; MSJ App. at 195-96 ¶ 192; MSJ App. at 241 ¶ 192. |
| 208. | The video titled "Jackie's Groove: Interview Sheldon Reynolds, Earth, Wind & Fire About Golden Sunrise Nutraceutical" is an interview of the musician in which the following exchange occurs: Interviewer: "I say it tastes like WD-40 and licorice, but it works—it works; and so with that said, this has helped you pick up the guitar again, it helped you with your beautiful voice again, how are you right now today as we speak? How much playing are you doing?" Musician: "Well I'm actually preparing to do a whole lot. I'm still sort of [indecipherable] at home and recording, because I'm trying to put together some projects for Japan actually . . . I've got a bunch of gigs lined up . . . " | MSJ App. at 151 ¶ 193; MSJ App. at 196 ¶ 193; MSJ App. at 241 ¶ 193; Answer, (Doc No. 40 at 8 ¶ 66.) |

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| 209. | The video video titled "Jackie's Groove: Interview Sheldon Reynolds, Earth, Wind & Fire About Golden Sunrise Nutraceutical" is an interview of the musician in which the interviewer states, "Check out Golden Sunrise Pharmaceuticals.com and everything they've done for people who are ailing with cancer, multiple sclerosis, ALS, and Parkinson's." | Answer, (Doc No. 40 at 8 ¶ 66.) |
| 210. | Defendants further promoted their Metabolic treatment plan as a cure for Parkinson's disease through a document titled "Insulin Resistance Cellular Restorative Results" available on their GSN website. | MSJ App. at 151 ¶ 194; MSJ App. at 196 ¶ 194; MSJ App. at 241-42 ¶ 194; Pg. 117, line 3-8; Answer, (Doc No. 40 at 8 ¶ 67); TRO App. (Doc. 3-5 at 41, 147-153.) |
| 211. | The document titled "Insulin Resistance Cellular Restorative Results" available on the GSN website represented, endorsed, promoted, marketed, or advertised the Metabolic Plan of Care to mitigate the symptoms of Parkinson's disease. | MSJ App. at 151 ¶ 195; MSJ App. at 196 ¶ 195; MSJ App. at 242 ¶ 195; TRO App. (Doc. 3-5 at 149, 153.) |
| 212. | The document titled "Insulin Resistance Cellular Restorative Results" available on the GSN website states that "Golden Sunrise Nutraceutical's *METABOLIC Plan of Care*, with Golden Sunrise Nutraceutical's products produced a significant response in 99% of their patients," and provides a list of conditions including Parkinson's Disease that see a "reduction of symptoms in patient[s] with [the] condition[]." (Emphasis in original). | Answer, (Doc No. 40 at 8 ¶ 67;) TRO App. (Doc. 3-5 at 149.) |
| 213. | Defendants disseminated or caused to be disseminated advertisements and marketing materials through Facebook to endorse, promote, market, or advertise the Metabolic Plan of Care for the treatment, mitigation of symptoms of, or cure of Parkinson's disease. | MSJ App. at 146-47 ¶¶ 171-173; MSJ App. at 191 ¶¶ 171-173; MSJ App. at 236-37 ¶¶ 171-173; TRO App. (Doc. 3-6 at 5.) |

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| 214. | In a March 18, 2020 post on their GSN Facebook page, Defendants claim that the "METABOLIC Nursing Plan is a carefully planned treatment plan that uses herbal treatments to treat chronic diseases such as hypertension, diabetes, peripheral neuropathy, Parkinson's disease, multiple sclerosis, gastrointestinal disorders, mental illness at the cellular level Schizophrenia, Lyme disease, etc." | TRO App. (Doc. 3-6 at 5.) |
| 215. | In a February 27, 2020 post on their GSN Facebook page, Defendants state that Golden Sunrise products treat, mitigate the symptoms of, or cure Parkinson's disease. | MSJ App. at 152 ¶ 196; MSJ App. at 196-97 ¶ 196; MSJ App. at 242 ¶ 196. |
| | *ii.    FTC Expert Testimony from Ramsey Falconer, M.D.* | |
| 216. | Dr. Ramsey Falconer is Associate Professor of Neurology at the University of Virginia School of Medicine. | MSJ App. at 1260 ¶ 5. |
| 217. | Dr. Falconer is also Director of the Parkinson's & Movement Disorders Center at Inova Medical Group Neurology. | MSJ App. at 1260 ¶ 5. |
| 218. | Dr. Falconer received his M.D. from Tulane University School of Medicine and completed a fellowship at Georgetown University in movement disorders and neuroestoriation. | MSJ App. at 1259 ¶ 3. |
| 219. | Dr. Falconer has authored or co-authored 21 peer-reviewed research papers, primarily relating to Parkinson's disease and deep brain stimulation. | MSJ App. at 2 ¶ 9. |
| 220. | Based upon his education, training, and experience, Dr. Falconer considers himself an expert in the fields of neurology in general and Parkinson's disease in particular, with a comprehensive knowledge in the medical and scientific standards governing the safety and efficacy of Parkinson's disease treatment. | MSJ App. at 1260 ¶ 11. |
| 221. | The FTC has consulted with Dr. Falconer to determine whether Defendants' Parkinson's disease claims are supported by the level of scientific evidence that experts in each field would require. | MSJ App. at 1263 ¶ 14. |
| 222. | Dr. Falconer states that experts in the community that study Parkinson's disease would require two or more clinical studies to have a reasonable basis to claim that a | MSJ App. at 1269-1270 ¶ 39. |

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| | product treats, mitigates the symptoms of, or cures Parkinson's disease. | |
| 223. | After reviewing the product ingredients and other evidence, the Defendants have produced, and conducting a literature review, Dr. Falconer concluded that Defendants' efficacy claims are not supported by competent and reliable scientific evidence. | MSJ App. at 1270-1279 ¶¶ 40-48. |
| 224. | No randomized, clinical trial substantiates the claim that the Metabolic Plan of Care, or any of their constituent products, can treat, mitigate the symptoms of, or cure Parkinson's disease. | MSJ App. at 152 ¶ 198; MSJ App. at 197 ¶ 198; MSJ App. at 242 ¶ 198; MSJ App. at 365, lines 22-366, line 3; 367, lines 3-10 (Tieu Dep. pg. 118, line 22-pg. 119, line 3; pg. 124, lines 3-10); MSJ App. at 438 ¶4. |
| 225. | No peer-reviewed scientific literature or study substantiates the claim that the Metabolic Plan of Care, or any of their constituent products, can treat, mitigate the symptoms of, or cure Parkinson's disease. | MSJ App. at 153 ¶ 203; MSJ App. at 198 ¶ 203; MSJ App. at 243 ¶ 203. |
| | *d)*  **Count Four: False FDA Claims** | |
| | *i.*  *Marketing and Advertising FDA Claims* | |
| 226. | Defendants claimed on their GSN website that their products have been reviewed and accepted by the FDA. | MSJ App. at 374, lines 8-21 (Tieu Dep. pg. 144 lines 8-21); Answer, (Doc No. 40 at 4 ¶ 22); TRO App. (Doc. 3-5 at 23.) |
| 227. | Defendants claimed on their GSN website that "[a]ll Golden Sunrise Nutraceutical products are in compliance with Food and Drug Administration (FDA) regulations. All necessary documentation on each of the products was submitted to the FDA." | Answer, (Doc No. 40 at 4 ¶ 22); TRO App. (Doc. 3-5 at 23.) |
| 228. | Defendants claimed on their GSN website that "Golden Sunrise Nutraceutical announces on July 01, 2018, that the Food and Drug Administration (FDA) has approved | MSJ App. at 374, lines 8-21 (Tieu Dep. pg. 144 lines 8-21); |

| No. | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | *ImunStem* . . . to treat *Serious or Life-threatening* diseases or conditions." | TRO App. (Doc. 3-5 at 46.) |
| 229. | Defendants claimed on their GSN website that the product ImunStem "has been reviewed by the FDA and has received a pre-IND on February 22, 2010, NDA and NDC on July 02, 2018." | TRO App. (Doc. 3-5 at 23.) |
| 230. | In Defendants promotional video titled<br><br>"Rusty Hilger NFL Quarterback has Results with KemoHerb for Cancer, Part 2" the narrator states<br><br>The Immune Stem, just that product alone, it's the only product of its kind to go through the FDA approval process. | MSJ App. at 136 ¶ 120;<br>MSJ App. at 181 ¶ 120;<br>MSJ App. at 226 ¶ 120. |
| 231. | In the product description documents for their Metabolic and Cancer treatment plans, Defendants also claim that their products are "designated as a Regenerative Medicine Advance Therapy (RMAT) by the Food & Drug Administration (FDA)." | Answer, (Doc No. 40 at 4 ¶ 23);<br>TRO App. (Doc. 3-5 at 123, 156.) |
| 232. | In an April 9, 2020, post on their GSN Facebook page, Defendants claim that "ImunStem, a dietary supplement, was approved by the Food and Drug Administration in 2018 as a treatment for serious, life threatening conditions." | TRO App. (Doc. 3-6 at 2.) |
| 233. | In the product description document for the Emergency D-Virus treatment plan, Defendants claimed that Golden Sunrise products "have proven themselves" to the FDA. | Answer, (Doc No. 40 at 4 ¶ 24);<br>TRO App. (Doc. 3-5 at 26, 49, 72.) |
| 234. | In the product description document for the Emergency D-Virus treatment plan, Defendants claimed that one of their products "was the first dietary supplement in the United States to be approved as a prescription medicine and also for the indication to treat *Serious or Life-threatening* conditions. It qualified for both of these under the Regenerative Medicine Advance Therapy (RMAT) . . . . This designation acknowledges not only the effectiveness of these herbs, usually only associated with pharmaceutical drugs, but also [that they] caus[e] no side effects, a quality of dietary supplements." (Emphasis in original). | Answer, (Doc No. 40 at 4 ¶ 24);<br>TRO App. (Doc. 3-5 at 49, 72.) |

| No. | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | ***ii.*** ***The FDA Repeatedly Advised Defendants That They Did Not Have FDA Approval, Could Not Market Their Products as Having FDA Approval, and Needed to Conduct Clinical Trials in Order to Obtain FDA Approval.*** | |
| 235. | In 2013 Defendants were advised by the FDA clinical trials were required to obtain FDA approval. | MSJ App. at 371, line 22-371, line 24 (Tieu Dep. pg. 136, line 22-137, line 24); MSJ App. at 418-419. |
| 236. | Defendants made an RMAT request on February 16, 2017, that the FDA rejected on April 6, 2017. | MSJ App. at 298-299; MSJ App. at 373, lines 10-23 (Tieu Dep. pg. 139, lines 10-23); MSJ App. at 427. |
| 237. | Defendants GSP and Tieu received notice from the FDA on September 18, 2018, advising that the NDA number in its filings "is not an approved application by FDA and the product should not be listed as an approved drug." | MSJ App. at 300-301; MSJ App. at 375, lines 3-11 (Tieu Dep. pg. 148, lines 3-11); MSJ App. at 428-429. |
| 238. | When Defendant Tieu responded to a delisting threat by the FDA by submitting another application for FDA approval on November 9, 2018, the FDA responded less than a week later, on November 15, 2018, by stating, "This application, though submitted to FDA, was never approved and cannot be used as a marketing authorization for the listed product." | MSJ App. at 302; MSJ at App. at 376, lines 3-9 (Tieu Dep. pg. 152, lines 3-9); MSJ App. at 430. |
| 239. | Defendant Tieu received an email from the FDA dated September 6, 2019, advising that while he stated in 2018 that his "product was approved; however, you do not have a record of the approval" and requesting that he prove his claim. | MSJ App. at 303-304; MSJ App. at 431. |
| 240. | The FDA followed up on September 16, 2019 to advise (i) that Defendants' "request for a [RMAT] designation . . . was denied on April 6, 2017, because CBER has determined that your product is not a regenerative medicine therapy" and (ii) that the FDA employee "cannot find an approved marketing application for ImunStem . . . [t]herefore, I cannot confirm that your | MSJ App. at 305-306; MSJ App. at 375, lines 3-11 (Tieu Dep. pg. 148, lines 3-11); MSJ App. at 433-434. |

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| | product is approved or provide an approval letter for the product." | |
| 241. | Defendant Tieu was verbally advised by an FDA official in September 2019, that clinical trials were necessary in order to obtain FDA approval. | MSJ App. at 377, lines 7-15; 378, lines 4-9; 379, line 23-380, line 3; 384, lines 21-25; 385, line 18-386, line 7 (Tieu Dep. pg. 162, lines 7—15; pg. 164, lines 4-9; pg. 165, line 23-pg. 166, line 3; pg. 175, lines 21-25; pg. 177, line 18-pg. 178, line 7.) |
| 242. | In response to Defendants' April 3, 2020 request for admission to the "Coronavirus Treatment Acceleration Program" and submission of yet another New Drug Application, [Attach 4 at 1-23], to which the FDA responded on August 26, 2020—notably, after the FTC sought its TRO—to confirm that the FDA had reviewed "what you referred to as [their] NDA" and found it deficient. The FDA also advised Defendants that clinical trials were required to get FDA approval for COVID-19 treatment. | MSJ App. at 307-308;<br><br>MSJ App. at 381, line 21-384, line 4 (Tieu Dep. pg. 172, line 21- pg. 175 line 3;)<br><br>MSJ App. at 435-436. |
| 243. | Defendants have no written documentation showing they have any FDA approval for any product. | MSJ App. at 386, lines 3-7 (Tieu Dep. 178, lines 3-7.) |
| iii. | **FDA Declarations Confirming Defendants Do Not Have FDA Approval** | |
| 244. | In support of Plaintiff's TRO and PI motions, the FTC submitted two declarations from the FDA. The first stated that Defendants had no FDA approval, (Doc. No. 3-10 at 74 ¶¶ 6-7,) and that only FDA approval would permit a product to be deemed safe and effective by the FDA. *Id.* at ¶ 3. | TRO App. (Doc. Nos. 3-10 at 73 and 17-3.) |
| 245. | The first FDA declaration stated that Defendants had no FDA approval, and that only FDA approval would permit a product to be deemed safe and effective by the FDA. | TRO App. (Doc. No. 3-10 at 74 ¶¶ 3, 6-7.) |
| 246. | The second FDA declaration stated that Defendants had no product designated as an RMAT. | TRO App. (Doc. No. 17-3 at 2 ¶¶ 7-8.) |

| No. | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| **IV.** | **Tieu Participated Directly in the Conduct at Issue and Had the Ability to Control That Conduct.** | |
| 247. | Tieu has operated or participated in operating a website at the URL https://goldensunrisenutraceutical.com/, and endorsed, promoted, marketed, or advertised the products at issue in the Complaint at that URL. | MSJ App. at 38 ¶ 19 and 39 ¶ 21; MSJ App. at 63 ¶ 19 and 64 ¶ 21; MSJ App. at 88 ¶ 19 and 89 ¶ 21; MSJ App. at 332, line 15-333, line 6; 334, lines 8-12 (Tieu Dep. pg. 34, line 15-pg. 35, line 6; pg. 36, lines 8-12.) |
| 248. | Nothing could get posted to https://goldensunrisenutraceutical.com/ without Tieu's approval. | MSJ App. at 334, lines 2-7 (Tieu Dep. pg. 36, lines 2-7.) |
| 249. | Tieu has operated or participated in operating a website at the URL https://goldensunrisepharmaceutical.com/, and endorsed, promoted, marketed, or advertised the products at issue in the Complaint at that URL. | MSJ App. at 39 ¶ 25 and 39 ¶ 27; MSJ App. at 64 ¶ 25 and 64 ¶ 27; MSJ App. at 89 ¶ 25 and 89 ¶ 27; MSJ App. at 333, line 7-334, line 7 (Tieu Dep. pg. 35, line 7-pg. 36, line 7.) |
| 250. | Nothing could get posted to https://goldensunrisepharmaceutical.com/ without Tieu's approval. | MSJ App. at 334, lines 8-12 (Tieu Dep. pg. 36, lines 2-7.) |
| 251. | Tieu created the content for the GSN and GSP websites. | MSJ App. at 332, line 15-334, line 7 (Tieu Dep. pg. 34, line 15-pg. 36, line 7.) |
| 252. | Tieu operated or participated in operating a Facebook social media account at the URL https://www.facebook.com/GoldenSunriseNutraceutical/, and endorsed, promoted, marketed, or advertised the products at issue in the Complaint at that URL. | MSJ App. at 40 ¶¶ 31 and 33; MSJ App. at 65 ¶¶ 31 and 33; MSJ App. at 90 ¶¶ 31 and 33; |

| No. | Undisputed Fact | Supporting Evidence |
|-----|-----------------|---------------------|
| | | MSJ App. at 334, line 13-335, line 7; 336, line 15-20; 337, line 14-338, line 4 (Tieu Dep. pg. 36, line 13-pg. 37, line 7; pg. 39, lines 15-20; pg. 40, line 14-pg. 41, line 4.) |
| 253. | Tieu operated or participated in operating a Facebook social media account at the URL https://www.facebook.com/goldensunrisepharma/, and endorsed, promoted, marketed, or advertised the products at issue in the Complaint at that URL. | MSJ App. at 41 ¶¶ 37 and 39; MSJ App. at 66 ¶¶ 37 and 39; MSJ App. at 91 ¶¶ 37 and 39; MSJ App. at 334, line 20-335, line 7; 336, lines 15-20; 337, line 14-338, line 1 (Tieu Dep. pg. 36, line 20-pg. 37, line 7; pg. 39, lines 15-20; pg. 40, line 14-pg. 41, line 1.) |
| 254. | Tieu operated or participated in operating a YouTube channel at the following URL: https://www.youtube.com/channel/UC_10G-V0hw4DPQLhl4LdyXg, and endorsed, promoted, marketed, or advertised the products at issue in the Complaint at that URL. | MSJ App. at 42 ¶¶ 43 and 45; MSJ App. at 67 ¶¶ 43 and 45; MSJ App. at 92 ¶¶ 43 and 45; MSJ App. at 338, lines 18-24 (Tieu Dep. pg. 41, lines 18-24.) |
| 255. | Nothing for posted to Defendants' YouTube Channel without Tieu's approval. | MSJ App. 338, lines 18-21 (Tieu Dep. pg. 41, lines 18-21.) |
| 256. | Tieu helped create the content that went up on Defendants' YouTube Channel. | MSJ App. at 338, lines 18-24 (Tieu Dep. pg. 41, lines 21-24.) |
| 257. | Tieu was actively involved in the creation, design, development and implementation of the advertisement of | MSJ App. at 307-308; MSJ App. at 332, line 15-334, line 12; 336, lines 15- |

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| | each of the Golden Sunrise products that are the subject of the Complaint. | 20; 337 line 22-338, line 1; 338, lines 18-24; 341, line 21-345, line 2; 352, lines 13-15 (Tieu Dep. pg. 34, line 15-pg. 36, line 12; pg. 39, lines 15-20; pg. 40, line 22- pg. 41, line 1; pg. 41, lines 18-24; pg. 44, line 21-pg. 45, line 2; pg. 76, lies 13-15.) |
| 258. | Tieu represented, endorsed, promoted, marketed, or advertised that at least one product at issue in the Complaint was able to treat, mitigate the symptoms of, or cure COVID-19. | MSJ App. at 44 ¶ 56; MSJ App. at 69 ¶ 56; MSJ App. at 94 ¶ 56. |
| 259. | Tieu knew at the time the Emergency D-Virus Plan of Care was marketed that that there have been no randomized, clinical trials that substantiate the claim that the Emergency D-Virus Plan of Care, or any of their constituent products, can treat, mitigate the symptoms of, or cure COVID-19. | MSJ App. at 122 ¶ 51; MSJ App. at 167 ¶ 51; MSJ App. at 212 ¶ 51; MSJ App. at 360, lines 9-13 (Tieu Dep. pg. 99, lines 9-13.) |
| 260. | Tieu knew at the time the Emergency D-Virus Plan of Care was advertised, marketed, offered for sale, or sold that there was no peer-reviewed scientific literature or study that expressly addressed whether the Emergency D-Virus Plan of Care can treat, mitigate the symptoms of, or cure COVID-19. | MSJ App. at 141 ¶ 147; MSJ App. at 186 ¶ 147; MSJ App. at 231 ¶ 147. |
| 261. | Tieu represented, endorsed, promoted, marketed, or advertised that at least one product at issue in the Complaint that GSN and GSP advertised, marketed, offered for sale, or sold was able to treat, mitigate the symptoms of, or cure cancer. | MSJ App. at 44 ¶ 57; MSJ App. at 69 ¶ 57; MSJ App. at 94 ¶ 57. |
| 262. | Tieu knew at the time the Metabolic Plan of Care was advertised, marketed, offered for sale, or sold that that there was no randomized, clinical trial that substantiated the claim that the Metabolic Plan of Care, or any of their constituent products, can treat, mitigate the symptoms of, or cure cancer. | MSJ App. at 140 ¶ 142; MSJ App. at 185 ¶ 142; MSJ App. at 230 ¶ 142; MSJ App. at 368, lines 18-23; 369, lines 4-13 (Tieu Dep. pg. 125, lines 18-23; pg. 126, lines 4-13.) |

| No. | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| 263. | Tieu knew at the time the Metabolic Plan of Care was advertised, marketed, offered for sale, or sold that that there was no peer-reviewed scientific literature or study that substantiated the claim that the Metabolic Plan of Care can treat, mitigate the symptoms of, or cure cancer. | MSJ App. at 141 ¶ 148; MSJ App. at 186 ¶ 148; MSJ App. at 231-232 ¶ 148. |
| 264. | Tieu knew at the time the Cancer Plan of Care was advertised, marketed, offered for sale, or sold that that there was no randomized, clinical trial that substantiated the claim that the Cancer Plan of Care, or any of their constituent products, can treat, mitigate the symptoms of, or cure cancer. | MSJ App. at 142 ¶ 154; MSJ App. at 187 ¶ 154; MSJ App. at 232-233 ¶ 154; MSJ App. at 387, lines 15-19 (Tieu Dep. pg. 189, lines 15-19.) |
| 265. | Tieu knew at the time the Cancer Plan of Care was advertised, marketed, offered for sale, or sold that that there was no peer-reviewed scientific literature or study that substantiated the claim that the Cancer Plan of Care, or any of their constituent products, can treat, mitigate the symptoms of, or cure cancer. | MSJ App. at 143 ¶ 160; MSJ App. at 188 ¶ 160; MSJ App. at 234 ¶ 160. |
| 266. | Tieu represented, endorsed, promoted, marketed, or advertised that at least one product at issue in the Complaint that Corporate Defendants advertised, marketed, offered for sale, or sold was able to treat, mitigate the symptoms of, or cure Parkinson's disease. | MSJ App. at 44-45 ¶ 58; MSJ App. at 69-70 ¶ 58; MSJ App. at 94-95 ¶ 58. |
| 267. | Tieu knew at the time the Metabolic Plan of Care was advertised, marketed, offered for sale, or sold that that there was no randomized, clinical trial that substantiated the claim that the Metabolic Plan of Care, or any of their constituent products, can treat, mitigate the symptoms of, or cure Parkinson's disease. | MSJ App. at 152 ¶ 200; MSJ App. at 197 ¶ 200; MSJ App. at 242-43 ¶ 200; MSJ App. at 365, line 24-366, line 3; 367, lines 3-10 (Tieu Dep. pg. 118, line 24-pg. 119, line 3; pg. 124, lines 3-10.) |
| 268. | Tieu knew at the time the Metabolic Plan of Care was advertised, marketed, offered for sale, or sold that that there was no peer-reviewed scientific literature or study that substantiated the claim that the Metabolic Plan of Care, or any of their constituent products, can treat, mitigate the symptoms of, or cure Parkinson's disease. | MSJ App. at 153 ¶ 206; MSJ App. at 198 ¶ 206; MSJ App. at 244 ¶ 206. |

| No. | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| 269. | Tieu represented, endorsed, promoted, marketed, or advertised at least one product at issue in the Complaint to be FDA approved to consumers. | MSJ App. at 49 ¶ 88; MSJ App. at 74 ¶ 88; MSJ App. at 99 ¶ 88. |
| 270. | Tieu has represented, endorsed, promoted, marketed, or advertised at least one product at issue in the Complaint to have been deemed safe and effective by the FDA when communicating with consumers. | MSJ App. at 53 ¶ 112; MSJ App. at 78 ¶ 112; MSJ App. at 103 ¶ 112. |
| 271. | Tieu knew that GSN and GSP were advertising, marketing, offering for sale, or selling at least one at least one product at issue in the Complaint as reviewed and accepted by the FDA. | MSJ App. at 55-56 ¶ 124; MSJ App. at 80-81 ¶ 124; MSJ App. at 105-106 ¶ 124; MSJ App. at 369, lines 23-25 (Tieu Dep. pg. 126, lines 23-25.) |
| 272. | Tieu knew that GSN and GSP were advertising, marketing, offering for sale, or selling at least one at least one product at issue in the Complaint as approved by the FDA. | MSJ App. at 56 ¶ 125; MSJ App. at 81 ¶ 125; MSJ App. at 106 ¶ 125. |
| 273. | Tieu knew that GSN and GSP were advertising, marketing, offering for sale, or selling at least one at least one product at issue in the Complaint as being deemed safe and effective by the FDA. | MSJ App. at 56 ¶ 127; MSJ App. at 81 ¶ 127; MSJ App. at 106 ¶ 127. |
| 274. | Tieu represented, endorsed, promoted, marketed, or advertised a Challenged Product to be FDA approved | MSJ App. at 49-50 ¶¶ 89-91; MSJ App. at 74-75 ¶¶ 89-91; MSJ App. at 99-100 ¶¶ 89-91; TRO App. (Doc. Nos. 3-5 at 23, 26, 46, 49, 72, 123, 156 and 3-6 at 2.) |
| 275. | Tieu represented, endorsed, promoted, marketed, or advertised a Golden Sunrise product contained in its treatment plans to have been deemed safe and effective by the FDA | MSJ App. at 53-54 ¶¶ 113-115; MSJ App. at 78-79 ¶¶ 113-115; |

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| | | MSJ App. at 103-104 ¶¶ 113-115; TRO. (Doc. Nos. 3-5 at 23, 26, 46, 49, 72, 123, 156 and 3-6 at 2.) |
| 276. | Tieu knew that Corporate Defendants had been advertising, marketing, offering for sale, or selling a Golden Sunrise product contained in its treatment plans as designated to be an RMAT by the FDA. | MSJ App. at 56 ¶ 126; MSJ App. at 81 ¶ 126; MSJ App. at 106 ¶ 126; TRO App. (Doc. No. 3-5 at 26, 49, 72, 86, 123, 156.) |
| 277. | Tieu represented, endorsed, promoted, marketed, or advertised a Golden Sunrise product contained in its treatment plans to be FDA approved when communicating with the FDA. | MSJ App. at 50 ¶¶ 92-93; MSJ App. at 75 ¶¶ 92-93; MSJ App. at 100 ¶¶ 92-93. |
| 278. | Tieu represented, endorsed, promoted, marketed, or advertised a Golden Sunrise product contained in its treatment plans to be deemed safe and effective by the FDA when communicating with the FDA. | MSJ App. at 54 ¶ 117; MSJ App. at 79 ¶ 117; MSJ App. at 104 ¶ 117. |
| 279. | Tieu was repeatedly advised by the FDA that the products at issue in this complaint were not FDA approved. | MSJ App. at 298-308; MSJ 375, lines 3-11; 376, lines 3-9; 378, line 10-380, line 3 (Tieu Dep. pg. 148, lines 3-11; Pg. 152, lines 3-9; pg. 164, line 10-166, line 3); MSJ 417-436. |
| 280. | Tieu was advised by the FDA that the products at issue in this complaint could not be marketed as having FDA approved. | MSJ App. at 376, lines 3-9 (Tieu Dep. pg. 152, lines 3-9;) MSJ App. at 430. |
| 281. | Tieu was repeatedly advised by the FDA that clinical trials were necessary in order to get FDA approval. | MSJ App. at. 377, lines 7-15; 378, lines 4-9; 379, line 23-380, line 3; 384, lines 21-25; 385, line 18-386, lines 7 (Tieu Dep. pg. 162, lines 7—15; pg. 164, lines 4-9; pg. 165, line 23- |

| No. | Undisputed Fact | Supporting Evidence |
|-----|-----------------|---------------------|
|  |  | pg. 166, line 3; pg. 175, lines 21-25; pg. 173, line 17-174, line 24; pg. 177, line 18-pg. 178, line 7.) |

Respectfully submitted,

Dated:  October 1, 2021

/s/Edward Hynes
EDWARD HYNES
New York Bar No. 4887584
ehynes@ftc.gov; (214) 979-9381
REID A. TEPFER
Texas Bar No. 24079444
rtepfer@ftc.gov; (214) 979-9395
Federal Trade Commission
1999 Bryan St. Ste. 2150
Dallas, Texas 75201
Fax: (214) 953-3079
Attorneys for Plaintiff
FEDERAL TRADE COMMISSION